N663GAR1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                          22 Cr. 540 (VEC)

JAMES GARLICK,

                                       Jury Trial
                Defendant.

------------------------------x

                                    New York, N.Y.
                                    June 6, 2023
                                    9:15 a.m.

Before:

                      HON. VALERIE E. CAPRONI,

                                      District Judge
                                   and a Jury

                        APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
ADAM S. SOWLATI
JERRY FANG
JACQUELINE KELLY
    Assistant United States Attorney

JAMES GARLICK, Pro Se

DAVID E. PATTON
    Federal Defenders of New York, Inc.
    Standby Attorneys for the Defendant
MARNE LYNN LENOX
MICHAEL ARTHUS
JENNIFER BROWN

Also Present:   Julia Gutierrez, Paralegal USAO
                 Maria Barkhurst, Paralegal Federal Defenders

N663GAR1

1          (Trial continued; jury not present)

2          THE DEPUTY CLERK:  Counsel, please state your

3    appearance for the record.

4          MR. SOWLATI:  Good morning, your Honor, Adam Sowlati

5    for the United States.  I'm joined at counsel's table by AUSA

6    Jackie Kelly, Jerry Fang, and our paralegal, Julia Gutierrez.

7          MR. GARLICK:  Darnell, attorney in fact and the

8    accused.

9          THE COURT:  Good morning, Mr. Garlick.  Please be

10   seated.  Angela said there were some things to discuss.  Let's

11   start with the government.  Anything to discuss?

12         MR. SOWLATI:  Yes, your Honor.  The government's

13   motion to preclude cross on Detective Alonzo relating to

14   certain instances from his past.

15         MS. LENOX:  Your Honor, may I approach just to show

16   Mr. Garlick something?

17         THE COURT:  Sure.

18         Mr. Garlick, are you going to respond to that?

19         MR. GARLICK:  I have a question.  In light of the fact

20   that I already explained that I don't know much about what's

21   going on, I wonder if it is possible just to have side counsel

22   at the desk just for objection purposes.  Because you are

23   saying I have to object in a certain way, and I don't know how

24   to do it.

25         THE COURT:  The primary way to do it is to stand up

1    and say "objection."

2            Yes, you can have Ms. Lenox sitting at the table, but

3    that means I am going to have to explain to the jury what's

4    going on, so they will be told that you have standby counsel.

5            MR. GARLICK:  Okay.

6            (Defendant conferring with standby counsel)

7            MR. GARLICK:  I move to preclude Alonzo's testimony

8    because of Brady/Giglio violation.

9            2012 Alonzo pled guilty at an NYPD proceeding.  (1)

10   engaging in fight with ex-wife and throwing her phone against

11   the wall.

12           THE COURT:  Slow down.  Slow way down.  Okay.

13           MR. GARLICK:  2012, Alonzo pled guilty at an NYPD

14   proceeding.  (1) engaging in a fight with his ex-wife, and (2)

15   throwing her cell phone against the wall causing the screen to

16   shatter.  Alonzo was suspended for 30 days without pay.

17           NYPD firearm found in Alonzo's person.  Alonzo was

18   disciplined by the NYPD and suspended for 30 days.

19           On June 1st, less than a week ago, Alonzo lied to the

20   government on -- lied to the government on about pleading

21   guilty in an NYPD administrative proceeding.  Government got

22   Alonzo's NYPD records, turned out he had pled guilty.

23   Government knew about DV incident on June 1st.  Told defense

24   about it the next day.  Say he had not been punished by NYPD

25   for DV incident.

N663GAR1

1          June 3, the government filed a letter with the Court

2     saying he had been punished by NYPD for DV.  Did not tell the

3     defense about the witness's lie to the government before filing

4     letters with the Court asking that the defense not be allowed

5     to ask about it.

6          They filed this letter on Saturday night.  You could

7     not have seen the filing or known about -- known to ask for the

8     documents.  I could have not seen or known about the documents

9     on Saturday night to file what I would like to file.

10          I demand they turn over the documents related to the

11     punishment.  If the Court won't give me the documents, I ask

12     the Court to review the documents in camera to decide if I'm

13     entitled to the documents.

14          In Brady and Giglio, I must have the central facts.

15     The government has to give me enough information to be useful.

16     I do not have enough information right now to be useful.

17     Unlike the government, I cannot access NYPD Internal Affairs

18     records.

19          THE COURT:  Mr. Sowlati.

20          MR. SOWLATI:  Thank you, your Honor.  We just wanted

21     to first state on the record that it appears that the defendant

22     is reading a document or a narrative provided by standby

23     counsel.  And while we have no objection to standby counsel

24     sitting at counsel's table, we do object to hybrid

25     representation, and we do think that crosses the line.

1          As to the merits, Detective Alonzo was the person that

2     told the government in the first instance that he had been

3     arrested for this DV incident.  He told government that.  He

4     disclosed that.  And he actually told the government that he

5     had been disciplined for not safeguarding his work firearm.

6     The next day, the government got NYPD files, we saw he had pled

7     guilty in an administrative proceeding, and we asked him about

8     it and he did not remember.  He thought he just pled guilty to

9     the firearm incident.

10          THE COURT:  Which that was like 30 days on the beach

11     for the firearms incident?

12          MR. SOWLATI:  It was 30 days for -- so, when we look

13     at the NYPD records, they actually don't show he was

14     disciplined for the firearms incident.  What it shows is he was

15     disciplined for the DV incident.  So it was 30 days.  So it

16     seems like he was confused.  He was confused thinking it was

17     the firearm incident.

18          So he did disclose it to the government.  We don't

19     think it affects his credibility.  We do think that the other

20     incidents we mentioned, unauthorized use of computer, the loss

21     of a badge, those also don't go to his credibility.

22          So for those reasons, we would ask that the Court

23     preclude cross on those issues.

24          THE COURT:  So what I understood Mr. Garlick, although

25     it was sort of two arguments, one was he says there is a Brady

1    violation because these weren't disclosed in a timely way.

2              When did the government first meet with Detective

3    Alonzo and determine he was going to be a witness?

4              MR. SOWLATI:  So, we had reached out to him

5    probably -- I don't have the exact day, but it was within the

6    last two weeks.  It was because we had learned, we had realized

7    that the defendant would not be stipulating to really anything.

8              Detective Alonzo is a very narrow role.  He is just

9    testifying that he test fired the weapon and it worked.  He

10   works in a lab.  He has no connection at all with any of the

11   case agents.

12             So we met, we asked him our Giglio questions on

13   Thursday, this past Thursday.  On Friday we produced the

14   Giglio.  Then on Friday afternoon, we received NYPD files.  It

15   was already past the cutoff to send materials to the MDC.  We

16   then immediately called Detective Alonzo, and then on Saturday

17   is when we filed our motion.

18             THE COURT:  So the motion to preclude based on

19   Brady/Giglio is denied.  The government turned this information

20   over as quickly as they had it.  There was no reason for them

21   to explore with Detective Alonzo anything up until the point

22   they realized there were going to be no stipulations, and

23   therefore they would have to prove that the gun was a working

24   gun.  So that's denied.

25             So that brings us to the issue of whether the domestic

1    violence incident itself or the statements of Alonzo to the

2    AUSA in the first instance that he wasn't disciplined for the

3    domestic violence incident is itself Brady information that

4    they're entitled to go into, the defense is entitled to explore

5    for purposes of impeachment.

6         So, Mr. Garlick, do you want to say anything

7    specifically directed to that issue?

8         MR. GARLICK:  Your Honor, I object to the government's

9    motion to preclude cross-examination about Alonzo.

10        THE COURT:  Slow down.

11        MR. GARLICK:  I'm sorry.  I object to -- I'm a little

12   nervous.

13        THE COURT:  I know you are, but just to try to

14   remember when you're reading, there is a tendency to talk very

15   fast.  I had this problem as a lawyer.  I have this problem as

16   a judge.  The court reporter gets fussy with me.  So just focus

17   on the fact that you need to speak slower and read more slowly.

18   You think you are talking slower than you actually are.

19        MR. GARLICK:  Once again, I object to the government's

20   motion to preclude cross-examination about Alonzo's lies to the

21   government.  The lie to the government goes directly to his

22   credibility.  Credibility always relevant.  He did not lie once

23   years ago.  He lied less than a week ago, and he lied to the

24   federal government.  That is a federal crime.  F.R.E. 608

25   Section (b).  You are allowed to cross-examine witness of the

character for truthfulness or untruthfulness.  The Court is
supposed to give wide latitude to the defendant in a criminal
case to cross-examination government witness.  United States v.
Cedeno, 644 F.3d 79, 82 (2d Cir. 2011); United States v. Weiss,
930 F.2d 185, 197 (2d Cir. 1991); United States v. Pedroza, 750
F.2d 187, 195-96, 2d Department 1984.

            THE COURT:  Those are Second Circuit decisions, not
Second Department decision.

            MR. GARLICK:  Second Circuit.

            THE COURT:  Here is the thing.  But while it is true
that credibility is always in issue, it is also true that we
are talking about an incident that occurred over 10 years ago.
It appeared to be two incidents together that were the basis of
the discipline.  It wasn't that he was hiding the issue from
the government.  It is certainly entirely believable that in
his head it was sort of all one discipline, and he didn't get
separately disciplined from the domestic violence incidents.

            The other problem is that there is also still a 403
issue.  And the relevance of this for the man's credibility,
given his involvement in this case, is low.  Whereas the
probability and the risk of confusion and a waste of time is
high, because we are going to get distracted in what went on
with the domestic violence incident, because you can't cross on
what he said to the government without getting into the
underlying issue.  So the government's motion is granted.

N663GAR1

1        MR. GARLICK:  Your Honor, I just like to object one

2    more time.

3        THE COURT:  You don't have to object again.  Once you

4    have objected once -- this isn't like state court where you

5    have to preserve an objection.  Your objection was overruled.

6    You have your objection for purposes of appeal.

7        MR. GARLICK:  It is a different objection.

8        THE COURT:  What's your different objection?

9        MR. GARLICK:  I would like to object to the

10   opportunity about the operability of the gun.  It is not

11   relevant to case that the gun is working.

12       THE COURT:  It is.  In order to prove it was a

13   firearm, they have to prove it is capable of projecting a

14   projectile.  That's the definition of a gun.

15       Unless you want to stipulate.  If you'd like to

16   stipulate that the gun was a working gun, that would be fine.

17   It would cut down on the number of witnesses.

18       MR. GARLICK:  Your Honor, I mean, I understand that

19   that sounds good, but that would just -- where would the case

20   be if I stipulate that the gun worked.  That means I knew about

21   the gun, which I didn't.

22       THE COURT:  No, no, no.

23       MR. GARLICK:  How would I have firsthand knowledge

24   that the gun works?

25       THE COURT:  You can stipulate to a fact without

N663GAR1

1    stipulating to knowledge of the fact.  That is, the gun in fact

2    works.  That's all they're proving, that the gun in fact works.

3    That's different from proving that you knew it worked.  And

4    actually, knowledge that the gun works is not an element of the

5    crime.  So you could be unwitting to whether that would

6    undercut other elements.  But the government doesn't have to

7    prove that you knew the gun was capable of firing a projectile.

8                MR. GARLICK:  I would not like to stipulate.

9                THE COURT:  You would not like to stipulate.  That's

10   fine.  There is no obligation to.

11               One other thing, just so you know, so you don't get

12   confused, you may have noticed the juror who is in the second

13   row, he wore a mask yesterday, he is an older gentleman.  He is

14   having a little bit of trouble getting down the row.  He'll

15   still be Juror No. whatever, so he doesn't have to climb over

16   other chairs.

17               Anything else before we get started?

18               MR. SOWLATI:  Nothing further from the government,

19   your Honor.

20               THE COURT:  Anything further from the defense?

21               MR. GARLICK:  Yes.  I forgot to ask you about on the

22   last time we was here before this week they said something

23   about stipulating to Cheri Valdez and to Maurice Himes, Reo Don

24   or something like that.  We didn't get to that point.

25               THE COURT:  Because, no, we didn't get to that point

N663GAR1

1  because you boycotted court on Thursday when we were going to

2  discuss it.

3          MR. GARLICK:  So, you don't want me to stipulate?

4  You're good?

5          THE COURT:  I am indifferent to what you stipulate to

6  or not.  If you want to stipulate to it, tell the government,

7  and that way, I don't know whether they're still interested in

8  the stipulation.  But that's between you and them.

9          Are we going to get to that issue before the morning

10 break?

11         MR. SOWLATI:  No, your Honor.  I'd just like to note

12 we've already produced exhibits in preparation for all of that.

13         THE COURT:  Mr. Sowlati, I'm not pressing you to

14 enter into a stipulation.  If you want to stipulate, stipulate.

15 If you don't want to stipulate, tell Mr. Garlick that that

16 train has left the station.  It's your decision.  I want to

17 know if we can get the jury out.

18         MR. SOWLATI:  You can get the jury out from the

19 government's perspective.

20         THE COURT:  You can talk to the government about that

21 at the morning break.

22         Anything further from the defense?

23         MR. GARLICK:  No, your Honor.

24         THE COURT:  Okay.  Can you find Angela and say let's

25 get the jury out.

N663GAR1

1          We're still missing a juror.  So, while we wait on the
2      juror, I am going to leave the bench.  Feel free to talk about
3      the stipulation.  Don't go away, because as soon as we have the
4      juror, we are going to start.

5          (Recess)

6          THE COURT:  We got our jurors.  Everybody ready?
7      Okay.  Let's go.  We lost somebody.

8          MR. FANG:  Stepped out.

9          THE COURT:  Okay to proceed without her?

10          MR. FANG:  Yes, your Honor.

11          THE COURT:  Okay.  Flying solo.  Where's your witness?

12          MR. SOWLATI:  Outside.

13          THE COURT:  Bring him in the courtroom and sit him on
14      one of the benches.

15          (Jury present)

16          THE COURT:  Good morning, ladies and gentlemen.

17          You may have noticed there is a little reshuffling on
18      the tables.  Ms. Kelly is out, but she'll be in shortly.  At
19      the defense table you now have Ms. Lenox and Mr. Arthus.  They
20      are what we call standby counsel.  So they can assist
21      Mr. Garlick.  They can't talk.  They will not be talking in
22      court.  But if he has a question and wants to kind of better
23      understand what's happening, he has a lawyer that he can turn
24      for that purpose.  But he remains the captain of his ship and
25      the one who will be representing him.

1          With that, Mr. Sowlati.

2          Officer Dempsey, you are still under oath.

3    VINCENT DEMPSEY,

4        called as a witness by the Government,

5        having been previously sworn, testified as follows:

6    DIRECT EXAMINATION (Continued)

7          MR. SOWLATI:  Ms. Gutierrez, can you please publish

8    Government Exhibit 301.

9          THE COURT:  Is this a tape?

10         MR. SOWLATI:  This is a body cam footage; yes, your

11   Honor.

12         THE COURT:  Can I have a copy of the transcript.  Does

13   the jury have their transcripts still from yesterday?

14         MR. SOWLATI:  Yes, your Honor.  They should be on

15   their seats.

16         THE COURT:  Everybody have a copy of the transcript?

17         MR. SOWLATI:  Ms. Gutierrez, whenever you can, if you

18   can please play the first minute and 35 seconds of Officer

19   Dempsey's body cam.  That's page 1 of the transcript.

20         THE COURT:  Is it on your screens?

21         A JUROR:  No.

22         (Video playing)

23   Q.  Officer Dempsey, why is the sound off for the first minute

24   or so of your body cam?

25   A.  So, the NYPD body cams that we are issued, basically, so

N663GAR1                          Dempsey - Direct

1    you have to tap the button twice. You wear it on your chest.

2    As soon as you press it, when you activate, it is an audio and

3    visual recording. It is just a feature with Axon, which is the

4    company that provides our body cameras to us. So once you

5    activate it, there is a minute buffer prior that is only video

6    but no audio recording. So once you activate the camera, it is

7    a live audio video, but prior to the activation that 60 seconds

8    is only audio but -- sorry. Only video, but no audio.

9    Q. Officer Dempsey, who is the person that we see there on the

10   moped?

11   A. On the moped is James Garlick.

12   Q. Who are the other people we saw in this video clip?

13   A. So, in the beginning portion, the person in the white

14   shirt, that's Captain Pierce. That was our executive officer

15   at the time of the precinct. The female officer is Officer

16   Cosma, and the male officer is Officer Shakoor.

17   Q. Who is Officer Shakoor?

18   A. Officer Shakoor is -- he was one of the new, brand-new

19   officers that were assigned to the 44th Precinct at the time.

20   Officer Shakoor and Officer Cosma were working with me at the

21   post that I was at 162 and Jerome.

22   Q. Who is Officer Cosma?

23   A. She is also one of the brand-new officers that was assigned

24   to the 44th Precinct for that night that was working with me.

25   Q. Before this evening, did you know either of those officers?

1   A.   No, I had seen them in the precinct.  Like I said, they

2   weren't assigned to the 44.  So at the time when they were

3   brand new, they would rotate between three different precincts.

4   So I had seen them before, but I had never worked with them or

5   spoken to them prior.

6   Q.   What was your role with respect to Officer Shakoor and

7   Cosma?

8   A.   My role was to, I was basically teaching them how to

9   conduct a stop.  Like I said, they were brand new, they had no

10  experience with car stops, moped stops.  They didn't have much

11  experience writing summons.  I was assisting with the summons.

12  And later on, we was going to be assisting with vouchering the

13  mopeds we had seized from the operation.

14  Q.   At the time he was stopped, was Mr. Garlick committing any

15  traffic violations?

16  A.   Yes, he was operating a moped without a helmet.

17  Q.   Did he have registration and insurance?

18  A.   No, he did not.

19       MR. SOWLATI:  Ms. Gutierrez, can you please put on the

20  screen minute 4:48 of Officer Dempsey's body cam and put a

21  freeze frame there.  Thank you.  If you can go back a couple

22  seconds.  Keep going.

23       (Video playing)

24  Q.   So Officer Dempsey, there was a real -- it happened pretty

25  quickly, but there was a flap that was opened.  What was that

N663GAR1                        Dempsey - Direct

1   flap?

2   A.   That flap, that was basically the -- it looks like the gas

3   tank of the moped, even though it is electric, but it looks

4   like a gas tank that's between the handlebars and the seat.

5   That's a compartment that opens up where you can store items

6   in.

7   Q.   During the stop, what, if anything, was Mr. Garlick doing

8   with that compartment?

9   A.   So, during the stop, he used the key to open the flap.

10  Once the flap was opened, like I had said before, he was kind

11  of just rummaging through the compartment.  So, he took an item

12  out, which the first item was the moped battery.  He would

13  place it on the seat.  We would continue talking.  He would

14  look around, put the battery back into the compartment.  He did

15  that a few times.  And then he asked if I had a bag that he

16  could put his items in to carry off with.  I told him I didn't

17  have a bag.  Whatever he could take on his person, he's free to

18  take with him.  But anything that was left behind, we were

19  going to take and we were going to voucher.

20  Q.   Could you see what he was doing?  Could you see what was in

21  the center compartment when he was doing that?

22  A.   No.  From where I was standing, the bike, sorry, the moped

23  was on its kickstand so it was facing toward him, as opposed to

24  toward me.  So, like I said, the compartment was pretty deep.

25  I could see, like, the top rim of the compartment, but I

N663GAR1                    Dempsey - Direct

1    couldn't see the contents all the way inside.

2              MR. SOWLATI:  Ms. Gutierrez, can you please continue

3    playing Officer Dempsey's body cam until five minutes

4    30 second.

5              THE COURT:  Does this pick up the transcript again?

6              MR. SOWLATI:  Page 3.  Page 3 of the transcript, for

7    all of your reference.

8              (Video playing)

9    Q.  Officer Dempsey, in the clip of your body cam that we just

10   saw, whose hand is that holding an object?

11   A.  So that's my right hand.  That's my hand holding my

12   department issued cell phone.

13   Q.  What were you doing with your phone?

14   A.  So on my phone, in my left hand I have the ID that

15   Mr. Garlick had given me.  From there I was running his

16   pedigree information, so his name, date of birth, in our

17   system.  The reason I was doing that was because during these

18   kind of operations, if a summons is issued, the person that is

19   issued the summons, they can't have any active warrants.  If

20   they have any active warrants, they have to be returned on the

21   warrant.  So basically they are placed in custody and brought

22   back to the precinct.  If he had a Bronx warrant, he would go

23   to Bronx criminal court.  Same thing if it was Manhattan,

24   Brooklyn, whatever the case may be.  So, I was running to make

25   sure he didn't have any active warrants before the summonses

1   was issued.

2           He didn't have any active warrants, therefore we would

3   be able to issue the summons and take the moped.

4   Q.  You were holding something in your left hand.  What was

5   that?

6   A.  That was the ID that he had given.

7   Q.  Whose name was listed on that ID?

8   A.  James Garlick.

9           MR. SOWLATI:  Ms. Gutierrez, if you can please play

10  Officer Dempsey's body cam from 6:58 to 9 minutes and that

11  starts at page 4 of the transcript.

12          THE COURT:  What line?

13          MR. SOWLATI:  I don't have the exact line.

14          THE COURT:  Okay.

15          (Video playing)

16  Q.  Officer Dempsey, why did you ask Mr. Garlick about how he

17  had purchased the moped?

18  A.  So I asked him how he purchased the moped because he didn't

19  have registration for it.  And in order to register and insure

20  it, you need the title to bring to the DMV obviously to get the

21  plate put on the moped.

22  Q.  Why did you offer to voucher it under his name?

23  A.  So, during the stop, Mr. Garlick, I could tell he was very

24  upset.  So from the beginning of the operation, we were told we

25  were going to issue a summons and take the moped.  So how it

1    works with us, for example, a gas line powered scooter, for

2    example, with no license plate, it could be gas or electric,

3    once a summons is issued, there is two ways to voucher the

4    moped.  Okay.  So the first way would be determine true owner.

5    So basically that means if someone's operating a moped that has

6    to be registered, and it is not properly registered, we issue

7    the summons, take the moped, and we voucher it in a specific

8    way for determining true owner.  So that means that the person

9    that we take the moped from, their name goes on the invoice of

10   our paperwork.  That person then has to go to the DMV, get a

11   license plate, get insurance, obviously they need the title.

12   Once they have a license plate, they can come to the precinct

13   and pick the moped up from us if they have the proper

14   paperwork.

15          In this case, I felt bad for Mr. Garlick, especially

16   when he said he needed the moped to support his family, he was

17   using it for work, which I understood.  So in this case, I told

18   him we were still issuing the summons and we were still seizing

19   the moped regardless.  For him, I was going to voucher the

20   moped under his name, provided as safekeeping.  So what that

21   means is he's able to come to the precinct, I would release it

22   with discretion to him, knowing that -- giving him the

23   opportunity to go to the DMV, to get insurance, all of that, on

24   his own time.

25          Because obviously if he wanted to come back as

1    determine true owner, he would have to go to the DMV, spend

2    money in a quick period of time, before we move the moped.  So,

3    like I said, I felt bad for him.  I told him I would voucher it

4    under safekeeping under his name.  I would release it to him.

5    Provide --

6              MR. GARLICK:  Objection.  Narrative.

7              THE COURT:  Overruled.

8    A.   Provided that he had the title.  So that was the biggest

9    thing.  He would need the title.  If he had the title, he could

10   come back and we would release it to him for safekeeping with

11   the title to him.

12             MR. SOWLATI:  Ms. Gutierrez, can you please freeze

13   Officer Dempsey's body cam at minute 12:39.

14             (Video playing)

15   Q.   Officer Dempsey, what angle was the moped facing?

16   A.   So the moped was, it was facing westbound.  But like I

17   said, it is on the kickstand, so it's tilted toward

18   Mr. Garlick, away from me.

19   Q.   How did that affect your ability to see?

20   A.   I couldn't see anything at this point.  I could just see

21   the flap being open, but I couldn't see any of the contents

22   inside.

23             MR. SOWLATI:  Ms. Gutierrez, can you please play

24   Officer Dempsey's body cam from 12:39 through 16:40.

25             (Video playing)

N663GAR1                        Dempsey - Direct

1   Q.  Officer Dempsey, what was James Garlick doing here in the

2   portion of the video that we can't see?

3   A.  So here he's, like I said, taking items out, putting them

4   on the seat, putting items back into the compartment of the

5   moped.

6   Q.  Could you see inside the compartment?

7   A.  No, I could not.

8   Q.  Why did you need the key?

9   A.  So we needed the key to open -- obviously to drive the

10  moped back, and later on to open the compartment to inventory

11  whatever was left behind that Mr. Garlick couldn't carry with

12  him.

13  Q.  How do you know that the key could be used to open that

14  compartment?

15  A.  He opened it in front of me.

16          MR. SOWLATI:  Ms. Gutierrez, if you can please play

17  the rest of the video through 18:38, and that starts at page 11

18  of the transcript.

19          (Video playing)

20  Q.  Officer Dempsey, we see at the end of the clip that you

21  start running.  Why did you do that?

22  A.  So, a block away from where we were, you know, at our post,

23  there was another group doing the same thing, just a block

24  south of us.  So there, there was a moped that they had tried

25  to stop that crashed, and the driver of the moped took off on

1    foot.  So from there, I saw one of the officers chase behind

2    him.  So I left the stop I was on to go apprehend the person

3    that was running.

4    Q.  After you ran off to pursue this person, did you later go

5    back to deal with Mr. Garlick's stop?

6    A.  No.  So, once we made the arrest on the separate defendant,

7    we walked him back to the parked police car we had, put the

8    person in the car, and then from there I went back to the

9    precinct.  Officer Perez took that arrest of the person that

10   crashed and ran.  He was also brand new, just like Officer

11   Shakoor and Officer Cosma.  So, the arrest paperwork he wasn't

12   familiar with.

13           So, from the moment we arrest this person, I was in

14   the precinct the rest of the night assisting him with the

15   arrest paperwork.

16   Q.  To be clear, were you involved in any other moped stops

17   that night?

18   A.  No, I was not.

19           MR. SOWLATI:  Ms. Gutierrez, you can take that down.

20   Thank you so much.

21   Q.  Officer Dempsey, after you had dealt with that arrest, did

22   you have any further involvement with Mr. Garlick's moped?

23   A.  Yes.  So hours later, after the moped operation had ended,

24   the mopeds were brought back to the 44th Precinct.  From there,

25   I went outside with Officer Pino, Officer Shakoor -- Officer

N663GAR1                          Dempsey - Direct

1   Pino, Officer Cosma, and Officer Perez, where we conducted the
2   inventory searches of all of the mopeds that were brought back
3   from the operation.
4   Q.  You had mentioned Officer Shakoor at one moment.
5   A.  Yeah, no, he was not -- during the inventory, he was not
6   outside.
7       It was Officer Pino, Officer Perez, and Officer Cosma.
8   Q.  Do you know approximately how many mopeds were seized that
9   evening at the checkpoint outside of Yankee Stadium?
10  A.  I believe it was approximately 12 to 15 mopeds.
11  Q.  To your knowledge, were all of them inventoried?
12  A.  Yes, all of them were.
13  Q.  How did the inventory that night work at a high level?
14  A.  So, basically what would happen is every moped, whatever
15  contents were left from the stop, whatever is left inside, they
16  would be placed in a plastic bag.  And then from there, the
17  shell of the moped -- so the moped itself was vouchered
18  separately.  Usually how it works is the person that issues the
19  summons, they voucher that moped.  So, I believe that's how we
20  decided to do it that night.
21  Q.  Who issued the summons for Mr. Garlick's moped?
22  A.  Officer Cosma issued the summons.
23  Q.  Were the contents of the mopeds also vouchered?
24  A.  Yes, they were.
25  Q.  What time did the inventories of the mopeds from the

1    checkpoint start?

2    A.   Approximately 2 a.m.

3    Q.   What time did the inventory of Mr. Garlick's bike start?

4    A.   Approximately like 2:10 to 2:15 in the morning.

5    Q.   Were you present for the inventory of Mr. Garlick's moped?

6    A.   Yes, I was.

7    Q.   Who else was present?

8    A.   Officer Pino, Officer Perez, and Officer Cosma were

9    present.

10   Q.   Who is Officer Pino?

11   A.   He was my partner in the NCO unit.  He was assisting with

12   the operation as well.

13   Q.   Who is Officer Perez again?

14   A.   He was the cop that took the separate arrest.  He was brand

15   new, assigned to the 44th Precinct that night.

16   Q.   How did you know which moped was Mr. Garlick's?

17   A.   I knew Mr. Garlick's moped just because I had only been

18   involved in two stops.  His moped is very distinct looking.  It

19   looks like an actual motorcycle, but it is electric.  So I knew

20   what moped was his, just because, like I said, I had only been

21   involved in two that night, and only one of them was seized.

22   Q.   Can you describe what happened during the inventory of

23   Mr. Garlick's moped.

24   A.   Yes.  So during the inventory of Mr. Garlick's moped, we

25   were all outside.  Officer Pino had opened the compartment of

1    Mr. Garlick's moped.  From there he began to take items out of

2    the moped.  At one point, he says "Oh shit."  I look at him.

3    As soon as he says that, I kind of knew what it was.  I walk

4    over.  There is a firearm in the compartment of the moped.

5    Q.  Just taking a step back.  Do you remember how Officer Pino

6    opened the compartment?

7    A.  He had used the key.

8    Q.  Was the compartment locked?

9    A.  It was locked, yes.

10   Q.  How do you know that?

11   A.  Because he used the key to open it in front of me.

12   Q.  Before we get to the firearm, do you recall anything else

13   that Officer Pino pulled out of that compartment?

14   A.  Yes.  It was the moped battery, there was a rag in there,

15   there was -- I believe it was like two electrical wires, and I

16   believe there was one other item in there.

17   Q.  Do you remember if he pulled out these items before he

18   pulled out the firearm?

19   A.  Yes, it was before.

20   Q.  Do you recall if Officer Pino was wearing gloves when he

21   was performing the inventory?

22   A.  No, he was not.

23   Q.  What was your immediate reaction when you heard Officer

24   Pino had found a firearm?

25   A.  My immediate reaction was like, all right, well, we are

N663GAR1                        Dempsey - Direct

1    going to be here longer than we should have been.  Any time you

2    find a firearm, it is a lot of tedious work.  It is a lot of

3    work.  There is a lot of steps that go into it.

4            So once I realized, you know, all right, well, there

5    is a gun in there, I immediately look at Officer Cosma.  From

6    there I asked her to see the summons she issued when I was with

7    her.  She gave me the summons she had issued to James Garlick.

8    I immediately said, yes, this is the moped that I was a part of

9    the stop for.  From there I called my supervisor Sergeant

10   Roscino.  He came outside.  And then from there Captain Pierce

11   came outside as well.

12   Q.  Do you remember what type of firearm was found in

13   Mr. Garlick's moped?

14   A.  Yes.  It was a Colt .25.

15   Q.  Was it loaded?

16   A.  It was loaded, yes.

17   Q.  Officer Dempsey, were you wearing your body cam when the

18   firearm was discovered?

19   A.  No.  So, I was not.  So, prior to the inventory search,

20   like I said, I was assisting Officer Perez with the arrest

21   processing.  So for us, we have to share our body worn

22   camera --

23           MR. GARLICK:  Objection.  Not responsive to the

24   question.

25           THE COURT:  Overruled.

1    A.  We have to share our Bronx -- we have to share our body

2    cameras with the Bronx DA's Office.  So in order to do that, we

3    have to dock them to charge them and upload them to the cloud

4    before we can share it.  From there, I went outside to conduct

5    the inventory.  I did not grab my camera.  I did not have a

6    camera on.  It was a mistake on my end.  It is protocol,

7    procedure to have body camera on any time you are conducting an

8    inventory search.  It was just a mistake on my end.  Like I

9    said, I should have grabbed it and I should have put it on, but

10   I did not.

11   Q.  How many moped inventories have you performed in your

12   career?

13   A.  My career, approximately 20 to 25 inventories.  Moped

14   inventories.

15   Q.  Until this instance, had you ever found a firearm during

16   one of those inventories?

17   A.  No, I had not.

18            MR. GARLICK:  Objection.  Relevance.

19            THE COURT:  Overruled.

20   Q.  What did you do immediately after Officer Pino said he had

21   found a firearm?

22   A.  So once he said he found the firearm, I called my boss,

23   Sergeant Roscino.  He came outside.  And then Captain Pierce

24   came outside as well.

25   Q.  Are you familiar with the NYPD protocol for what to do

1    after you find a firearm during an inventory?

2    A.  Yes, I am.

3    Q.  What is that?

4    A.  So any time a firearm is found, depending on where it is,

5    so in this case it was found in the precinct.  So, we had to

6    call Evidence Collection Team, which we refer to as ECT.  ECT

7    comes out.  They come out, they take pictures of everything,

8    they take pictures of the firearm, they take pictures of where

9    the firearm was recovered from.

10          From there, they make the weapon safe, so they make

11   sure there is no round in the chamber, they eject the magazine,

12   they count the rounds that are in the magazine.  And they

13   separate everything for you for you to process.  So, they'll

14   put the magazine in one plastic bag, they'll put the rounds in

15   a separate plastic bag, and then they put the frame of the gun

16   in a separate bag as well.

17   Q.  What, if anything, did you do with Mr. Garlick's firearm

18   after it was found?

19   A.  After it was found, I vouchered it later on in the morning.

20   Q.  Can you remind us again what it means to voucher?

21   A.  Yes.  So we take it into our possession and then we --

22          MR. GARLICK:  Objection, your Honor.  Asked and

23   answered already.

24          THE COURT:  Sustained.  Ask another question.

25   Q.  Why did you voucher it?

1    A.  I vouchered it because it was recovered in the precinct,

2    and at that time it was a found firearm.

3    Q.  How long after the firearm was found did you voucher it?

4    A.  I vouchered it around three hours after it was recovered.

5    Q.  Why did you wait until then?

6    A.  Like I said, it is a lot of paperwork to be done.  So, we

7    can't finalize the voucher until ECT comes out.  ECT can take a

8    while.  Usually there's only two cops working, especially on

9    the midnight, for the entire Bronx.  So it takes a while for

10   them to come out.  After they come out, they have to do their

11   thing, take the pictures and everything.  And then on my end,

12   we do what's called a complaint report, which takes a while as

13   well.  There's notifications that have to be made, things of

14   that nature.  So it takes -- it's a process to voucher a

15   firearm.

16           MR. SOWLATI:  Ms. Gutierrez, can you please put on the

17   screen what's been marked for identification as Government

18   Exhibit 1104.

19   Q.  Officer Dempsey, do you recognize this?

20   A.  Yes, I do.  That is the voucher of the firearm.

21   Q.  Who authored it?

22   A.  Myself.

23   Q.  When did you author it?

24   A.  When?  August 28.  It was finalized at 6:54 in the morning.

25   Q.  Is this form used in the regular course of NYPD business to

1   voucher evidence?

2   A.  Yes, it is.

3   Q.  Is making the record part of NYPD's regular practice?

4   A.  Yes.

5           MR. SOWLATI:  The government offers Government Exhibit

6   1104.

7           THE COURT:  Any objection to 1104?

8           MR. GARLICK:  Your Honor, I would like to object.

9   It's hearsay.  Pertaining to Rule 803(8)(a).

10          THE COURT:  That's sufficient.  Overruled.

11          1104 is received.

12          (Government's Exhibit 1104 received in evidence)

13          MR. SOWLATI:  Ms. Gutierrez, please publish Government

14  Exhibit 1104.

15  Q.  Earlier you had mentioned vouchering.  What's the

16  difference between an invoice and a voucher?

17  A.  It's interchangeable.  It is basically the same thing.

18  Q.  In addition to the gun itself, did you voucher anything

19  else that was present with the gun?

20  A.  Yes, I vouchered the contents that were inside of the

21  moped.

22  Q.  Sorry.  With respect to the firearm.

23  A.  Oh.  I'm sorry.  Can you repeat the question?

24  Q.  Yes.  In addition to the gun itself, did you voucher

25  anything that was present with the gun?

1  A.  Yes.  So the magazine and the rounds inside.  Aside from

2  the firearm, no.

3        MR. SOWLATI:  Ms. Gutierrez, if you can please take

4  that exhibit down.

5        Your Honor, if I can have a moment to grab an exhibit.

6        THE COURT:  Okay.

7        MR. SOWLATI:  If I can please hand the witness an

8  exhibit.

9        THE COURT:  Hand it to Angela.  She'll hand it to the

10  witness, please.

11       What's the exhibit number?

12       MR. SOWLATI:  Government Exhibit 201.

13  Q.  Officer Dempsey, do you recognize this?

14  A.  Yes, I do.

15  Q.  What is it?

16  A.  This is the firearm that was recovered from Mr. Garlick's

17  moped.

18  Q.  Is there anything else in there?

19  A.  There is the magazine and there's rounds, the bullets are

20  in there as well.

21  Q.  Does this bag appear to be sealed?

22  A.  Yes.  Well, it is open now, but yes, it was sealed.

23  Q.  Can you remove the firearm and the other contents from the

24  pouch.

25  A.  You want everything out?

1    Q.  Just the firearm.

2    A.  Okay, yes.  This is the firearm that was recovered.

3    Q.  Can you please hold up the ammunition bag or the remaining

4    contents so the jurors can see it.

5            How do you recognize this firearm?

6    A.  So, this is the firearm that I vouchered.  I recognize it

7    by the lead seal number that was attached to the firearm.

8    Q.  What is a lead seal number?

9    A.  So, a lead seal number, so basically, can I -- so this

10   metal piece here --

11           MR. GARLICK:  Objection.  Not in evidence, your Honor.

12   And I would also like to object to it because I think that you

13   are trying to --

14           THE COURT:  Hold on.  Don't do that.

15           He's right, it's not been moved into evidence.  Would

16   you like to move it into evidence?

17           MR. SOWLATI:  Yes, your Honor.

18           THE COURT:  Any objection to 201?  That's the gun and

19   the ammunition.

20           MR. GARLICK:  Yes, your Honor.

21           THE COURT:  Come to sidebar.

22           (Continued on next page)

23

24

25

1           (At the sidebar)

2           THE COURT:  You can't make speaking objections.  If

3    you object and I don't know why you are objecting, I'll let you

4    come to sidebar.  But don't explain the objection before the

5    jury, okay?

6           What's your objection?

7           MR. GARLICK:  My objection is that you have numerous

8    pictures of this firearm in evidence or will be put into

9    evidence.

10          THE COURT:  That's your objection?

11          MR. GARLICK:  I'm not finished.  My objection is you

12   are trying to show guns are fearful.  So when you show a

13   physical gun, I am afraid.

14          THE COURT:  Let me just say this is the least

15   impressive, least terrifying gun I've ever seen in my career.

16   I've never seen a .25 before.

17          MR. GARLICK:  Me neither.

18          THE COURT:  That's fine.  But in any event, your

19   objection is overruled.  This is a gun case.  The gun is the

20   thing.

21          (Continued on next page)

22

23

24

25

1          (In open court).

2          THE COURT:  The objection is overruled.  So 201 is

3    received in evidence.

4          (Government's Exhibit 201 received in evidence)

5    Q.  Officer Dempsey, what is a lead seal number?

6    A.  So, the lead seal --

7          THE COURT:  Now you can show it to them.

8    A.  This is the lead seal.  On the bottom is a metal clasp.  So

9    basically what happens is, it is a wire that goes through the

10   opening, and then to seal it shut, you have to basically bang

11   on it.  It is metal on metal.  You can't take out this piece

12   here.

13         So the lead seal number is given to any firearm that

14   doesn't have a serial number to it.  If the serial number is

15   defaced or scratched off, we use the lead seal to identify it

16   on our end, as this lead seal number belongs to this firearm.

17   Q.  What is the lead seal number?

18   A.  The lead seal number is 274858.

19         THE COURT:  E58?

20         THE WITNESS:  858.  I'm sorry.  274858.

21   Q.  Is the number that you just read from the lead seal the

22   same number that's in your invoice for the firearm?

23   A.  Yes, it is.

24   Q.  Is the firearm substantially in the same condition as when

25   you last saw it?

1    A.  Yes, it is.  A little rusted, but yes.

2    Q.  Is it typical for a firearm to get rusted?

3    A.  Yes, it is.

4           MR. SOWLATI:  Ms. Gutierrez, if you can please put on

5    the screen Government Exhibit 1106.

6           MR. GARLICK:  Excuse me, your Honor.  I just would

7    like to know if this is also being shown to the jury as well.

8           THE COURT:  1106 is the invoice?  Right now, no, it's

9    not in evidence.  So it is just on your screen and my screen

10   and the lawyers' screen and the witness screen.

11   Q.  Officer Dempsey, do you recognize this?

12   A.  Yes, I do.

13   Q.  What is it?

14   A.  This is the invoice for the moped that Mr. Garlick was

15   operating.

16   Q.  Who drafted it?

17   A.  Officer Sordellini, one of the NCOs that was working with

18   us on the operation.

19   Q.  Why didn't you draft it?

20   A.  Why didn't I draft it?  So, like I said, any time a firearm

21   is recovered, it is a lot of paperwork.  So we had seized over

22   12 to 15, so, everybody was helping out, just in the interest

23   of time, to speed up the process, basically.

24   Q.  Were you present when this was drafted?

25   A.  Yes, I was.

N663GAR1                          Dempsey - Direct

1    Q.  When was it drafted?

2    A.  This was drafted August 20, 2022.  It was finalized at 4:56

3    in the morning.

4    Q.  Can you repeat the date.

5    A.  Sorry.  August 28, 2022.

6    Q.  Is this form used in the regular course of NYPD business to

7    voucher evidence?

8    A.  Yes, it is.

9    Q.  Is making the record part of NYPD's regular practice?

10   A.  Yes.

11          MR. SOWLATI:  The government offers Government Exhibit

12   1106.

13          THE COURT:  Any objection to 1106?

14          MR. GARLICK:  Objection.  Hearsay.  Sidebar, please.

15          THE COURT:  No.  Overruled.

16          1106 is received.

17          (Government's Exhibit 1106 received in evidence)

18          MR. SOWLATI:  Ms. Gutierrez, if you can please publish

19   this exhibit.

20   Q.  Officer Dempsey, on the invoice there is a line that says

21   sticker number.

22   A.  Yes.

23   Q.  What is that?

24   A.  So, any vehicle that we have, whether it is a car, moped,

25   we call it a pet sticker.  So basically it is a sticker that we

N663GAR1                    Dempsey - Direct

1    place on the moped to identify that moped being vouchered under

2    that pet sticker number.

3    Q.   Can you please read the sticker number.

4    A.   Yes.  It is 64 -- sorry.  6746853.

5            THE COURT:  That's right in the middle of the document

6    on the far left side where it appears?

7            THE WITNESS:  Yes.

8            MR. SOWLATI:  Ms. Gutierrez, if you could please take

9    that down.

10   Q.   Officer Dempsey, after the firearm was found, what did you

11   do next with respect to Mr. Garlick?

12   A.   So, I notified Sergeant Roscino, he came outside.  Captain

13   Pierce came outside as well.  When Captain Pierce came outside,

14   he was running the operation.  I immediately told him I know

15   who the moped belongs to.  I showed him the summons that

16   Officer Cosma had wrote, the name and the address that was on

17   there was what Mr. Garlick had stated to me during the stop.

18   So from there Captain Pierce said, okay.  Go get him.

19   Q.   What do you do after that?

20   A.   So, from the precinct, myself, Officer Alvarado, Officer

21   Castellano, and sergeant Roscino went to the residence that

22   Mr. Garlick had provided for the summons.

23   Q.   Do you recall approximately when you went to that address?

24   A.   I believe it was around 3 a.m.

25   Q.   What happened there?

1    A.  So, when we got there, I knocked on the door.  We waited,

2    you know, probably 30 seconds.  From there, Mr. Garlick's son

3    answered the door.  I asked him who he was.  He said his name.

4    I asked him James Garlick, does he live here?  He said yes,

5    that's my father.  He's not here.  He hadn't seen him since the

6    morning.  So from there, I told -- I told his son, I told him

7    we had made a mistake that we took his moped, we shouldn't have

8    taken it.  That he could come pick up the moped at the

9    precinct.

10         Also, Officer Alvarado asked him for a phone number

11   for Mr. Garlick to contact him.  Mr. Garlick's son closed the

12   door, but not completely, so it was still open a little bit.

13   He went to get his cell phone.  Came back and provided us with

14   Mr. Garlick's cell phone number.

15   Q.  What, if anything, did you do with that number?

16   A.  So when we left the location, I believe I called that time

17   at like 3, 3:15 in the morning, I called Mr. Garlick.  I

18   believe I left him a voicemail stating that we made a mistake

19   with the moped, that he could come and pick up the moped from

20   the precinct.

21   Q.  Did you later speak with Mr. Garlick?

22   A.  Yes, I did.  So, I had went home, so that would have been

23   Sunday morning.  Early afternoon, around 11 or 12, Mr. Garlick

24   had called me.  Sorry.  Sunday, 11 or 12, 11 a.m., 12 p.m.  He

25   called me, said he got my message.  That he said, okay, I am

1   going to pick up the moped at the precinct.  I said, okay, no

2   problem.  The next day, he called me again early afternoon.  He

3   called me and he was like, hey, why are you guying knocking on

4   my door.  I said what are you talking about?  I'm not even at

5   work, I'm home.  He said, yeah, my son just called me, he said

6   you guys were knocking on my door with regards to the moped.  I

7   don't understand why you're there.  You already told me I could

8   pick up the moped.  I said I don't know why anyone went to your

9   door, but I'm in Tuesday.  Just come in on Tuesday, I will

10  release the moped to you as we discussed earlier.

11          I could tell from his voice, he was questioning why

12  are you knocking on my door, you just told me I could pick it

13  up.

14          MR. GARLICK:  Objection, your Honor.  Hearsay.

15          THE COURT:  Overruled.

16  A.  So, like I said, I could hear it in his voice that he was

17  very, like, shaken up about it.  So again, I told him, come on

18  Tuesday, come pick up the moped from us.  I'm in on Tuesday.

19  I'll be in at 3 o'clock.

20  Q.  Did he come on Tuesday to pick it up?

21  A.  No.  So on Tuesday, we were waiting around at 3 for him to

22  come in.  He never came in.  I called him again, so probably

23  around 4 o'clock.  I asked him if he was coming in.  He said he

24  wasn't coming in.  He doesn't need the moped anymore.  He got a

25  new moped to do deliveries for with.

N663GAR1                              Dempsey - Direct

1    Q.  Did you take any further steps to arrest Mr. Garlick?

2    A.  Yes.  So after he didn't show up, I went into the Field

3    Intelligence Office in the precinct.  I was working with

4    Officer Alvarado and Detective Cadavid.  Mr. Garlick was on

5    parole, so they were in contact with his parole officer.  The

6    plan was to do a parole meeting.  So basically what happens is

7    that Mr. Garlick had already been issued a I-card, in NYPD

8    terms, an active warrant.  So the plan was --

9              MR. GARLICK:  Objection, your Honor.

10             THE COURT:  Put another question.

11             How do you know he had been issued an I-card?

12             THE WITNESS:  So I know it because I was in contact

13   with the officer that had issued it.

14             THE COURT:  So your understanding was that an I-card

15   had been issued.

16             THE WITNESS:  Yes, yes.  The I-card had been issued.

17             THE COURT:  Overruled.  Continue.

18             I think you need to put another question.  I've lost

19   track of what was the question is.

20   Q.  Yes.  So, did you take any further steps to arrest

21   Mr. Garlick?

22   A.  Yes.  So they were in contact with his parole officer.  The

23   plan was to set up a date for Mr. Garlick to report to parole.

24   From there we would meet at parole, we would meet his parole

25   officer, give them the I-card or the active warrant.  How it

N663GAR1                        Dempsey - Direct

```
 1  works is they would call any parolee into their office --
 2              MR. GARLICK:  Objection, your Honor.
 3              THE COURT:  Overruled.  What he's relaying to you is
 4  what the plan was.  This was the plan as of this that point?
 5              THE WITNESS:  Yes.
 6  A.  So the plan was for him to come.  Parole officer would call
 7  him in, they would bring him into their office.  They would
 8  place him -- the parole officer would place him into custody,
 9  and then we would transport him back to the 44th Precinct to
10  start the arrest processing.
11  Q.  Did there come a time that you went to his parole office?
12  A.  Yes, we did.  We went we did go to his parole office, yes.
13  Q.  What happened there?
14  A.  So, when we had got there --
15              THE COURT:  What day was this?
16              THE WITNESS:  I believe it was September 6, I believe.
17  A.  When we had gotten there, we went in through the front
18  door, which I didn't realize was the front door.  We went in,
19  we went to the window.  From there, Detective Cadavid said we
20  were there to see Mr. Garlick's parole officer.  The person at
21  the window said, okay, no problem.  They opened the door, they
22  brought us to the back, to like the parole officer's offices.
23  Mr. Garlick's parole officer was not there at the time.  We met
24  with the supervisor.  He didn't know we were coming.  He didn't
25  know Mr. Garlick had an I-card.
```

N663GAR1                          Dempsey – Direct

1       MR. GARLICK:  Objection, your Honor.

2       THE COURT:  Sustained.

3  Q.  So what time did you get to the parole office?

4  A.  I believe it was around 10 in the morning.  10 to 10:30 in

5  the morning.

6       THE COURT:  In uniform?

7       THE WITNESS:  Yes, I was in uniform.

8  Q.  Did you speak with anyone when you got there?

9  A.  So we spoke with the parole supervisor when we had gotten

10 there.

11 Q.  Did he tell you anything about Mr. Garlick's whereabouts?

12 A.  Yes.  So once we gave the paperwork to the supervisor, the

13 supervisor went out to --

14      MR. GARLICK:  Objection, your Honor.

15      THE COURT:  Sustained.

16 Q.  You can proceed to answer.

17      THE COURT:  I sustained the objection.

18 Q.  Was Mr. Garlick there?

19 A.  No, he was not there.  The supervisor told us that he was

20 there.

21      MR. GARLICK:  Objection, your Honor.

22      THE COURT:  Don't tell us what the supervisor told

23 you.

24      THE WITNESS:  Sorry.

25 A.  So no, he was not there.

N663GAR1                        Dempsey - Cross

1    Q.   Then what did you do?

2    A.   So from there we left.  We went into the car we had taken.

3    I called Mr. Garlick, because I knew that I knew he wasn't far.

4    So I called him.

5              MR. GARLICK:  Objection, your Honor.

6              THE COURT:  Sustained as to you knew he wasn't far.

7              THE WITNESS:  Okay.

8              THE COURT:  Why did you know he wasn't far?

9              THE WITNESS:  So, we knew -- from what we were told.

10             THE COURT:  You thought he was close by?

11             THE WITNESS:  Correct.  Yes.

12             THE COURT:  Go ahead.

13   A.   So, I called him, and no answer from there.  Then we went

14   back to the precinct.

15             MR. SOWLATI:  May I have a moment, your Honor.

16             THE COURT:  Sure.

17             MR. SOWLATI:  Thank you, Officer Dempsey.  No further

18   questions.

19             THE COURT:  Mr. Garlick.

20             MR. GARLICK:  Your Honor, I would ask for five minutes

21   to consult.

22             THE COURT:  No.

23   CROSS-EXAMINATION

24   BY MR. GARLICK:

25   Q.   Good morning, Mr. Dempsey.  How you doing today?  All

N663GAR1                        Dempsey – Cross

1    right?

2    A.   Good morning.  Yes.

3    Q.   Okay.  Officer Dempsey, have you ever, did you on the date

4    of August 27, 2002, at the stop, did you see me with a handgun?

5               THE COURT:  You don't mean 2002.  You mean 2022.

6    Q.   Excuse me.  Correction.

7               August 27, 2022, did you see me with a firearm?

8    A.   No, I did not.

9    Q.   You testified on direct today that you was working for the

10   NYPD at the time; is that correct?

11   A.   That is correct.

12   Q.   Do you y'all contract through different precincts?  Because

13   you said a couple of the officers that was there, they weren't

14   from the precinct.  They was actually just there for the

15   search.  So, and also, because on your voucher it says that you

16   work for the city as well as the NYPD.

17              So I was kind of unclear about do you all do contracts

18   with other places as officers?

19              THE COURT:  Do you understand the question?

20              THE WITNESS:  No.

21              THE COURT:  Rephrase the question.

22   Q.   You work in the 44 Precinct, correct?

23   A.   Correct.

24   Q.   Your post is the 44 Precinct, correct?

25   A.   That's the precinct that I belong to, yes.

N663GAR1                    Dempsey – Cross

```
 1   Q.  From the 44 Precinct, can they out you to other precincts
 2   to work?
 3   A.  Yes.  The department can do anything they want, yes.
 4   Q.  So, the other people that was there in question, they
 5   wasn't from your precinct.  Fair to say?
 6   A.  So, at the time, they were brand-new officers that just
 7   came out of the academy.  Okay.  So at that time, these
 8   officers were assigned to a field training zone.  So that means
 9   that they were assigned to multiple commands.  So for example,
10   I forget the zone number that they were, but those officers
11   that came out of the academy were assigned to that particular
12   zone worked in the 40 Precinct, the 42 Precinct and the 44
13   Precinct.  So they would rotate.  Whereas myself is assigned to
14   the 44th Precinct in the Bronx.  Those officers, whatever the
15   department decided, they were assigned to a zone, a field
16   training unit, and would rotate between precincts, depending
17   from what their commander had wanted them to do.
18   Q.  So safe to say from what you just said, that they had
19   experienced officers and inexperienced officers working
20   together?
21   A.  During the time of the operation?
22   Q.  At the time of the stop.  Of the operation.
23   A.  Yes.  So they were assigned to work in the 44th Precinct,
24   those field training officers were working with the NCO
25   officers.  So, I was working with the two new officers at the
```

N663GAR1                    Dempsey - Cross

1    time of the stop.

2    Q.  So basically in your role with them, you was basically a

3    supervisor?

4    A.  No.  I wasn't a supervisor.  I was just helping them.  Like

5    I said, they didn't have any experience with stops and didn't

6    have any experience with issuing summons, so more this is what

7    you do and how you write and things like that.

8    Q.  So that would mean that in your helping them, that you were

9    doing the right thing all the time as far as showing them the

10   steps, how they were supposed to conduct the search?

11   A.  Conduct the search?

12   Q.  You saying that they was there for a training field, that

13   they came, they was new to the area, they didn't do traffic

14   searches anymore.  So basically you was there to kind of

15   chaperon them during the search to show them exactly what

16   procedures to follow?

17   A.  I don't know what you mean by traffic search.

18   Q.  It was a traffic stop.

19   A.  Oh.  A stop.  Correct.  Yes.

20   Q.  So you was basically training them on how to do the traffic

21   stop?

22   A.  Correct.

23   Q.  You also said that you said the reason that you stopped me

24   was because I wasn't wearing a helmet, and you didn't notice a

25   plate.

1           First let me ask you, do you know what a moped is?

2   A.  Yes.

3   Q.  Can you explain to me in your opinion what a moped is.

4   A.  Yes.  A two wheeled vehicle, gasoline or electric.

5   Q.  When you say gasoline or electric, where did you get the

6   information that electric bikes are considered mopeds?  Because

7   in the Oxford English dictionary, a moped is considered --

8   excuse me?

9           MR. SOWLATI:  Objection, your Honor.

10          THE COURT:  Sustained.  Sustained.

11          MR. GARLICK:  Your Honor, I am trying to see if he

12  knows --

13          THE COURT:  You've asked your question.  The question

14  is why does he think an electric two wheeled vehicle is

15  considered to be a moped.

16          MR. GARLICK:  He said because it's gas --

17          THE COURT:  Whether it is gas or electric trick.

18  Q.  You said it was --

19          THE COURT:  Otherwise it is a bicycle.

20          MR. GARLICK:  Excuse me, ma'am?

21          THE COURT:  I am trying to clarify your question.  It

22  would be a bicycle.

23          MR. GARLICK:  That is incorrect.  That's why I am

24  asking him if he knows.  If you notice from --

25          THE COURT:  You can't testify, Mr. Garlick.

1                MR. GARLICK:  I am not testifying.

2                THE COURT:  You can only ask questions.  So ask

3      Officer Dempsey a question.  I think the pending question he

4      didn't answer is why does he believe that a two wheeled vehicle

5      that is either electric or gas powered is considered to be a

6      moped.  That's the question.

7                THE WITNESS:  Why is it considered to be --

8                THE COURT:  Why is an electric bike considered to be a

9      moped?

10               THE WITNESS:  Mopeds are also commonly referred to as

11     scooters as well.  It is that style.  Like I said, they do look

12     like a motorcycle, they look like a scooter.  But if you are

13     not pedaling, if you are pushing a throttle of some sort, it

14     would be considered a moped.

15     Q.  On that day, in one of your statements you said this was a

16     training op.  Did they give you anything to reference before

17     you left the precinct?

18     A.  So on that date there was no training materials given to

19     us.

20     Q.  Really.  How about a cheat sheet.  Did they give you a

21     cheat sheet?

22     A.  No, we were not given that.  We had knowledge of what we

23     were allowed to stop for.  So, on that exact date, no, sir, we

24     weren't given anything.  But I had knowledge of, you know, what

25     can be stopped and can't be stopped.

N663GAR1                    Dempsey – Cross

1    Q.  So, how did you know, so basically you said you was

2    stopping every bike, regardless of if they had helmets, plates,

3    anything?

4    A.  Correct.  During the checkpoint we were stopping any moped

5    that came toward us to conduct an investigation.

6            MR. GARLICK:  Excuse me, ma'am.  Can you pull up

7    Exhibit Number 201.

8            THE COURT:  201.

9            MS. GUTIERREZ:  The gun?

10           THE COURT:  That's the gun.

11           MR. GARLICK:  1201.

12           MR. SOWLATI:  Your Honor, that's not in evidence right

13   now.

14           THE COURT:  1201 is not in evidence.

15           MR. GARLICK:  It's part of their exhibits.  I got it

16   from them.  So I am not asking to put it in evidence right now.

17           THE COURT:  You want to show it?

18           MR. GARLICK:  He would be able to see it.

19           THE COURT:  Just show it to the lawyers and to the

20   witness.

21           Mr. Garlick.

22   Q.  Have you ever seen this before, Officer Dempsey?

23   A.  Yes, I have.

24   Q.  Would you where have you seen this?

25   A.  I've seen this in the precinct before.

1          MR. GARLICK:  I would like to submit this into

2     evidence.

3          MR. SOWLATI:  No objection, your Honor.

4          THE COURT:  Okay.  1201 is received.

5          (Government's Exhibit 1201 received in evidence)

6          MR. GARLICK:  Your Honor, I don't have -- I guess the

7     screen doesn't show it.

8          THE COURT:  Would you like it shown to the jury?

9          MR. GARLICK:  Yes, ma'am.

10         THE COURT:  Please publish it to the jury.

11         Go ahead, Mr. Garlick.

12    Q.  From your experience and knowledge of these types of

13    traffic stops, you said that you stopped over how many scooters

14    was it again?  Or mopeds or motorcycles that you have stopped

15    in your career of doing these traffic violations traffic stops?

16    A.  I never said how many mopeds I had stopped.  I was asked

17    how many inventory searches I had conducted.

18         THE COURT:  It doesn't matter.  Do you want to ask him

19    that question?

20    Q.  Yes.  How many scooters or mopeds, motorcycles, bikes,

21    E-bikes have you searched, stopped in your career as an

22    officer?

23         THE COURT:  That's two different questions.  Break it

24    down.  Do you want to know about searching or stopping?

25         MR. GARLICK:  I want to know how many bikes he's

1    stopped.

2              THE WITNESS:  Over 50.

3    Q.  Over 50?

4    A.  Correct.

5    Q.  The reason why I asked this is because --

6              THE COURT:  We don't care why you asked this.

7              MR. SOWLATI:  Objection.

8    Q.  You said in the precinct that you've seen this model posted

9    somewhere.  So can you explain to me, in this model and your

10   experience, of what reason did you actually have to stop me?

11   Because you are saying that you stopped me because I wasn't

12   wearing a helmet and a plate.  You also said that bikes over

13   100 pounds have to be registered.

14             MR. SOWLATI:  Objection.

15             THE COURT:  Sustained.  That's a misstatement of his

16   testimony.

17   Q.  How do you know which E-bikes have to be registered?

18             THE COURT:  How does he know?

19             MR. GARLICK:  He is the one saying they stopped me.

20             THE COURT:  Don't argue with me.

21             MR. GARLICK:  I'm not arguing.

22             THE COURT:  You want to know how?

23             MR. GARLICK:  I would like to know how does

24   Mr. Dempsey know how does E-bikes have to be registered.

25   A.  Are you asking at the time of the operation or just in

 1    general?

 2    Q.  I am asking in your career, because you said that you've

 3    stopped over 50-something bikes, and I would like to know with

 4    this model that you said you have seen in your precinct, how do

 5    you know which E-bikes need to be registered.

 6    A.  Well, for example, for the mopeds that weigh over 100

 7    pounds, you can tell by the size of them.  If they're over 100

 8    pounds, just by looking at it, if it looks over 100 pounds and

 9    you stop the moped, then that's what it is.  You don't

10    necessarily -- I don't necessarily have to, I can stop a moped

11    whether it is fully registered, insured, whatever the case may

12    be, if it goes through a red light.  So I can stop a moped for

13    a traffic violation.

14    Q.  I am asking you saying that so, you are saying by looks,

15    you can tell how much a bike weighs and because it is over 100

16    pounds it has to be registered with the DMV?

17    A.  Depending on the case and the moped, yes, correct.

18    Q.  I am saying by this model that was provided by your

19    precinct, it doesn't actually say bike over 100 pounds have to

20    be registered.  So I am asking you, where did you get this

21    information from as far as bikes have to be registered with DMV

22    because they are over 100 pounds?

23    A.  Give me a second.  I'm reading the chart.

24         THE COURT:  Do you understand the question?

25    A.  Yeah, so basically -- why if it is over 100 pounds, why can

1    it be stopped?

2    Q.   The question was, where did you get the information that

3    bikes over 100 pounds, E-bikes have to be registered?

4    A.   Okay.  So, Captain Pierce had mentioned during the

5    operation anything over 100 pounds had to be registered and

6    insured as well.

7    Q.   Do you know what Captain Pierce got this information from?

8    A.   I do not know, no.

9    Q.   So you are out there stopping bikes on information that you

10   didn't corroborate.  Do you consider yourself an officer of the

11   law?

12   A.   Yes, I do.

13   Q.   So as an officer of the law, do you have to know laws?

14   A.   Yes.

15   Q.   So I am asking you what law says that bikes over 100 pounds

16   have to be registered.

17   A.   What -- I'm sorry.  Can you say that again?

18   Q.   What law were you referencing when you stopped me on this

19   alleged what you are calling a moped.

20   A.   What law were we stopping you for?

21   Q.   No.  What law are you referencing that says E-bikes have to

22   be registered over 100 pounds.  Because according to this

23   chart, that's posted in your precinct, it doesn't say that.

24   And it doesn't even say that E-bikes have to be registered.

25   A.   As I said, Captain Pierce, who was running the operation,

1    had told us anything over 100 pounds electric had to be

2    registered.

3    Q.  So, basically, you were in violation of my Fourth Amendment

4    right.  Do you know what the Fourth Amendment is?

5            MR. SOWLATI:  Objection.

6            THE COURT:  Sustained.

7            MR. GARLICK:  We can move on.

8    Q.  According to motor vehicles, there is no law that says

9    bikes over 100 pounds have to be registered with them.

10           MR. SOWLATI:  Objection.

11           MR. GARLICK:  If you like, I have a copy that I am

12   willing to furnish to the witness --

13           THE COURT:  Mr. Garlick, the objection was sustained.

14   Do you want a sidebar?

15           MR. GARLICK:  Yes, please.

16           THE COURT:  How much more cross do you have of Officer

17   Dempsey?

18           MR. GARLICK:  I am just beginning, ma'am.

19           THE COURT:  Definitely come up.

20           (Continued on next page)

21

22

23

24

25

N663GAR1                         Dempsey - Cross

1                    (At the sidebar)

2                    MR. GARLICK:  The reason I am asking --

3                    THE COURT:  Hang on.  All this is irrelevant.

4                    MR. GARLICK:  It is not irrelevant to the stop.  He

5     stopped me.

6                    THE COURT:  This is not an issue about whether the

7     stop is legal or not.  That's not an issue in this case, and I

8     am going to tell the jury that's not an issue in the case.  If

9     you continue down this path --

10                   MR. GARLICK:  I am going to continue down the path

11    because it was an illegal stop.

12                   THE COURT:  You are not going to continue down --

13    again, Mr. Garlick.  Mr. Garlick, listen to me.

14                   MR. GARLICK:  I am listening to you.  I can only go on

15    the laws.  You are saying this is a court of law.  You are

16    saying --

17                   THE COURT:  Stop.  You have, Mr. Garlick, we've got a

18    whole jury who are citizens who are giving up their time.

19                   MR. GARLICK:  I understand that.

20                   THE COURT:  Stop talking and listen.  I understand --

21                   MR. GARLICK:  Your Honor, I feel like you are

22    infringing on my rights.  You are not allowing me to ask these

23    people questions, because as you can see, there are differences

24    between mopeds, motorcycles, E-bikes, and motor scooters.  You

25    are saying this is an E-bike because the way it looks.  The

N663GAR1                      Dempsey - Cross

1    motorcycle.  It's not.  This is a shell.  This is plastic.  So

2    if you take this away, it is an E-bike.

3              THE COURT:  Mr. Garlick, you are very close to losing

4    your right to represent yourself.

5              MR. GARLICK:  You do what you have to do.

6              THE COURT:  I don't want to take away your right to

7    represent yourself.

8              MR. GARLICK:  So then don't.  Let me represent myself.

9              THE COURT:  Be quiet and listen to me.

10             MR. GARLICK:  You are not saying anything that's

11   relevant.

12             (In open court)

13             THE COURT:  Ladies and gentlemen of the jury should

14   step out for a moment.  Don't discuss the case.  Place all your

15   stuff on the chairs.

16             (Jury excused)

17             THE COURT:  Please be seated.  You can step out.

18             (Witness temporarily excused)

19             THE COURT:  Mr. Garlick, as I said at sidebar, I do

20   not want you to forfeit your right to represent yourself.

21             MR. GARLICK:  Let me --

22             THE COURT:  Quit talking and just listen.

23             MR. GARLICK:  Objection, your Honor.  You cannot talk

24   to me this way.  You don't have a right to yell at me because I

25   am asking questions of law.  If you don't want to pertain to

1    the law, if you are not going to pertain to the law, this is

2    not a court of law.  You are saying that you don't have to

3    apply the law as it is given.  And I don't understand that.

4    And this is why I don't understand nothing that's going on in

5    here, because I am giving you the law as it is.  I'm providing

6    facts of the law, and you are telling me it is irrelevant.  I

7    don't understand how that's possible.

8            THE COURT:  Mr. Garlick, when I am talking, you need

9    to stop and listen.  I am willing to tolerate a fair amount of

10   nonsense from you.  But once I make a ruling, you cannot

11   persist.  I have a jury that has been empaneled, they are

12   entitled to try the case without a great deal of nonsense from

13   you.

14           MR. GARLICK:  I'm entitled to represent myself.

15   Because you are saying it's nonsense because I am trying to

16   defend myself with which you are giving me, but it's nonsense.

17   I don't understand.  I think that this law that you are

18   applying, like I said, and I am going to say it again, is

19   nonsense.  Because if you say this is a criminal matter, I

20   don't understand how the Supreme Court says on the federal

21   level 27 C.F.R. 72.11 all crimes are commercial on the federal

22   level.  We've already went through, and I am asking you to

23   explain the law to me that has been governing federal courts.

24   You can't explain to me what jurisdiction I am.  You rambled

25   off about a section, but you never actually stated which one of

1    those three that the Constitution and the article mentions.  It

2    mentions law and equity, and it is funny how you just stopped

3    before you got to admiralty.  So you haven't, you haven't put

4    jurisdiction on the record for the prosecution.  One.

5            Second, you are trying to railroad me saying that the

6    law he applied to stop me, you are saying they're irrelevant

7    because they don't exist.  So I don't understand how this is a

8    court of law, if we are not following no laws that govern

9    court.

10           THE COURT:  Mr. Garlick, you have to comply with my --

11           MR. GARLICK:  I don't haven't to do anything.  That's

12   the first thing.  Because I told you that I didn't want to be

13   here.  I already gave them an out.  I said I'm willing to plead

14   guilty.  All you have to do is stipulate what the jurisdiction

15   is.  So I told that you I am doing trial under duress.  If I

16   sit here and don't say nothing, then my intent is implied.  I

17   am not implying, I am not agreeing to anything.  I am not

18   waiving anything.  And that's the only reason why I am going

19   along with this freak show you got going on running on here.

20           At the end of the day, you are not practicing law

21   here.  Because if you was practicing law, and I am giving you

22   the laws, you are saying the laws you are practicing under is

23   irrelevant.  What do you really want from me.

24           THE COURT:  If you do not comply with my rulings and

25   do not respect the decorum of the court --

1          MR. GARLICK:  I have not received any rules of the

2     decorum of the court to say what they are.  I have the rules of

3     federal, civil, criminal, I have your rules of evidence.  I

4     have all your rules that I am supposed to follow in this book.

5     Courtroom decorum is not in here.

6               (Continued on next page)

N66Ggar2

|    |    |
|----|----|
| 1 | THE COURT:  If you do not comply with my rulings and |
| 2 | do not comply and behave consistently with decorum of the |
| 3 | Court, you are going to forfeit your right to represent -- |
| 4 | MR. GARLICK:  Objection.  On what grounds? |
| 5 | THE COURT:  I do not -- |
| 6 | MR. GARLICK:  On what amendment, on what part of the |
| 7 | Constitution are you referring that you can waive my right to |
| 8 | represent myself because that's not in the Constitution either? |
| 9 | THE COURT:  Let's take Mr. Garlick back to the cell. |
| 10 | I'm going to give you an opportunity to consult with your |
| 11 | client. |
| 12 | MR. GARLICK:  I don't need consultation.  What I need |
| 13 | is the intent of the Court.  I want to know why you have me in |
| 14 | this courtroom.  I don't need consultation.  Because if I need |
| 15 | consultation, you're only going to tell me what you want me to |
| 16 | know. |
| 17 | THE COURT:  Mr. Garlick, you don't shut up long enough |
| 18 | for me to explain. |
| 19 | MR. GARLICK:  Objection, your Honor.  Please stop |
| 20 | talking to me like that, because I'm not disrespecting you by |
| 21 | asking you questions of law.  You are refusing to give me |
| 22 | answers I'm asking for.  I don't know which courtroom we're in, |
| 23 | I don't know if we're fighting criminal cases, civil cases, I |
| 24 | don't know if we're fighting patent cases, I don't know, |
| 25 | because you won't stipulate jurisdiction.  If you won't |

1    stipulate what the jurisdiction is, I'm going to defend myself

2    the best way that I know possible by exposing the law.

3            If you don't want me to expose the law, you might as

4    well put jurisdiction on the record and let me cop out to these

5    people.  If you don't want to do that, then the courtroom is

6    going to be run the way I say it's going to be run because I'm

7    defending myself on a mystery jurisdiction that I have no clue

8    what is and the only way I can defend myself is by the laws

9    that's governing this courtroom.

10            THE COURT:  You're not being respectful.  And again, I

11   don't want you to forfeit your right to represent yourself.

12   You are actually --

13            MR. GARLICK:  You can't take my right to represent

14   myself, so stop saying that.  I already gave you the case law.

15   The Second Circuit you said is upstairs, right, has already

16   ruled repeatedly.  You cannot impinge on my right to represent

17   myself, so what are we talking about?

18            THE COURT:  You cannot continue to interrupt me.  You

19   cannot act this way.  I'm going to take a break, and I hope

20   that you will calm down.

21            MR. GARLICK:  I'm calm now.  All I want -- I just gave

22   you the law governing -- from DMV itself, I just gave you the

23   law.  Where is the law that says that these bikes have to be

24   registered?  There's no law pertaining to that.  He's saying

25   his captain told him that was the law.  What law are you

N66Ggar2

1    reference this from?  The laws that you got, which you say are

2    laws, which are not really laws, because there's only ten laws

3    in the world, the law of the land, which came from who -- okay,

4    then.

5           So what law says that he had the right to even stop me

6    in the first place?  Even if he stopped me in the first place,

7    once he stopped me, he infringed on my Fourth Amendment rights.

8           THE COURT:  If there was a Fourth Amendment motion to

9    be made, it should have --

10          MR. GARLICK:  Exactly.  This is why I am representing

11   myself because those motions were not made.  I don't know why

12   the suppression of this bike was never put in.  That was before

13   I had took the reins.  Under the Fourth Amendment, my right is

14   to ask these questions.

15          THE COURT:  Well, we're not doing that, so --

16          MR. GARLICK:  You're not doing that.  Don't say we.

17   Say you're not doing that.

18          THE COURT:  Well, you're not doing it either, because

19   if you persist, you are going to wind up watching the trial

20   from the back.

21          MR. GARLICK:  I object to that, because you have no

22   authority to do that.

23          THE COURT:  Let's take a break.  It's 11:18, let's

24   take --

25          MR. GARLICK:  Can I please have my paper back, too,

N66Ggar2

 1   please, that you had tooken from me and all of a sudden has

 2   disappeared.

 3              THE COURT:  You want this back?

 4              MR. GARLICK:  Yes, thank you.  That's part of my case.

 5   Thank you.  I'm pretty sure, Angela, the clerk, whoever is

 6   running the show, really running the show --

 7              THE COURT:  I don't need a copy of it.

 8              Ten-minute break.

 9              MR. GARLICK:  Thank you, appreciate you.

10              THE DEPUTY CLERK:  All rise.

11              MR. GARLICK:  I'm about to get me something to eat and

12   all that.

13              (Recess)

14              THE COURT:  Mr. Garlick, are you prepared to comply

15   with my rulings?

16              MR. GARLICK:  No, your Honor, because I don't know

17   what your rules are.  The only rules I know are the federal

18   rules of procedure.

19              THE COURT:  If I overrule an objection, I will let the

20   person answer.  If I sustain an objection, the person won't

21   answer.  If I tell you to move on from a subject matter, you

22   need to move on.  Those are the rules.

23              MR. GARLICK:  Funny thing you said about subject

24   matter.  I asked that to be put into the jurisdiction too.  So

25   what subject matter are you talking about?

N66Ggar2

```
 1              THE COURT:  If I say as to a subject matter of your
 2     questions that objections are sustained, that line of
 3     questioning is not relevant, please move on, will you move on
 4     and go to a different line of questions, a different subject
 5     matter of your questioning?
 6              MR. GARLICK:  It's possible, it's possible.  I'm not
 7     making any guarantees.
 8              THE COURT:  So if you disobey my rulings and don't
 9     comply --
10              MR. GARLICK:  You're saying your rulings or your
11     rules?
12              THE COURT:  If you interrupt me one more time --
13     please stop interrupting me.
14              I am entitled to rule.  Once I rule, if you decline
15     and do not comply with my ruling, you are running the risk that
16     I am going to say that you cannot represent yourself.
17              MR. GARLICK:  Objection.  You have no authority to do
18     that.  I mean, you can use another threat, because you don't
19     have no authority to say that I can't represent myself, so try
20     something else.
21              THE COURT:  Try it and watch.
22              MR. GARLICK:  Excuse me, is that a threat?
23              THE COURT:  No.  What I am telling you is, if you do
24     not obey my rulings, your choice will be to change seats and
25     allow them to represent you --
```

N66Ggar2

1          MR. GARLICK:  It's never going to happen.

2          THE COURT:  -- or sit there quietly -- that seems

3     unlikely to happen.

4          MR. GARLICK:  Definitely not going to happen.

5          THE COURT:  Or go to the pen and watch your trial from

6     the pen.

7          MR. GARLICK:  I object to all of those.

8          THE COURT:  I understand that.

9          But here is the thing, your objection will not carry

10    the day if you violate my rules.

11         MR. GARLICK:  Okay.

12         THE COURT:  Okay.

13         MR. GARLICK:  If you say so.  I don't agree, consent.

14         THE COURT:  You don't have to consent.

15         MR. GARLICK:  I object to you saying that I have to

16    follow your rules.  As far as your rulings, that's another

17    story.  But unless you furnish me with your own personal rules

18    of the Court, your rules, I'm not abiding to any of those.

19         THE COURT:  So let's disengage with this issue.

20         And I'm doing this because he's pro se -- excuse me,

21    he is representing himself.

22         MR. GARLICK:  All the paperwork that you gave me say

23    pro se.  I'm not representing myself pro se.  I'm representing

24    myself pro per.  So can you please correct all the paperwork

25    that you have given me that says pro se.

N66Ggar2

```
1              THE COURT:  No.

2              MR. GARLICK:  Then it's a misrepresentation of who I

3   am.

4              THE COURT:  Had Mr. Garlick made a motion to suppress

5   for the seizure of the minibike, what would the government's

6   evidence have been in terms of why, what the legal basis for

7   seizing the bike was?  Do you know, or because that ship

8   sailed, you don't know?

9              MR. SOWLATI:  Your Honor, our understanding is that

10  the bike that is electric, that it weighs over 100 pounds has

11  to be registered and insured.  That's the law within New York.

12  I don't have the particular law.

13             THE COURT:  Statute in front of you.

14             MR. GARLICK:  Statute in front of me, but that is my

15  understanding.

16             THE COURT:  I don't think that answers it.

17             MR. GARLICK:  You're not going to find it anywhere,

18  trust me.  I have looked.

19             THE COURT:  If you have --

20             MR. GARLICK:  I will give you a copy.

21             THE COURT:  Mr. Garlick, this is one where I'm doing

22  what I can to assist what you want to know.  So if you will let

23  me do my job, then I will turn and let you do yours.  Okay?

24             MR. GARLICK:  Thank you.

25             Can you assist me in finding out what jurisdiction I'm
```

N66Ggar2

1    in while you're doing this?

2              THE COURT:  I'm not going to let you go into this any

3    further on your cross-examination.  But what I want to task the

4    government with is whether, one, the 100-pound limit is

5    actually in either a New York City law or a New York State

6    law -- I'm not sure which governs -- or second, whether the

7    100 pounds is sort of a stand in, which is maybe easier for the

8    police on the ground to operate with it, that is, a bike that

9    weighs more than a hundred pounds is in all likelihood going to

10   be able to go faster than 20 miles an hour, and therefore, it

11   has to be registered, but in their head, they're calling it a

12   weight limit, rather than a speed limit, because a weight limit

13   can be evaluated by looking at the bike, rather than getting on

14   the bike and going vroom, vroom.  I don't know the answer.

15             The point is, just to be clear, there was no motion to

16   suppress, and therefore, the issue of the legality of the

17   seizure of the scooter is not at issue in this trial.  But it

18   seems to be a burr under Mr. Garlick's sow.  So I would like to

19   be able to respond to that issue.  So if over lunch you can

20   figure that out, we can talk about it when the jury is not in

21   the box.

22             MR. SOWLATI:  We can do that, your Honor.

23             One thing I also want to note is he was also not

24   wearing a helmet at the time, which is a traffic violation.

25             THE COURT:  Would that give rise -- he didn't have a

N66Ggar2

1    helmet, so that would be a reason to seize the bike?

2             MR. GARLICK:  No, there's no laws governing that.

3             MR. SOWLATI:  At least to stop him, your Honor.

4             MR. GARLICK:  The only thing you can do for that is a

5    summons.

6             THE COURT:  Mr. Garlick, all of these require helmets.

7             MR. GARLICK:  I am not disputing the helmet.  That's

8    irrelevant.  I wasn't given a ticket for a helmet.

9             I was given a ticket for an unregistered motor

10   vehicle.  The bike does not have a motor and is not considered

11   a motor vehicle by DMV.

12            THE COURT:  Mr. Garlick, you and I are simply going to

13   have to agree to disagree on this.

14            MR. GARLICK:  In all likelihood, ma'am, I will agree

15   with that.  I will say for the officer and for the jury you are

16   saying I cannot go on with these questions.

17            THE COURT:  Correct.

18            MR. GARLICK:  I just want to say, because of that, he

19   violated my Fourth Amendment rights, because there's no law

20   governing e-bikes.

21            THE COURT:  What I'm saying is, I'm going to

22   essentially not allow you to make that argument to the jury

23   because it's not a correct -- procedurally, where we are, you

24   can't make that argument.  Be that as it may, what I would like

25   to do is to proceed with Officer Dempsey.  This issue is off

N66Ggar2

1    the table.  We will discuss it further at lunch.  You can't

2    cross-examine him on what New York Law on registration of

3    e-bikes is.

4        MR. GARLICK:  I don't see how that's -- I don't

5    understand how that's --

6        THE COURT:  Do you have other lines of questioning

7    that you want to pursue?

8        MR. GARLICK:  I don't understand.  I don't understand.

9    I don't understand if he, on the record, has already said that

10   he's an officer of the law, that means that he knows laws, I

11   don't understand, this is -- this is why I'm confused.  And

12   you're saying that I'm trying to be manipulative and all of

13   this stuff, when I'm actually not.  I'm asking for clarity,

14   because I'm giving you the laws and you are trying to make me

15   interpret them, which is more favorable to you.  I don't

16   understand how the law works like that.  So what I'm asking is,

17   I have done my research -- I mean, they knew that they were

18   bringing this -- I've been going to trial since December, they

19   knew that all of this was going to happen.  I don't understand

20   how the prosecution at this point in the juncture don't know if

21   this was a law for him to legally seize my bike.  I don't

22   understand.

23       And that goes to show that if there is no law for them

24   to seize my bike, which there isn't, that means that this is an

25   illegal search and that all proceedings after the illegal

N66Ggar2

1    search are fruit of the poisonous tree.  So I don't understand

2    how you are going to say that it's irrelevant to the fact that

3    whether he knew what a moped was, what a motorcycle was, it's

4    irrelevant, that he knew the actual law that says that the bike

5    has to be registered over a hundred pounds, when they have a

6    guy in their office that says that these bikes don't have to be

7    registered.  I don't know how you are trying to say that an

8    e-bike can be classified as a moped, when it clearly says in

9    the dictionary that mopeds have engines.

10           So I'm confused about what law and which strategy they

11   are trying to use to bring the case into court, because if you

12   think this is the worst issue that I'm going to bring up about

13   this, this is the least of your worries, you know what I'm

14   saying.  I'm trying to establish something now to show you

15   later that you actually are not governed on any laws.

16           The first law I'm bringing up is where is the law that

17   says these bikes have to be registered.  They have a whole

18   section that says not legal, immobility devices.  They don't

19   have a section that says illegal e-bikes, illegal mopeds.

20   Because this is the thing, this is the thing that they was

21   going off of.  Where is my bike in this scenario is my

22   question.  So even if it says required by law that I'm supposed

23   to wear a helmet, so you're saying that gives you the right to

24   seize my property without a search warrant?

25           THE COURT:  Do you have another line of inquiry that

N66Ggar2

1    you want to pursue with Officer Dempsey?

2                MR. GARLICK:  Yes, I have a whole bunch of lines of

3    inquiry.

4                THE COURT:  Well, then you need to move on to other

5    lines of inquiry.

6                Let's get the jury out.  Let's get the witness back on

7    the stand.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N66Ggar2                            Dempsey – Cross

1                (In open court; jury present)

2                THE COURT:  Officer Dempsey, you are still under oath.

3                Mr. Garlick.

4                MR. GARLICK:  Unfortunately, I have to move on, but I

5      would just like to state for the record that --

6                THE COURT:  Mr. Garlick, don't do that.

7                MR. GARLICK:  I would like to state for the record

8      that my First Amendment rights of free speech is being

9      infringed upon.

10               THE COURT:  Mr. Garlick, please proceed with your

11     questioning.

12               MR. GARLICK:  I'm trying to, but you're saying I can't

13     ask the questions that I want to ask, so I'm letting the jury

14     know that I'm being forced to move on from asking these

15     questions for some unknown reason.  Why, I don't understand.

16               THE COURT:  Please proceed.

17               MR. GARLICK:  I want to put for the record that,

18     during this stop, I feel that you violated my Fourth Amendment

19     rights at the stop.  They're saying that's irrelevant, but I'm

20     saying for the record, I know where you got your -- as an

21     officer of the law --

22               THE COURT:  Please disregard Mr. Garlick's statements.

23               Mr. Garlick, ask a question.

24     BY MR. GARLICK:

25     Q.  You said that these checkpoints was an operation.  Did they

 1  give you any material pertaining to how many bikes you were

 2  supposed to stop, what to look for?  Did they give you anything

 3  other than your own knowledge to say what was supposed to

 4  happen during this checkpoint?

 5  A.  As I stated before, we were stopping every moped, gas or

 6  electric, that came towards us.  So if you are asking for a

 7  physical copy or something that was handed out, no, I was not

 8  given anything.

 9  Q.  You said that you stopped two people that night; is that

10  correct?

11  A.  Correct.

12  Q.  You said that the first stop, she had all the legal

13  paperwork; correct?

14  A.  Correct.

15  Q.  Do you remember what kind of bike she was riding?

16  A.  I do not recall, no.

17  Q.  Do you remember what kind of papers she had, the legal

18  documents you said that she had?

19  A.  I do not recall, no.

20  Q.  You said that I was upset that night.  Why do you think I

21  was upset?

22  A.  At what portion during the stop you are asking?

23  Q.  You said in your statement just now and in your interview

24  with Federal Agent Tom Ford that I seemed frustrated, that I

25  was upset.

N66Ggar2                          Dempsey - Cross

1     A.   Mm-hmm.

2     Q.   I'm asking, what reason would I be upset?

3             THE COURT:  You are asking why did he think you were

4     upset?

5             MR. GARLICK:  Yes.

6             THE WITNESS:  Why did I believe you were upset?  I

7     stated that we were taking your moped.

8     BY MR. GARLICK:

9     Q.   Thank you.

10            You said I was continuously putting things in and

11    taking things out, but according to the video -- excuse me --

12    you said I was rummaging through the top compartment, but

13    according to the video, if we would like to put it back up --

14            MR. GARLICK:  Can we put it back up, please, his body

15    cam video.

16            THE COURT:  What's the exhibit number, please?

17            MS. GUTIERREZ:  301.

18            THE COURT:  Do you have a particular time reference,

19    Mr. Garlick?

20            MR. GARLICK:  1:16 through 1:38.

21            (Media played)

22    BY MR. GARLICK:

23    Q.   Once again, you refer to this as a motorcycle, technically;

24    is that correct?

25    A.   That's what I stated.

N66Ggar2                          Dempsey – Cross

1    Q.  But upon closer review, you would technically say that it's

2    an e-bike?

3    A.  An electric moped.  It's not an e-bike.

4    Q.  You asked me for identification, and I said yes, I

5    immediately opened the compartment and took out my ID and

6    handed it to you; is that correct?

7    A.  Yes.

8    Q.  During the time this compartment was opened, are you

9    standing within close proximity of me and this bike?

10   A.  Yes.

11   Q.  While I was going through this bike, did I give you any

12   indication that I had anything to hide from you while I was

13   going through this bike?

14   A.  No, you did not.

15   Q.  Did I cooperate fully with you and all the questions you

16   asked; got off the bike, didn't try to flee at any point, to

17   your knowledge?

18   A.  Yes, you did.

19          MR. GARLICK:  Can you go to 301, 12:39 through 12:42.

20          (Media played)

21   BY MR. GARLICK:

22   Q.  Now, once again, when you came back, the compartment is

23   open, as you can see in this video, the flap is still open; is

24   that correct?

25   A.  Yes, it's open.

N66Ggar2                        Dempsey - Cross

1    Q.  Who was the gentleman standing next to me on my -- from

2    this, it would be my right -- it would be my left?

3    A.  That is Officer Shakoor.

4    Q.  And who is the woman standing in the street there?

5    A.  That's Officer Cosma.

6    Q.  So while you were gone, I guess that was the point where

7    Officer Pierce came and gave you a water gun or whatever it was

8    to put into the back of your jeep, these officers were still

9    there, and as you are coming up, you see that the compartment

10   was still open; is that correct?

11   A.  Yes.

12   Q.  The compartment remains open most of the time that this

13   search is going on, would you say that's correct?

14   A.  Yes.

15   Q.  You said -- you are saying that it was dark outside and

16   that you all weren't able to see in the compartment, but

17   judging by this video, it seems the area is very much

18   illuminated; would you agree or disagree?

19   A.  Is it illuminated, yes.  It is illuminated, yes.

20          MR. GARLICK:  Can you please go to 301 starting at

21   15:58 through 16:02.

22          (Media played)

23          MR. GARLICK:  Can you go back to 15:58 one more time,

24   please.

25          (Media played)

N66Ggar2                          Dempsey - Cross

BY MR. GARLICK:

Q.  Would you say that the compartment to this bike is also

open again?

A.  Yes.

Q.  So from this perspective, you are standing in front of me,

Officer Shakoor is on my left and Officer Cosma was standing on

the side writing the ticket; is that correct?

A.  Yes.

Q.  Would you say that I left the compartment open, judging by

this video, while talking to you?

A.  Yes, it is open.

Q.  My question to you is:  You said that y'all was stopping

all bikes because there was an uptick in unregistered e-bikes,

mopeds and motorcycles; is that correct?

A.  I'm sorry.

Q.  You said there was an uptick in unregistered e-bikes, motor

scooters and the like, that's why you were stopping everybody's

bikes to check for registrations; is that correct?

A.  No.

Q.  That's not correct?

A.  No.

Q.  Well, according to your Federal Bureau of Investigation, in

your interview with Mr. Tom Ford and NYPD Detective Michael --

do you know who those people are?

A.  Yes.

N66Ggar2                    Dempsey - Cross

1   Q.  Do you recall having an interview with them?

2   A.  Yes.

3   Q.  And your interview was in person or was it by phone?

4   A.  Which date was it?  Some of them were over the phone and

5   some of them were in person.

6   Q.  The one I'm referring to is 305101.  The date was on

7   9/16/2002, and it says that it was over the phone.

8           According to this draft by Mr. Thomas Ford, you said

9   that on the night of August 27th, 2022, the 44th Precinct was

10  executing an operation led by Captain Pierce, the XO.  What is

11  an XO?

12  A.  Executive officer.

13          MR. SOWLATI:  Objection, your Honor.

14          THE COURT:  Sustained as to the form of the question.

15          That question was fine; what is an XO.

16          What's an XO?

17          THE WITNESS:  Executive officer.

18          THE COURT:  That question was fine.

19  BY MR. GARLICK:

20  Q.  It says, after you was advised of the identity of --

21          MR. SOWLATI:  Objection.

22          THE COURT:  Sustained.

23          You can't read from the document.  If you want to put

24  the document in front of him to refresh his recollection.

25          MR. GARLICK:  May I.

1          THE COURT:  Give it to Angela.  She'll give it to the
2   witness.
3          So the question is asking whether this is refreshing
4   your recollection that there was an uptick in unregistered
5   mopeds and electric bikes that led to the checkpoint.  Is that
6   correct?
7          MR. GARLICK:  Yes, your Honor.
8          THE COURT:  Re-ask your question, Mr. Garlick.
9   BY MR. GARLICK:
10  Q.  Does it refresh your memory, now, officer?
11  A.  Yes, yes.
12  Q.  So my next question to you is:  Were those the only reasons
13  that you were notified or refresh your memory that you were
14  stopping these bikes?
15  A.  No.  So in regards to what you showed me, the uptick I was
16  talking about was an uptick in violence on mopeds.  For
17  example, when the gas and electric moped isn't registered,
18  whatever the case may be, at the time, we were facing a serious
19  problem in the confines of the 44th Precinct of robberies that
20  were occurring on individuals on mopeds, okay.  So what I'm
21  saying is at that time there was a pattern in the 44th Precinct
22  where individuals would hop off of the moped, robberies with
23  firearms, grand larcenies, purse snatching, whatever the case
24  may be, get back on the mopeds, flee the location.  Those
25  mopeds that are unregistered, we have no way of tracking them.

N66Ggar2                    Dempsey - Cross

1   There's no way to distinguish who that moped belongs.  So the
2   uptick I'm talking about was the uptick in violence on mopeds.
3   Q.  Thank you.
4         So prior to you being an NYPD officer, what did you
5   do?
6   A.  I was a security guard.
7   Q.  So would you say that you have extensive knowledge in like
8   securing things, making sure things check out, things of that
9   nature, as far as your ability to secure stuff -- I guess
10  that's what security in NYPD, they make sure that everything is
11  secure as far as the --
12        MR. SOWLATI:  Objection, your Honor.
13        THE COURT:  Sustained as to the form of the question.
14        Rephrase the question.  I'm not sure what you were
15  asking.
16  BY MR. GARLICK:
17  Q.  What were your duties as a security guard?
18  A.  It was multiple, we would -- you know, multiple things,
19  depending on where you worked and the environments, if you come
20  in -- the patient comes in, there were four people, you are
21  only allowed one person to the room.  When visiting hours are
22  over, you have to clear visitors out of the hospital, exit the
23  building, things like that.
24  Q.  Would you say that these skills that you learned as a
25  security guard carried over into why you wanted to be an NYPD

1    officer?

2    A.   Why I wanted to be a police officer?

3    Q.   What I'm saying is the skills that you learned as a

4    security guard, do you think they carried over into your new

5    career as an NYPD officer?

6    A.   I guess you could say that, yes.

7    Q.   So you just said that the reason, other than stopping these

8    unregistered motor vehicles, as you classified them, is also

9    because there was an uptick in violence in the community; is

10   that correct?

11   A.   You are asking me was that the reason for the checkpoint?

12   Q.   You just stated that, besides the reason that you stopped

13   these bikes, is that the community itself around the 44th

14   Precinct was being crime ridden with violence, robberies coming

15   off these mopeds, scooters, things of that nature; is that

16   correct?

17   A.   Correct.

18   Q.   So my question to you is:  If you are stopping these motor

19   vehicles with that knowledge, wouldn't, in your expert --

20   wouldn't, in your own knowledge of these things that's

21   happening in the community, wouldn't your first thing to be

22   when somebody is getting off these bikes, looking in the

23   compartment, rummaging around, wouldn't it be in your best

24   interest for your safety and the safety of others to be looking

25   at what's going on?

N66Ggar2                          Dempsey - Cross

1    A.  Yes, that would make sense.  But at the time of your stop,

2    everything that you took out of the moped, I would be able to

3    see, so I'm not directly looking into your belongings.  Every

4    item you would have taken out of the moped, I would have seen

5    in my line of sight.  There was no reason to stand over in

6    front of the compartment to see what was inside.

7    Q.  So you are saying that you trusted my judgment as far as

8    being a citizen that nothing was out of the ordinary as far as

9    you stopping me on this moped, as far as that I wasn't being --

10   I didn't seem to be fleeing from the scene of a crime, I didn't

11   seem to be on my way to the scene of a crime, I gave you no

12   indication the -- where you felt comfortable where as you're

13   saying you didn't look in this bike to feel that I was not a

14   threat?

15            THE COURT:  Do you understand the question?

16            THE WITNESS:  Kind of.

17            THE COURT:  Sometimes, Mr. Garlick, a short, direct

18   question is easier to understand.

19   BY MR. GARLICK:

20   Q.  When you pulled me off of this motorcycle, did I perceive

21   to be a threat?

22            THE COURT:  Did he perceive you to be a threat?

23            MR. GARLICK:  Yes.

24            THE WITNESS:  No.

25   BY MR. GARLICK:

N66Ggar2                    Dempsey - Cross

1   Q.  So you are saying that because I didn't perceive you to

2   be -- because I didn't perceive to be a threat, that you lacked

3   on your training as far as to observe what was going on at the

4   time of the search?

5   A.  At the time of what search?

6   Q.  The time that you were searching my -- I keep saying

7   search, my apologies -- at the time of the traffic stop.

8   A.  Uh-huh.

9   Q.  You are saying that I made you so relaxed that you

10  neglected your training, as far as to be observant of the

11  things that I was doing?

12  A.  No.  I observed everything that you were doing.  As you

13  could see at the time, there was heavy traffic.  As an officer,

14  you are trained to keep your head on a swivel, so I was not

15  directly looking at you, focusing on you.  There was still

16  traffic to our left and to our right.  So as I'm saying,

17  obviously, from my training is I'm watching you as well as I'm

18  watching everyone that's going on around me.  As I stated

19  before, anything that you would have taken out of that

20  compartment, I would have seen you take out of that

21  compartment.

22  Q.  Did you see a black rag?

23  A.  It had --

24  Q.  When I was removing these items from the compartment, did

25  you see a black rag?

N66Ggar2                      Dempsey - Cross

1    A.  No.

2    Q.  When I was removing these items out of the compartment, did

3    you see a gun?

4    A.  No.

5              MR. GARLICK:  Can you go to 16:17 on the GX 301 again,

6    please, through 16:40.

7              THE COURT:  You asked did he see a black rag, then you

8    asked did he see something else.  What was the second thing you

9    said?

10             MR. GARLICK:  Firearm.

11             THE COURT:  Did you see a gun?

12   BY MR. GARLICK:

13   Q.  Did you see a firearm?

14   A.  No.

15             MR. GARLICK:  16:17 through 16:40.

16             (Media played)

17   BY MR. GARLICK:

18   Q.  In this video that we just watched, was the compartment

19   open again?

20   A.  Yes.

21   Q.  Who was this man in the white shirt that came up?

22   A.  Captain Pierce.

23   Q.  Was I obscuring your view of the compartment in any way

24   during this traffic stop, from your knowledge of the events

25   that happened, from your recollection, did I ever obstruct your

N66Ggar2                          Dempsey - Cross

1   view and try to cover it or anything from you physically seeing

2   in inside of this compartment?

3   A.  No.

4           MR. GARLICK:  So I would just like to say for the

5   record that, as you can see --

6           THE COURT:  You can't do that.

7           MR. GARLICK:  I can't?

8           THE COURT:  You can only ask questions when we have a

9   witness on the stand.

10          MR. GARLICK:  I'm sorry.

11          THE COURT:  You'll have an opportunity to say things

12  in your summation.

13          MR. GARLICK:  Can you please go to -- well, I have a

14  question.

15          I was asked to --

16          THE COURT:  You have a question for him or for me?

17          MR. GARLICK:  For the Court.

18          THE COURT:  So you have to ask for a sidebar.

19          MR. GARLICK:  Can I have a sidebar, please.

20          THE COURT:  No.

21          We'll break for lunch in a little bit.  So just hold

22  that thought until after this.

23          Do you need the answer to the question to ask your

24  next question?

25          MR. GARLICK:  Yes.

1          THE COURT:  Let's take a short sidebar.

2          (Continued on next page)

1          (At sidebar)

2          THE COURT:  What's the question?

3          MR. GARLICK:  I have exhibits I would like to submit.

4    I have copies.  How does that work?  Do I give them -- am I,

5    one, allowed to do that and -- am I allowed to do that?

6          THE COURT:  You are.  So the way you need to do it,

7    you say you have an exhibit, you will give it to Angela, Angela

8    will give it to the witness.

9          Do you have extra copies?

10         MR. GARLICK:  Yes, two extra copies; one for the

11   witness.

12         THE COURT:  You have two?

13         MR. GARLICK:  Yes.

14         THE COURT:  One for the witness, one for me -- we will

15   need three.  I will share with the witness.  Give the second

16   one to the government so the government knows what you are

17   doing.

18         Give me a hint, what are the documents?

19         MR. GARLICK:  Still forms from the body cam footage.

20         THE COURT:  Those are in evidence, aren't they?

21         MS. LENOX:  Specific still shots, as opposed to the

22   video itself.

23         THE COURT:  Give a copy to the government.  I'll look

24   at the witness'.

25         You need to hand it to him, ask him if he knows what

N66Ggar2                          Dempsey – Cross

1    it is, get him to identify it, and then move it into evidence.

2              (Continued on next page)

N66Ggar2                    Dempsey – Cross

<pre>
 1               (In open court; jury present)
 2               MR. GARLICK:  I have a document I would like to give
 3     to the witness, if possible.
 4               THE COURT:  If you will hand it to Ms. Caliendo, and
 5     if you could give a copy to the government, please.
 6               Do you have a number on it?
 7               MR. GARLICK:  Yes.
 8               THE COURT:  Defense what?
 9               MR. GARLICK:  A2 GX 302 at --
10               THE COURT:  We need a better identifier than that.
11               MR. GARLICK:  A2 GX 302.
12               THE COURT:  Just A2.  So this is going to be defense
13     Exhibit A2.
14               You need to ask him what it is.
15     BY MR. GARLICK:
16     Q.  Officer Dempsey, can you see the image in front of you?
17     A.  Yes.
18     Q.  It is a still shot from a body worn camera on August 27,
19     2020, do you recognize yourself in the picture?
20     A.  Yes.
21     Q.  Is it a fair and accurate representation of the moment of
22     when you stopped me on August 27th, 2020 -- 2022?
23     A.  That's a moment during the stop, yes.
24               MR. GARLICK:  I would ask that Exhibit A2 be entered
25     into evidence.
</pre>

1          MR. SOWLATI:  No objection.

2          THE COURT:  Defense Exhibit A2 is received.

3          (Defendant's Exhibit A2 received in evidence)

4          MR. GARLICK:  Can you please publish defense

5     Exhibit A2 to the jury.

6          THE COURT:  You are going to have to tell me exactly

7     what moment it is to show the still from the video to the jury.

8          MR. GARLICK:  11:55 on GX 302.

9          THE COURT:  Tell me again the timing, 11:52 is that

10    what you said?

11         MR. GARLICK:  11:55.

12         Excuse me, the time is at the right top corner of the

13    exhibit.

14         THE COURT:  It's on their screens.

15    BY MR. GARLICK:

16    Q.  Please take a look at this exhibit.

17         Am I the individual wearing the hat on the right side

18    of the picture?

19    A.  Yes.

20    Q.  Is that you standing in front of me?

21    A.  Yes.

22    Q.  Holding a notebook?

23    A.  It's not a -- yes.

24    Q.  I'm sorry --

25    A.  Yes, it is.

N66Ggar2                          Dempsey - Cross

1    Q.  It kind of looks like a notebook, technically.

2            That is the top of the console right by my arm, right

3    next to my arm; is that correct?

4    A.  Yes.

5    Q.  I'm reaching inside the bike; is that correct?

6    A.  Yes.

7    Q.  And you are standing right next to me as I reach into this

8    bike; is that correct?

9    A.  Yes.

10   Q.  Looking down; is that correct?

11   A.  I'm looking down.

12           Can I give you context as to what I'm looking at?

13           THE COURT:  You can do that on redirect.

14   A.  Yes, I'm looking down.

15   Q.  Is that Officer Cosma that you are next to?

16   A.  Yes.

17   Q.  She's also looking down as well, would you say that's a

18   fact, towards the bike?

19   A.  Can I say she's looking down as a fact, is that your

20   question?

21   Q.  From your opinion of the still shot, is she looking down?

22           THE COURT:  He can't give an opinion.

23   Q.  Well, is she looking down or not?

24   A.  No, to me, it does not look like she's looking down.  It

25   looks like she's looking at your face, from this picture,

1   that's what it looks like.

2   Q.  But the console is still wide open, would you say, from

3   this picture?

4   A.  Yes.

5          MR. GARLICK:  We can take the picture down.

6   Q.  During this stop, we interacted; is that correct?  You

7   asked me questions, things of that nature, took my ID, wrote

8   stuff down?

9   A.  Yes.

10  Q.  In your interaction with me, how would you say my persona

11  was while you was interacting with me?  How -- when we were

12  interacting, what type of vibe would you say I was giving; was

13  I polite, was I aggressive, did I want to cooperate, from my --

14  how was I toward you?

15  A.  I thought you were polite when I stopped you.  Once I

16  explained the reason for the stop, you were reluctant to give

17  me the key to the bike, you were frustrated, you made comments

18  that indicated you were upset or angry, so I feel like you kind

19  of changed during the stop when you found out we were taking

20  the moped.

21  Q.  I stood with you for approximately how long, would you say?

22  Do you remember?

23  A.  Approximately 18 minutes, I believe it was, 17 minutes.

24  Q.  Did I ever try to run away?

25  A.  No.

N66Ggar2                     Dempsey - Cross

1    Q.  You said that it was weird that I took the battery out and

2    put it in?  Which actually wasn't the battery --

3              THE COURT:  Don't testify.

4    Q.  You said it was weird that I was taking the things out of

5    the bike.  Why would you consider that weird?

6    A.  Because you put the items back inside the console.

7    Q.  Would you say that -- let's go back.  When we first

8    initially -- when I first initially got stopped by you, do you

9    recall what you said to me before your body cam was turned on?

10   I don't even know if it was turned off or on or not, but we had

11   a conversation before we actually went into the process.  Do

12   you remember what that was?

13   A.  Conversation prior --

14   Q.  From my recollection -- can't do that.

15             THE COURT:  Sustained.

16             MR. GARLICK:  All right.

17             THE COURT:  Your question was fine.

18             The question is:  Do you remember the conversation you

19   had with Mr. Garlick immediately when you stopped him?

20             THE WITNESS:  No, I don't believe we had any

21   interaction when you were stopped from me until my camera was

22   live.

23             MR. GARLICK:  He said, from his angle, he could not

24   see into the scooter compartment, I'm asking him if that's

25   correct.

N66Ggar2                          Dempsey - Cross

1              THE WITNESS:  Correct, yes.

2    BY MR. GARLICK:

3    Q.  So once again, as far as your training as a security guard

4    and an NYPD officer stopping bikes because of the uptick in

5    violence in unregistered motor vehicles, you didn't feel that

6    it was in your best interest to get a better looked in the bike

7    as I'm rummaging through it, as you say?

8    A.  No.  As I said, anything you would have taken out of the

9    bike, I would have seen myself.

10   Q.  You also said that it was dark outside.  Do you have a

11   department issued flashlight?

12   A.  Yes.

13   Q.  You indicated you shined the light on the firearm at -- you

14   didn't use your flashlight to illuminate the compartment; is

15   that correct?

16              THE COURT:  At the traffic stop?

17   Q.  At the traffic stop?

18   A.  No.

19   Q.  At the traffic stop, you never looked inside the

20   compartment as you stood next to it; is that correct?

21   A.  Correct.

22              THE COURT:  That's been asked and answered several

23   times, Mr. Garlick.  You have well established he did not look

24   into the compartment.

25              MR. GARLICK:  Yeah, but I don't know --

N66Ggar2                          Dempsey - Cross

1    BY MR. GARLICK:

2    Q.  You did not pat me down during this traffic stop; is that

3    right?

4    A.  No, I did not.

5    Q.  You did not have a weapon -- you did not think that there

6    was a weapon in the compartment at the time of the stop or did

7    you?  At the time of the traffic stop, were you aware of a

8    firearm or did you have any reason to think that there was a

9    firearm in that compartment based on the interactions that we

10   was having?

11   A.  No.

12           MR. GARLICK:  Can you please put up GX 301.

13           THE COURT:  Again, is this a government exhibit?

14           MR. GARLICK:  Yes.

15           THE COURT:  Government Exhibit what?

16           MR. GARLICK:  GX 301 from :37 through :41.

17           (Media played)

18   BY MR. GARLICK:

19   Q.  Officer Dempsey, is this your body cam footage from the

20   traffic stop from the night in question?

21   A.  Yes.

22   Q.  Is that Officer Ali Shakoor that flagged me down, that

23   stopped me?

24   A.  Yes.

25   Q.  From viewing this video of the traffic stop, would it be

1    safe to say that I was already past the point of the traffic
2    stop?  Like what I'm saying is that, from this video, it was
3    seen that I was already past the checkpoint at some point as to
4    where I could have kept going if I chose to; would you say that
5    was an accurate depiction of what we're seeing here?
6    A.   I don't know how far -- if there's traffic in front of you.
7    I can't say -- the checkpoint is at the location.  It's not
8    like we can only go 5 feet left, back, forward, right.  It's
9    not like there's a line and if you cross this line you're not
10   going to get stopped, that's not how it works.
11   Q.   I'm glad you said that.
12            MR. GARLICK:  Can you go back to :37, please.
13            (Media played)
14   BY MR. GARLICK:
15   Q.   From this view, you can now obviously see the traffic, from
16   this view, could you basically say there was nothing to obscure
17   my way if I chose to keep going?
18   A.   No, I can't say that.  I can't tell -- there's two cars in
19   front of you.  I can't see --
20   Q.   But I did stop?
21   A.   Correct.
22   Q.   I complied with all of the directions, as far as from your
23   knowledge, that you was giving me at the traffic stop?
24   A.   Yes.
25   Q.   Thank you.

N66Ggar2                          Dempsey - Cross

1          During this traffic stop, for some reason, you ran off

2     from the initial traffic stop that was pertaining to me, can

3     you repeat why that was?

4     A.  Yes, so there was a block before where we were located,

5     there was a separate -- they were doing a checkpoint, other

6     officers doing a checkpoint there, they attempted to stop a

7     moped; the moped crashed and one of the defendants took off on

8     foot.

9          MR. GARLICK:  Can you please put up GX 301 from 18:32

10    through 18:37.

11          (Media played)

12    BY MR. GARLICK:

13    Q.  Is this the moment that the individual ran from the traffic

14    stop on the other side that you said the officers was

15    conducting on the block?

16    A.  He crashed a block before and ran from there.

17    Q.  But this is when you seen him running?  In this video, at

18    one point, did you see this individual fleeing from the

19    checkpoint?

20    A.  From the moment of the crash, I heard the crash, looked

21    behind me, and then I saw him take off on foot.

22    Q.  And you chased him, obviously?

23    A.  Correct.

24    Q.  The person that was riding the motor scooter, do you

25    remember what kind of motor scooter it was, gas or electric?

N66Ggar2                         Dempsey - Cross

1    A.  I do not recall, no.

2    Q.  The man got off the motor scooter and continued running

3    after you had told him to stop; is that correct?  Did you ever

4    tell the individual running to stop, did you identify yourself

5    as a police officer as you were chasing him?

6    A.  I believe I told him to stop.  I don't know if I stated I

7    was a police officer, but I believe I told him to stop while I

8    was running.

9    Q.  Did he stop?

10   A.  Eventually.

11   Q.  Did he stop at the moment you told him to stop?

12   A.  I don't recall what moment I said to stop, but I know it

13   was a foot pursuit.

14   Q.  After the chase, did you end up arresting this individual?

15   A.  Yes.

16           MR. GARLICK:  Give me one minute, I'm sorry.  I'm

17   taking up a lot of your time, I apologize.

18   BY MR. GARLICK:

19   Q.  You said that, after the chase and the arrest of this

20   individual, you stayed back at the precinct; is that correct?

21   A.  Yes.

22   Q.  Do you know where the key -- did you have the keys to my

23   bike at this moment?

24   A.  No.

25   Q.  You said in your statement earlier that, as a general

1    practice, that the person who makes the stop keeps the keys; is

2    that correct?

3    A.   Depending on the situation, yes, that's how I do it.

4    There's no policy or procedure given by the NYPD as to, you

5    know, like -- there's no set in stone way to do it.

6    Personally, that's how I do it and the people on my team,

7    that's how we do it.

8    Q.   Did you instruct the people on your team at this particular

9    traffic stop, this day to keep the keys with them, as far as

10   that you said the person who does the summons, did you instruct

11   them to keep the keys to each of the bikes?

12   A.   At the time of the stop?

13   Q.   You said that this was -- you basically was training two

14   new officers, so I'm asking, as part of them being new to the

15   scene and you're there to coach them, did you coach them to

16   say, when you write the summons and you voucher this property

17   that you are supposed to keep the keys?

18   A.   No.  I was only involved in the two stops, so what I would

19   say is if I was involved in multiple stops, that's how I would

20   have done it.  But because I was only involved in the two

21   stops, I didn't give guidance as to who is going to keep what.

22   Q.   You said that the precinct is 10 to 11 blocks away from the

23   checkpoint?

24   A.   Approximately, yes.

25   Q.   And then back to the question about the keys, it would make

1    the most sense that the person who does the vouchers or who

2    does the summonses would keep possession of the keys, from what

3    you just said, that would make the most sense, but it's not

4    always what you said, but for the most sensible factors, the

5    person who writes the summons keeps the keys?

6    A.  That's how I do it.  So to me, that makes the most sense.

7    Q.  Now, it was also noted that the officer -- that officer who

8    takes the bike back is not necessarily the officer who stopped

9    the bike; is that correct?  Like there's -- you stated that the

10   bikes are either driven or put on a truck?

11   A.  Mm-hmm.

12   Q.  So I'm saying that the officer who stops the bike is not

13   necessarily the person who takes the bike back to the precinct?

14   A.  Correct.

15   Q.  Do you know how this one particular bike actually got back

16   to the precinct since you was already at the precinct?  I'm

17   imagining when these bikes were delivered or dropped offer --

18   let me back up.

19          Were you there when these bikes were driven or dropped

20   off by the truck that's supposed to drop the bikes off?

21   A.  Was I --

22   Q.  Were you already at the precinct?

23   A.  I was at the precinct, yes.

24   Q.  Do you know how this particular bike got back to the

25   precinct?

1    A.   No.

2    Q.   In the beginning, you told me you needed this key so that

3    you can drive my bike back; is that correct?

4    A.   Yes.

5    Q.   Then you said that you wasn't driving the bike back, that

6    it was going to be picked up by a barrier truck; is that

7    correct?

8    A.   Correct.

9    Q.   So you don't actually know if it ever was driven back or if

10   it actually got on the barrier truck?

11   A.   No.  So as you see in the video, my interaction with the

12   bike is done as soon as I take off, once the person -- the

13   separate individual is apprehended, I am back -- we transport

14   back and we're back at the precinct so that was my interaction

15   with the moped.  So no, I don't know how it got back.

16   Q.   Did you have the keys to this particular moped at this

17   time, the bike, whatever?

18   A.   No, no.

19   Q.   I want to talk to you about the inventory search.

20            During this motor bike operation, NYPD seized my

21   motorbike, seized other bikes as well, you said approximately

22   12 to 15 bikes; is that correct?

23   A.   Yes.

24   Q.   They took these bikes back to the precinct; is that

25   correct?

N66Ggar2                          Dempsey - Cross

1    A.  Yes.

2    Q.  Some of these bikes were either ridden back to the precinct

3    or dropped off by this barrier truck; is that correct?

4    A.  Yes.

5    Q.  After the confiscated motor vehicles in question were taken

6    back to the precinct, where exactly in the precinct were they

7    taken?

8    A.  They were taken to the rear station house.

9    Q.  And where is that located?  Is that with the precinct or is

10   that another area from the precinct?

11   A.  No, it's the rear of the precinct, so it's the rear of the

12   building.

13   Q.  After these bikes were uploaded to the precinct, did you

14   immediately begin to search these bikes in question?  Or at

15   some point was there officers coming back and forth from the

16   back of that garage, to your knowledge, dropping off bikes

17   before the final truck came and dropped off these bikes?

18   A.  That, I don't know.  Like I said, I was inside.  So I'm not

19   sure if there were people dropping them off in back or if it

20   was only the truck.  I'm not a hundred percent positive as to

21   that.

22   Q.  The police then begin -- do you know exactly when -- you

23   said the time they started searching these bikes was around

24   2:00 o'clock in the morning; is that correct?

25   A.  Yeah, it's around 2:00 o'clock.

1    Q.   So between the time of my stop and this time, the bike was

2    in your possession for approximately, let's say, four and a

3    half hours after the traffic stop?

4    A.   In my possession?

5    Q.   I mean, in NYPD's possession?

6    A.   Yes.

7    Q.   You said that the search got conducted -- you called this

8    search and inventory search, the search got conducted at a

9    precinct, an inventory search?

10   A.   Correct.

11   Q.   You don't need a search warrant to do that?

12   A.   No.

13   Q.   Why is that?

14   A.   Because anything that's left inside we remove, and then we

15   voucher it under the person's name.  Because when we send it to

16   the pound, the mopeds can't have any contents inside of the

17   moped.

18   Q.   My impression is that unless there is an instance of crime,

19   that you would need consent to open these bikes.

20            MR. SOWLATI:  Objection, your Honor.

21            THE COURT:  Sustained.

22   Q.   Did I ever give you consent to search my bike?

23            MR. SOWLATI:  Objection, your Honor.

24            THE COURT:  Overruled.

25            THE WITNESS:  No.

N66Ggar2                    Dempsey – Cross

1    BY MR. GARLICK:

2    Q.  During this search, you stated that the person that usually

3    does the summons searches the bike, but from your statements,

4    you said that another officer that -- from the videos that we

5    watched, the people that you mentioned -- conducted the search

6    of this bike that wasn't involved with the actual traffic stop;

7    is that correct?

8    A.  I'm sorry, can you repeat the first part of that.

9    Q.  Did the person that searched -- did the person that did the

10   summons inventory search my bike?

11   A.  Like personally, like person -- she was present during the

12   inventory search.  But the person going through the bike itself

13   was not the person that issued the summons.

14   Q.  During the search, you already stated that you weren't

15   wearing your body cam.  Do you know if any other officers had

16   body cams on?

17   A.  No, I don't believe there were any body cameras on at the

18   time.

19   Q.  You also stated that it's procedure for when you are doing

20   these inventory search that it has to be recorded, that the

21   inventory search has to be recorded by a body cam; is that

22   correct?

23   A.  Yes.

24   Q.  So how many people were actually conducting this inventory

25   search?

N66Ggar2                          Dempsey – Cross

1    A.  How many people were conducting the search?

2    Q.  There was 12 different bikes that you got back to the

3    precinct, you all were searching these bikes around

4    2:00 o'clock in the morning, I'm assuming that's initially when

5    the inventory search started.  So from the time that they

6    started the initial inventory search, how many officers -- not

7    just with my bike -- were involved as a total searching

8    these -- inventorying these bikes?

9    A.  I believe there was five of us that were outside during

10   this time.

11   Q.  Do you know if any five of those had their body cams on?

12   A.  No.

13   Q.  Do you know if Officer Cosma had her body cam on -- Cosma,

14   excuse me?

15   A.  No.

16   Q.  Do you know if Officer Pino had his body cam on?

17   A.  No.

18   Q.  Were you present when --

19           THE COURT:  Hold on a second.  No is ambiguous.

20           Do you know they didn't or do you just not know one

21   way or the other?

22           THE WITNESS:  No, they were not on.  No one had a body

23   camera on, no.

24   BY MR. GARLICK:

25   Q.  Did you -- were you involved with the inventory search of

N66Ggar2                    Dempsey - Cross

1    my particular bike?

2    A.  What do you mean by involved?  Like I was present.

3    Q.  Were you around?

4    A.  Yes, I was present, yes.

5    Q.  So there was three officers that knew that they had to have

6    body cams on while they was doing an inventory search, but

7    neither one of you had a body camera search on particularly

8    during the time of the search of my bike; is that correct?

9    A.  That's correct, yes.

10            MR. GARLICK:  Can I have a moment, please.

11            THE COURT:  Yes.

12            (Conferring)

13    BY MR. GARLICK:

14    Q.  You filled out a complaint report worksheet in this case;

15    is that correct?

16    A.  Yes.

17    Q.  Complaint report worksheets have field numbers -- have

18    numbers of fields; is that right?  Field of dates, field of

19    times?

20    A.  Yes.

21    Q.  You filled out this report on August 28th, is that correct,

22    at 2:25 a.m.?

23    A.  Yes.

24    Q.  Other fields on this include field of date, field of date

25    of occurrence, time of occurrence, you indicated the gun was

1    recovered that day at 2:20 a.m.; is that correct?

2              MR. SOWLATI:  Objection, your Honor.

3              THE COURT:  Overruled.

4              THE WITNESS:  Yes.

5    BY MR. GARLICK:

6    Q.  Fie minutes before you filled out these forms; is that

7    correct?

8    A.  Are you asking did I physically write the form at the time?

9    Is that what you are saying?

10   Q.  Well, it says that you physically wrote the form at 2:25 on

11   the --

12   A.  That's the report time and occurrence time, so it's

13   separate.  So it occurred at what time, you know what I'm

14   saying.  That doesn't mean I physically wrote it at that time.

15   The occurrence time and the report time are different.

16   Q.  Is there any kind of incentive, reward, any type of like

17   special -- anything in like, I guess, compensation for

18   recovering firearms?

19   A.  Compensation, no.  There are what's called medals that can

20   be submitted for, but it's not solely for firearms, no.

21   Q.  So after the stop, you had no role in issuing the summons;

22   is that correct?  You were not the person that issued the

23   summons?

24   A.  Correct.

25   Q.  Cosma is the person who issued the summons that you helped

N66Ggar2                         Dempsey - Cross

1    because she was new; correct?

2    A.  Yes.

3    Q.  So safe to say that Officer Cosma is the one who issued the

4    summons?  She's getting credit for issuing the summons?  She's

5    the one who --

6    A.  Issued the summons, correct.

7              THE COURT:  You all can't talk over top of each other.

8              She issued the summons; is that --

9              THE WITNESS:  Yes.

10              THE COURT:  -- correct.

11              THE WITNESS:  Yes.

12              THE COURT:  Okay.

13    BY MR. GARLICK:

14    Q.  From your recollection, who was the person who discovered

15    this firearm?

16    A.  Officer Pino.

17    Q.  So Officer Pino found the gun?

18    A.  Correct.

19    Q.  But you took credit for the arrest in this case; is that

20    correct?

21    A.  I -- I took the arrest, yes.

22    Q.  So this gun was documented under your collar?  This is

23    documented as your collar, like you are the arresting officer

24    for this case?

25    A.  Yes.

N66Ggar2                          Dempsey – Cross

1          THE COURT:  Mr. Garlick, you need to always talk into

2   the microphone so the court reporter can hear you.

3          MR. GARLICK:  Yes.

4   BY MR. GARLICK:

5   Q.  Officer Dempsey, on direct you testified about your career

6   in the NYPD; is that correct?

7   A.  Yes.

8   Q.  You testified about your career?

9   A.  Yes.

10  Q.  How long have you known Officer Pino?

11  A.  I've known Officer Pino for four years.

12  Q.  You started at -- in or around the time, same time as

13  Officer Pino; is that correct?

14  A.  No.

15  Q.  So how long before you started and he started before you

16  came in contact with each other?

17  A.  Are you asking how much time he -- like how much time he

18  has as a cop as opposed to how much time I have?

19  Q.  In your career, in the 44 Precinct, where did you actually

20  first get in contact with Officer Pino?  Because from my

21  understanding, y'all partners; is that correct?

22  A.  At the time, yes, we were partners, yes.

23  Q.  So prior to this stop, how long had you all been partners?

24  A.  About a year, I would say.  We were NCO partners and we

25  were on the conditions team prior that was comprised of a group

1    of eight.  But as like a one-and-one partnership, we were

2    partners as a one-to-one partnership for approximately, I

3    believe, eight months to a year.

4    Q.  So you just stated that you first started working for the

5    NYPD, that you was in the conditions unit; is that correct?

6    A.  When I first started with the NYPD?

7    Q.  No.  Now, you are in the conditions unit, that yours --

8    during the time of this traffic stop in your role in the NYPD,

9    you was in the conditions unit?

10   A.  No, I was in the NCO unit, neighborhood coordination

11   officer.

12   Q.  What's the difference between the neighborhood coordination

13   officer and the conditions unit?

14   A.  The neighborhood coordinations officer, for me, I work in a

15   particular sector.  So I had an area -- for me it -- I used

16   161 Street to East 116th Street to University Avenue.  So for

17   me, my sector is that area.

18           For conditions, I get the conditions team is basically

19   command Y, you know what I'm saying.

20   Q.  In the conditions unit, did you overlap with Officer Pino,

21   did y'all work together during the --

22   A.  Yes, yes.  We were on the same team, yes.

23   Q.  And this is in the 44 Precinct?

24   A.  Correct.

25   Q.  Officer Pino also -- since you're saying the conditions

1   unit is a different unit than the NCO program, I'm guessing,

2   right, or is that the same thing?

3   A.  No.  No, they are different.

4   Q.  Officer Pino also joined the NCO program along with you in

5   the 44 Precinct, right, after y'all worked in the conditions

6   program?

7   A.  Yes.

8   Q.  In the 44 Precinct?

9   A.  Yes.

10  Q.  So at the time that I -- at the time of my traffic stop,

11  you and Officer Pino were actually partners; is that correct?

12  A.  We were partners, yes.

13          THE COURT:  I think you need to move it along,

14  Mr. Garlick.

15  Q.  You worked for the NYPD for about five years; is that

16  correct?

17  A.  A little over four and a half.

18          THE COURT:  Currently now, as of now, it's four and a

19  half.

20          THE WITNESS:  As of now, it's four and a half.

21  BY MR. GARLICK:

22  Q.  Your current rank is?

23  A.  Police officer.

24  Q.  Are police officers the lowest rank inside the precinct?

25  Like is there -- as far as an officer, is there a lower officer

N66Ggar2                    Dempsey - Cross

1   than police officer in the precinct?

2   A.  No.

3   Q.  In addition to your rank as an officer, what other ranks

4   are there, as far as like when you climb the ladder, so to

5   speak?

6   A.  There's detective, sergeant, lieutenant, captain and then

7   different kinds of chiefs.

8           THE COURT:  We're getting pretty far afield,

9   Mr. Garlick.

10          MR. GARLICK:  Actually, your Honor, I'm not.

11  BY MR. GARLICK:

12  Q.  Sergeants is above police officers and detectives,

13  lieutenant is above the sergeant; is that correct?

14  A.  Correct.

15  Q.  Captain is above a lieutenant; correct?

16  A.  Correct.

17  Q.  High ranking officers have higher ranking salary; is that

18  correct?

19          MR. SOWLATI:  Objection, your Honor.

20          THE COURT:  Sustained.

21  BY MR. GARLICK:

22  Q.  In order to be promoted to a new rank, what do you have to

23  do?

24  A.  You take a written exam.

25  Q.  An NYPD promotion exam; correct?

1   A.  Correct.

2   Q.  You didn't take an NYPD promotion exam this year; is that

3   correct?

4   A.  No.

5   Q.  Because you can only take it once every four years; is that

6   correct?

7   A.  Yes, it's a rotation.  It's every four years.

8   Q.  You still have three more years to go before you take this

9   exam; is that correct?  A little more, little less than four

10  years?

11  A.  You asking before I take it?

12  Q.  Before your next exam.

13  A.  Yes, I believe it's another two to three years.

14  Q.  What happened the first time you took it?

15  A.  I never took it.

16  Q.  Promotions are based on what?

17          MR. SOWLATI:  Objection, your Honor.

18          THE COURT:  Sustained.

19  BY MR. GARLICK:

20  Q.  Are promotions based on merits?

21          MR. SOWLATI:  Objection.

22          THE COURT:  Sustained.

23  BY MR. GARLICK:

24  Q.  Do you need additional training before you take these

25  exams?

1          MR. SOWLATI:  Objection.

2          THE COURT:  Sustained.

3    BY MR. GARLICK:

4    Q.  Do medals help in the promotion process?

5          MR. SOWLATI:  Objection.

6          THE COURT:  Sustained.

7          MR. GARLICK:  Your Honor, may we have a sidebar,

8    please.

9          THE COURT:  No.

10   BY MR. GARLICK:

11   Q.  As an NYPD employee, you may submit your names for

12   recognition for your work.

13          Have you submitted your name for recognition of this

14   case to get a medal?

15   A.  It was submitted, yes.

16   Q.  Did you submit it yourself or did somebody else put you in

17   for a recommendation for it?

18   A.  I submitted it myself.

19   Q.  Did you submit that a few months ago or was it just for

20   this gun arrest in particular that you submitted for this

21   medal?

22   A.  Sorry?

23   Q.  Did you submit this before the traffic stop or did you

24   submit this recommendation for the medal for this particular

25   case that's happening right now, for this arrest?

N66Ggar2                          Dempsey - Cross

1          THE COURT:  I don't understand the question.

2          THE WITNESS:  No.

3          THE COURT:  Rephrase the question.

4          THE WITNESS:  Did I submit it before the --

5    BY MR. GARLICK:

6    Q.  Did you submit the medal because a gun was recovered from a

7    traffic stop that you initiated, did you submit a gun for this

8    gun that was allegedly found in this motor bike?

9    A.  Did I submit a medal request is what you're saying?

10   Q.  Yes.

11   A.  Yes.

12         MR. GARLICK:  I rest, your Honor.

13         THE COURT:  You just finish with -- you don't rest

14   yet.

15         MR. GARLICK:  I'm still learning.

16         THE COURT:  You've got a while until you rest.

17         Any redirect?

18         MR. SOWLATI:  Yes, your Honor.

19         THE COURT:  Let's go.

20         MR. SOWLATI:  Your Honor, I'm going to seek admission

21   of the moped, so we're going to need that moved in.

22         THE COURT:  Does that mean you want a break before

23   then?

24         MR. SOWLATI:  No, we can do it right now.  I think two

25   officers just need to move it in.  It will take a second.

1          THE COURT:  Okay.  Come on up.

2          MR. SOWLATI:  Your Honor, is it okay if we move the

3     podium out of the way?

4          THE COURT:  Yes.

5          You're just going to put it between my bench and the

6     government's table.

7     REDIRECT EXAMINATION

8     BY MR. SOWLATI:

9     Q.  Officer Dempsey, what was the purpose of the moped stop

10    that you made outside of the Yankee Stadium?

11    A.  It was just a checkpoint.  We were stopping every moped.

12    Q.  How many mopeds did you stop that night?

13    A.  Personally, I was involved in two stops.

14    Q.  Who was the other person you stopped?

15    A.  It was a female that was operating a moped.

16    Q.  Did that person have a license in their moped?

17    A.  Yes, I believe so.

18    Q.  Did they have all their other paperwork?

19    A.  I believe so, yes.

20    Q.  What happened to that person?

21    A.  I definitely think it was provided, so she was just let go.

22    The stop was ended.

23    Q.  You testified under direct that Mr. Garlick was not wearing

24    a helmet.  Is that a requirement for mopeds that weigh over

25    100 pounds?

N66Ggar2                    Dempsey - Redirect

1    A.  Yes.

2    Q.  Officer Dempsey, are you able to see the moped?

3         THE COURT:  You can come down to look at it.

4    A.  Yes.

5    Q.  Do you recognize that?

6    A.  Yes.

7    Q.  How do you recognize it?

8    A.  I can recognize it by, like I said, it looks like a

9    motorcycle and by the color, so I'll be able to recognize it by

10   that, and then also the voucher attached to it.

11   Q.  Whose moped is this?

12   A.  James Garlick.

13        MR. SOWLATI:  The government offers GX 202.

14        THE COURT:  Any objection to GX 202?

15        MR. GARLICK:  No, your Honor.

16        THE COURT:  GX 202 is received.

17        (Government Exhibit 202 received in evidence)

18        MR. SOWLATI:  Permission for the witness to approach

19   the moped.

20        THE COURT:  Yes.

21   BY MR. SOWLATI:

22   Q.  Can you please point out the center compartment?

23   A.  It's right here.

24   Q.  Can you stand next to the moped where you were during the

25   stop.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  So during the stop --

2              THE COURT:  You have your back to the jury.  Let's

3    hand him a mic.

4    A.  This is about how far I was during the stop.

5              THE COURT:  And the bike is on the kickstand tilted

6    towards the other wall away from the jury.

7              THE WITNESS:  Correct.

8    BY MR. SOWLATI:

9    Q.  So it was angled away from you at the time?

10   A.  Yes.

11   Q.  Could you see into the center compartment during the stop?

12   A.  No.

13   Q.  Why not?

14   A.  So where I was, how it was tilted away from me, if you can

15   notice like this is high up here, so as it opens up, it's

16   pretty deep.  So from my angle, I couldn't see the contents

17   then.  Like I said, I could just see the upper portion of the

18   compartment.

19             THE COURT:  Can he go back to his seat.

20             MR. SOWLATI:  Yes, your Honor.

21   BY MR. SOWLATI:

22   Q.  During your cross-examination, you were asked about using a

23   flashlight.  Do you recall that?

24   A.  Yes.

25   Q.  Did you provide Officer Pino with your flashlight during

N66Ggar2                    Dempsey - Redirect

1   the inventory search?

2   A.  Yes, I believe I gave him my flashlight during the

3   inventory search.

4   Q.  Why did you do that?

5   A.  I don't believe he had one on him, I believe he didn't have

6   one.

7   Q.  Why was that flashlight needed at the time?

8   A.  So at the time that the inventory is being conducted, he

9   felt something, and then, you know, he stated that it was a

10  firearm.  So he used a flashlight to confirm that it was a

11  firearm.

12  Q.  Are inventories routine?

13  A.  Yes.

14  Q.  How many inventories have you conducted in your career?

15  A.  Like just for vehicles itself or --

16  Q.  All --

17  A.  I mean, inventory, I've -- I mean, inventories itself, I've

18  done over 50, easily over 50.

19  Q.  Did you need the flashlight to see into the compartment?

20  A.  Yes.  So where we was, it was -- it's pretty -- it's not

21  well lit in the rear station house, so you need it to see, yes.

22  Q.  Officer Dempsey, to your knowledge, did anyone tamper with

23  Mr. Garlick's moped?

24  A.  No.

25  Q.  To your knowledge, did anyone other than Officer Pino open

N66Ggar2                          Dempsey - Recross

1    the center compartment after it was seized?

2    A.   No.

3    Q.   What would be the consequences of someone planting a

4    firearm in Mr. Garlick's moped?

5           MR. GARLICK:  Objection.

6           THE COURT:  Sustained.

7    BY MR. SOWLATI:

8    Q.   At any point in the night, did you have a key to the moped?

9    A.   I did not.

10   Q.   Could the compartment be opened without a key?

11   A.   No.

12          MR. GARLICK:  Objection.

13          THE COURT:  Overruled.

14          MR. SOWLATI:  If I could have one moment.

15          THE COURT:  Yes.

16          MR. SOWLATI:  No further questions, your Honor.

17          THE COURT:  Thank you.

18          Any recross?

19   RECROSS EXAMINATION

20   BY MR. GARLICK:

21   Q.   When you just described your proximity to this bike, is

22   that the same proximity that you stayed in relative to the bike

23   for the rest of the -- for the whole time during the traffic

24   stop?

25   A.   No, I did move during the stop.  At one point, I had to put

N66Ggar2                        Dempsey - Recross

1  something in the back of the car and then walk back to the

2  bike.

3           MR. GARLICK:  I would like to give him this, if

4  possible.

5           THE COURT:  Are you offering another exhibit?

6           MR. GARLICK:  Yes.

7           THE COURT:  So you say, I'm offering another exhibit,

8  give a copy to -- what's its exhibit number?

9           MR. GARLICK:  A25.

10          THE COURT:  A5?

11          MR. GARLICK:  A25.

12          THE COURT:  Defense Exhibit A5.

13 BY MR. GARLICK:

14 Q.  Do you recognize yourself and the participants in this

15 still shot?

16 A.  Yes.

17 Q.  Is this the same traffic stop in question that we're

18 discussing today?

19 A.  Yes, it's the same.

20 Q.  Is that you with your hand on the bike?

21 A.  Yes.

22 Q.  At the time of this picture, where are you looking?

23 A.  My eyes are cutoff, so I don't know.

24          MR. GARLICK:  I would like this submitted into

25 evidence.

1          THE COURT:  You would like to introduce it.

2          Any objection to A5?

3          MR. SOWLATI:  No, your Honor.

4          MR. GARLICK:  Is that a fair and --

5          THE COURT:  There's no objection.

6          A5 is received.

7          (Defendant's Exhibit A5 received in evidence)

8          MR. SOWLATI:  No, your Honor.  But for the record,

9  this is a still from Officer Cosma's body cam, not Officer

10  Dempsey's.

11          THE COURT:  What video is it from?

12          MR. SOWLATI:  GX 303.

13          THE COURT:  Do you want it published to the jury or

14  are you just --

15          MR. GARLICK:  Yes, ma'am.

16          THE COURT:  Can you publish this to the jury, please.

17  Can you hand her the still so she can find the timestamp.

18          What do you want to ask him?  It's on the screen.

19  BY MR. GARLICK:

20  Q.  During this traffic stop -- let me rephrase.

21          You said the backyard --

22          THE COURT:  Are you going to ask a question about this

23  picture or not?

24          MR. GARLICK:  Yes.

25          THE COURT:  This isn't in the backyard.

1          MR. GARLICK:  I'm asking about light.  I want to know

2     if it was more luminous here than in the back of the yard.

3          THE COURT:  Okay.

4          THE WITNESS:  There's more light here, yes.

5     BY MR. GARLICK:

6     Q.  You said that in order to access the center console that

7     you need the key; is that correct?

8     A.  Yes.

9     Q.  Do you know that to be a fact or is that something that's

10    in your opinion?

11    A.  Do I --

12    Q.  Do you know that that is the only way to open that

13    compartment is with the key?

14    A.  I mean, if it's left unlocked, you can open it.  But you

15    need the key to unlock it.  So I don't understand the question.

16    Q.  In the locked position, are you saying that the only way

17    you can open this compartment is with the key; is that correct?

18    A.  Yes.

19    Q.  Also, you said that bikes over 100 pounds have to wear a

20    helmet.  I'm going to ask again, where is this rule or law that

21    you're referring to?  Where is that at, that bikes over a

22    hundred pounds have to wear a helmet?

23    A.  So the sheet that you had provided, we have way more of

24    those.  So on that particular sheet, it may not be listed

25    there, but there are other New York City, you know, DMV rules

1    and regulation, things that we have seen, you know, documents

2    that we have seen that state that -- so 100 pounds -- the moped

3    also had a VIN Number, it's a vehicle identification number, so

4    any vehicle has to be registered in the City.

5    Q.  You just testified that when you stood up that you were

6    standing three or four feet away from the bike.  As you can

7    obviously see from this still photo that your hand is on the

8    bike and you are in close proximity to see the bike and myself

9    and the compartment.  The compartment is open and my hand is

10   reaching in the bike and the bike is obviously luminated from

11   the street lights we are standing under --

12            MR. SOWLATI:  Objection, your Honor.

13            THE COURT:  Well, there's not a question mark yet.

14            MR. SOWLATI:  Well, that's testifying.

15            MR. GARLICK:  I'm describing the picture.

16            THE COURT:  Overruled.

17            They can see the picture.  Mr. Garlick, just ask the

18   question.

19   BY MR. GARLICK:

20   Q.  My question to you is:  Even from this angle, would you say

21   that you still couldn't see inside the bike?

22   A.  As I stated earlier, I was not looking directly into the

23   moped.  Anything that would have been taken out I would have

24   seen be taken out.  So I was not looking directly into the

25   contents of the moped.

N66Ggar2                        Dempsey - Recross

Q.  You also stated you needed a key to drive it back, from
your knowledge, is that the only way that you can start the
bike?

        THE COURT:  That's beyond the scope.

        MR. GARLICK:  I'm asking as far as relevance to his
conversation that he needed the key.

        THE COURT:  So your recross is limited to the scope of
their redirect.  Your recross is limited by their scope.  They
didn't go into that, so you can't ask that question.

        Ask another question.

BY MR. GARLICK:

Q.  You said that you needed the key to open the compartment.
Are you aware of -- do you -- in your opinion, the only way to
operate that compartment and to operate the bike is through the
key?

A.  Yes.

        MR. GARLICK:  Thank you.

        THE COURT:  Thanks.  You can step down.

        You don't have anymore?

        Thank you.

        THE COURT:  Ladies and gentlemen, it's 1:00, so we're
going to break for lunch.  I'm going to cut your lunch break a
little short.  I'm going to cut it to 50 minutes.  So please be
back in the jury room ready to go at 10 till 2:00.

        Have a wonderful lunch, don't talk about the case,

1    leave your stuff on your chair.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N66Ggar2

1            (In open court; jury not present)

2            THE COURT:  They're going to be back at 1:50.  I want

3    all of you back at 1:40.  We'll continue the discussion we

4    started earlier.

5            (Lunch recess)

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N663gar3

                        AFTERNOON SESSION

1                            1:45 p.m.

2          (In open court; jury not present)

3          THE COURT:  Pay attention, Mr. Garlick.

4          Actually what I am going to do, I am assuming you are

5   going to start talking about Section 114-E and Section 125 of

6   the motor vehicle laws?

7          MR. SOWLATI:  114-E, your Honor.

8          THE COURT:  What I am going to hand to Mr. Garlick is

9   Section 125, Section 114-E, Section 401, 2261, 345, and 2265 of

10  the motor vehicle law.

11         Mr. Garlick, I think if you had that in front of you,

12  you might be able to follow along with what Mr. Sowlati will be

13  saying.

14         MR. SOWLATI:  We don't have all those statutes.

15         THE COURT:  You need the one that you have.  I just

16  happened to print them all out together.

17         MR. SOWLATI:  Under Section 114-E of the Vehicle and

18  Traffic Laws, an electric scooter is defined as:  Every device

19  weighing less than 100 pounds that (a) has handlebars, a

20  floorboard or a seat that can be stood or sat upon by the

21  operator, and an electric motor, (b) can be powered by the

22  electric motor and/or human power, and (c) has a maximum speed

23  of no more than 20 miles per hour on a paved level surface when

24  powered solely by the electric motor.

N663gar3

1          THE COURT:  That's the definition of an electric

2     scooter and under motor vehicles, every vehicle operated or

3     driven upon a public highway, which is propelled by any power,

4     other than muscular power, except, and then there is a whole

5     bunch of exceptions, including electric scooters --

6          MR. GARLICK:  Your Honor, that's the same paper that I

7     tried to tell you I already had copies of.  And nowhere does it

8     say that a bike over 100 pounds has to be registered.  So I

9     don't know why you are giving me the information that I tried

10    to give y'all.

11         THE COURT:  An electric scooter under the

12    definition -- so look at the definition of electric scooter.

13         MR. GARLICK:  Ma'am, we are not talking about electric

14    scooters.  You are not going to misrepresent the law, and

15    that's why I asked if they know the difference between motor

16    vehicles, because motor vehicles have engines.  So I don't

17    understand what you are trying to construe, whatever --

18         THE COURT:  Mr. Garlick, listen to me.

19         MR. GARLICK:  I don't need to listen to you, because I

20    already have this information, and I tried to give it to you

21    and you didn't want it.  You are trying to construe words, you

22    cannot make something other than what it is.  There is no

23    statute, there is no rule in the motor vehicle department that

24    says an electric bike over 100 pounds has to be registered.

25    There is nothing that says that.

N663gar3

1          THE COURT:  Yes, there is.

2          MR. GARLICK:  It says motor vehicle, under the

3  definition of motor vehicle, I have it for you.  Motor vehicles

4  have engines, have motors, have moving parts.  This bike is

5  battery operated.  It has no moving parts.  If you take the

6  battery out, I don't think the bike weighs 187 pounds anymore.

7  Basically what you are doing, because it looks like something,

8  you are trying to classify it as something.  That is not the

9  law.  You don't have no law stating that bikes over 100 pounds

10  electric has to be registered.  You cannot construe a motor

11  vehicle definition into something that you are saying is

12  standard.

13          THE COURT:  Is it a vehicle?

14          MR. GARLICK:  It's not a motor vehicle.

15          THE COURT:  Is it a vehicle?

16          MR. GARLICK:  If it's a vehicle, it would be a

17  recreational vehicle.

18          THE COURT:  It is a vehicle and it can operate on

19  public highway.

20          MR. GARLICK:  I don't know.

21          THE COURT:  You were on a public highway.

22          MR. GARLICK:  All right.  All right.

23          THE COURT:  It is powered by power other than muscular

24  power.

25          MR. GARLICK:  Say you're right.  Where did he get the

N663gar3

1    idea that electric bikes over 100 pounds have to be registered?

2    That's what I got a ticket for.

3         THE COURT:  Because you don't have to be registered if

4    you qualify as an electric scooter.  An electric scooter weighs

5    less than 100 pounds.

6         MR. GARLICK:  So where does it say electric scooters

7    over 100 pounds have to be registered?

8         THE COURT:  You are only an electric scooter if you

9    weigh less than 100 pounds by definition.

10        MR. GARLICK:  It is not an electric scooter, it is an

11   electric bike.  Where does it say electric bikes over 100

12   pounds have to be registered?

13        You keep saying no.  I got the motor vehicle thing.

14   It does not say that these E-bikes have to be registered.  Not

15   in the language, not in the description, nothing.  It doesn't

16   say exception to this or exception to that for E-bikes.

17        So what I am saying to you is, I understand what you

18   are trying to do.  But as a matter of law, that is not the law.

19        THE COURT:  I get to the say what the law is.

20        MR. GARLICK:  You can't say no.  See?  There you go

21   again.  I am going to renew my application to object to these

22   proceedings because you are not applying the law.  You are

23   governing what you think the law is, and you only want these

24   people to accept the law as you give it, and I am telling you,

25   you are giving the law false.

N663gar3

1           THE COURT:  Is your objection is --

2           MR. GARLICK:  You don't even know the law.  He try to

3   throw it on his boss.  His boss will come in here and we are

4   going to find out again where did you get this information

5   from.  Because I would like that submitted into evidence.  If

6   you are going to use that on that paper, it doesn't say

7   anything about E-bikes over 100 pounds have to be registered.

8   It doesn't consider E-bikes.  It doesn't say in the description

9   anywhere that E-bikes over 100 pounds are considered mopeds or

10  motorcycles.  It Is doesn't say that.  So how can you say that

11  that is the law governing E-bikes.

12          THE COURT:  Your objection is noted.

13          Who is your next witness?

14          MR. FANG:  Your Honor the next witness is Lairy Cosma.

15  However, before we call Officer Cosma, we're hoping to read a

16  stipulation into the record.

17          THE COURT:  Okay.  As soon as we get the jury.  We're

18  missing a juror.

19          The Elmo works.  Can you show him how to use it?  Do

20  either of you know how to use the Elmo.

21          MS. LENOX:  No, ma'am.  Embarrassingly.  But the

22  paralegal who just stepped out knows how, so she may sit back

23  before the jury comes in.

24          THE COURT:  If so, we'll give a little tutorial.  You

25  are doing fine.  I am not taking the gold star away from you,

N663gar3

1    but it would be easier if he could deal with his paper exhibits

2    on his own.

3            MS. LENOX:  May I test it, your Honor?

4            THE COURT:  Angela tested it.  She says it works.

5            There you go.

6            THE COURT:  Everybody ready?

7            MR. FANG:  Just one moment, your Honor.

8            THE COURT:  Are we going get to those before the next

9    break?  Are these pictures for the next witness?

10           MR. GARLICK:  They are just pictures we are going to

11   use during the entirety.

12           THE COURT:  Are you going to use them with Cosma?

13           MR. GARLICK:  Yes.

14           THE COURT:  Are you ready?

15           MR. FANG:  Your Honor, we actually didn't hear if the

16   defendant said no or yes.

17           MR. GARLICK:  Yes.

18           MR. FANG:  He does plan to use these during Officer

19   Cosma's testimony.

20           THE COURT:  Not all of them, but apparently some of

21   them.

22           MR. FANG:  Your Honor, at this point we are not

23   prepared to stipulate to these.  We are inclined to see how the

24   evidence comes in during Officer Cosma's testimony.

25           THE COURT:  That's fine.  If you can, if you have

N663gar3

1    where they came from, so it would expedite the government

2    paralegal finding them in the government exhibits, that would

3    be helpful.

4                MS. LENOX:  I'm happy to speak on that point.

5                THE COURT:  I'm sorry?

6                MS. LENOX:  I'm happy to speak on that point.

7                THE COURT:  If you could.

8                MS. LENOX:  So, the vast majority of them are stamps,

9    they're still shots from body worn camera surveillance.  So the

10   upper-right-hand corner should indicate where they're from.

11   And the remainder of those are photographs of the bike that

12   were turned over in discovery by the government.

13               THE COURT:  Okay.  If you could find them, great.

14   Let's get the jury out.

15               (Jury present)

16               THE COURT:  Mr. Fang or Mr. Sowlati.

17               MR. FANG:  Your Honor, at this point the government

18   would like to read a stipulation into the record.

19               THE COURT:  Okay.  A stipulation is just a fancy way

20   to say that the government agreed to whatever facts are in the

21   stipulation so you can accept them as true.  It just saves a

22   little bit of time.  So something that's not disputed is not

23   being proved.

24               Go ahead, Mr. Fang.

25               MR. FANG:  The stipulation reads:  It is hereby

N663gar3

1    stipulated and agreed by the United States of America --

2    apologies.  Let me take a step back.

3            I am reading into the record what has been marked for

4    identification as Government Exhibit 1601.  A stipulation that

5    reads:

6            It is hereby stipulated and agreed by the United

7    States of America by Damian Williams, United States Attorney

8    for the Southern District of New York, Adam Sowlati and Jerry

9    Fang, Assistant United States Attorneys, of counsel, and James

10   Garlick, the defendant, that:  First, on or about March 4,

11   2022, the defendant was convicted in Bronx County Supreme Court

12   by a crime punishable by imprisonment for a term exceeding one

13   year.  Second, on or before August 27, 2022, the defendant knew

14   that he had previously been convicted of a crime punishable by

15   imprisonment for a term exceeding one year.

16           It is further stipulated and agreed that this

17   stipulation may be received in evidence as a government exhibit

18   at trial.  Dated May 26, 2023.

19           At this point, the government offers Government

20   Exhibit 1601.

21           THE COURT:  Any objection?

22           MR. GARLICK:  No, your Honor.

23           THE COURT:  1601 is received.

24           (Government's Exhibit 1601 received in evidence)

25           MR. FANG:  The government calls Lairy Cosma.

1    LAIRY COSMA PAEZ,

2          called as a witness by the Government,

3          having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. FANG:

6    Q.  Good afternoon.  Where do you work?

7    A.  I work -- I currently work in the 45 Precinct.

8    Q.  Who is your employer?

9    A.  NYPD.

10    Q.  How long have you been working for the NYPD?

11    A.  One year and five months.

12    Q.  What is your current title?

13    A.  Police officer.

14    Q.  What is your current assignment?

15    A.  I am assigned to patrol.

16    Q.  What are some of your responsibilities on patrol?

17    A.  As patrol officers, we help people when they call 911.

18    Q.  Where, if anywhere, were you previously assigned?

19    A.  I was assigned to Patrol Borough Bronx, FTU program, which

20    is the field training officer program on the 44 Precinct.

21    Q.  You mentioned the field training program.  Can you tell the

22    jury briefly what that program is.

23    A.  Yes.  The FTU program is a program assigned to help new

24    officers to do their job as a police officer.

25          THE COURT:  Do you go there after the academy?

N663gar3                          Cosma - Direct

1                THE WITNESS:  Yes.

2                THE COURT:  So it is when you are a brand-new police

3     officer?

4                THE WITNESS:  Yes.

5     Q.  As a member of the field training program, are you assigned

6     to any particular precinct?

7     A.  I was assigned to the 44 Precinct on that day.

8                THE COURT:  I think he is just asking in general,

9     while you were in the field training program, are you also

10    assigned to a precinct?

11               THE WITNESS:  Yes, your Honor.  I was assigned to the

12    40 Precinct, the 42 Precinct, and the 44 Precinct.

13    Q.  Turn your attention to August 27, 2022.  What were you

14    doing that day?

15    A.  I was assigned to the 44 Precinct at that day as a station

16    house.  Station house is they usually have a station house for

17    security purpose in front of the precinct.

18    Q.  When did your shift start that day?

19    A.  It started at 5:30 p.m.

20    Q.  Did there come a time that day when you were asked to

21    participate in a moped operation?

22    A.  Yes.  I was in the muster room.  The muster room is where

23    you use to eat or process arrest, and my field training

24    officer, he told us that we were going to go out to do bikes

25    operation.

1   Q.  Approximately what time did you learn about the operation?

2   A.  I would say about two hours after 5:30, so around 7.

3   Q.  What was your understanding of what you would be doing as

4   part of the operation?

5   A.  As part of the operation, my understanding was that we were

6   going to go out to the streets, take illegal bikes,

7   unregistered bikes out of the street.  That was the operation.

8   Q.  Were there any particular things that you were looking for

9   in terms of stopping one of these mopeds?

10  A.  We were just going to stop people without helmets or

11  license plate.

12  Q.  Officer Cosma, where was this operation happening?

13  A.  It happened on 162 and Jerome Avenue.

14  Q.  Is that near any particular landmark?

15  A.  In the Bronx.

16  Q.  Was there anything specific going on that night?

17  A.  Yes.  It was a Bad Bunny concert going on in Yankee Stadium

18  that night.

19  Q.  What did that mean for traffic?

20  A.  We were expecting to be a lot of people around looking for

21  parking.

22  Q.  What happened after you learned about the moped operation?

23  A.  After we learned about the moped operation, we proceed to

24  go to the location, 162 and Jerome Avenue in the Bronx.

25  Q.  When you arrived, who were you partnered with?

1    A.   I was partnered with Officer Shakoor.

2    Q.   Who is Officer Shakoor?

3    A.   He is also, he was also an officer assigned to the field

4    training officer program at that time.

5    Q.   How long have you known Officer Shakoor?

6    A.   One year and five months.  I went to the academy with him.

7    Q.   Did you graduate at the same time?

8    A.   Yes, we graduated July 1st, 2022.

9    Q.   So approximately what time was it when you started the

10   moped operation?

11   A.   I would say like 20 minutes after we got there.  Around

12   7:30 I guess.

13   Q.   How many mopeds were you involved in stopping that night?

14   A.   That night I only stopped two mopeds.

15        MR. FANG:  Ms. Gutierrez, can you please display for

16   the witness Government Exhibit 202-13 on the left, and

17   Government Exhibit 202-13A on the right.

18   Q.   Officer Cosma, I am showing you what has been marked for

19   identification as Government Exhibit 202-13 on the left and

20   202-13A on the right.

21        Do you recognize these exhibits?

22   A.   Yes, I do.

23   Q.   What is the exhibit on the left?

24   A.   The exhibit on the left is Mr. Garlick's moped with a

25   sticker that we put for identification.

N663gar3                          Cosma - Direct

1    Q.  What is the exhibit on the right?

2    A.  The exhibit on the right is Mr. Garlick's moped with

3    identification number by NYPD.  It is a screenshot of the

4    pictures I took.

5    Q.  Just to clarify, who took the photograph on the left?

6    A.  I did.

7    Q.  Who took the photograph on the right?

8    A.  I did.

9    Q.  Is Government Exhibit 202-13 a true and accurate copy of

10   the photograph that you took of Mr. Garlick's moped?

11   A.  Yes, it is.

12   Q.  Is Government Exhibit 202-13A a true and accurate copy of a

13   screenshot that you took of Mr. Garlick's moped?

14   A.  Yes, it is.

15            MR. FANG:  Government offers Government Exhibits

16   202-13 and 202-13A.

17            THE COURT:  Any objection?

18            MR. GARLICK:  We would like to object to 202-13A for

19   hearsay purposes.

20            THE COURT:  202-13A is the picture you took on your

21   phone; is that correct?  The one on the right?

22            THE WITNESS:  Yes.

23            THE COURT:  Overruled.

24            202-13 and 202-13A are received.

25            (Government's Exhibit 202-13, 202-13A received in

1  evidence)

2          MR. FANG:  Can we please publish that to the jury.

3  Q.  Officer Cosma, how do you know that this is Mr. Garlick's

4  moped?

5  A.  The reason I know it was Mr. Garlick's moped because it

6  was -- I saw him riding on the bike, and it also -- I took this

7  picture few moments after the stop of Mr. Garlick.

8  Q.  Just to be clear, were you involved in the stop of

9  Mr. Garlick's moped?

10  A.  Yes, I was.

11  Q.  Directing your attention to the sticker on the moped.  Can

12  you remind the jury what that sticker is.

13  A.  Yes.  The sticker is a pet sticker.  It is usually

14  identification number we place on the bikes, so we link it to

15  the owner of the bike.

16  Q.  If you can just read that number for the jury.

17  A.  Yes.  The sticker number is 6746853.

18          MR. FANG:  With the Court's permission, I'd ask that

19  Officer Cosma be permitted to slide down into the well to

20  observe what has been entered into evidence as Government

21  Exhibit 202.

22          THE COURT:  Sure.  Are you going to ask her questions

23  down there?

24          MR. FANG:  Not currently, but as part of this

25  examination later on, yes.

1              THE COURT:  Okay.

2    Q.  Officer Cosma, you may return to the witness stand.

3              THE COURT:  Do you want her to look at something in

4    particular?

5              MR. FANG:  Just to see if she recognizes the bike.

6              THE WITNESS:  Yes.

7    Q.  What is Government Exhibit 202?  And if you can keep your

8    voice up, that would be great.

9    A.  It is 6746853.

10   Q.  What is the number that you just read?

11   A.  The number I just read is the pet sticker that we usually

12   put on bikes, on whatever we took from the defendants.

13             THE COURT:  Maybe you should return to your seat so we

14   can hear you.

15   Q.  Officer Cosma, who else was involved with stopping this

16   moped?

17   A.  It was Officer Dempsey, Officer Shakoor, and myself.

18   Q.  Approximately what time did that stop take place?

19   A.  It took place at 8 -- 8:10 p.m.

20   Q.  How did you learn the identity of the person who was riding

21   that moped?

22   A.  Mr. Garlick provide Officer Dempsey and myself with his New

23   York State Medicaid card with his picture on it.

24   Q.  Officer Cosma, had you ever heard of Mr. Garlick before

25   this stop?

1    A.  Never.

2    Q.  Had you ever met Mr. Garlick before the stop?

3    A.  No.

4    Q.  Did you know anything about Mr. Garlick before the stop?

5    A.  No.

6            MR. FANG:  Ms. Gutierrez, can you please display for

7    Officer Cosma Government Exhibit 202-12 on the left, and

8    Government Exhibit 202-12A on the right.

9    Q.  Officer Cosma, I'm showing you what has been marked for

10   identification as Government Exhibits 202-12 and 202-12A.

11           Do you recognize these exhibits?

12   A.  Yes, I do.

13   Q.  What is the exhibit on the left?

14   A.  Exhibit on the left is a picture of Mr. Garlick's

15   identification and his Medicaid card along with the summons.

16   Q.  Who took that photograph?

17   A.  Yes, I did.

18   Q.  What is the exhibit on the right?

19   A.  The exhibit on the right is a screenshot of the picture I

20   took from Mr. Garlick's Medicaid card along with the summons.

21   Q.  Is Government Exhibit 202-12 a true and accurate copy of

22   the photograph that you took of Mr. Garlick's ID card with the

23   summons?

24   A.  Yes, it is.

25   Q.  And is Government Exhibit 202-12A a true and accurate copy

N663gar3                          Cosma - Direct

1    of that same photograph?

2    A.  Yes, it is.

3         MR. FANG:  The government offers Government Exhibits

4    202-12 and 202-12 A.

5         THE COURT:  Any objection?

6         MR. GARLICK:  Your Honor, I would like to object

7    because 202-12A has two different time stamps on it, so I don't

8    know which one is the most accurate one, because it is two

9    different times.

10        THE COURT:  Overruled.  You can inquire.

11        So 202-12 and 202-12 A are received.

12        (Government's Exhibit 202-12, 202-12A received in

13   evidence)

14   Q.  Officer Cosma, what time did you take this photograph?

15   A.  I took this photograph at 8:26 p.m.

16   Q.  What is a summons?

17   A.  A summons is usually a ticket that we issue to a person

18   when they commit traffic infraction or a minor violation.

19   Q.  Who wrote the summons for Mr. Garlick's moped?

20   A.  I wrote the summons for Mr. Garlick's moped.

21        MR. FANG:  Ms. Gutierrez, please display for the

22   witness Government Exhibit 501.

23   Q.  Officer Cosma, I am showing you what has been marked for

24   identification as Government Exhibit 501.

25        Do you recognize this exhibit?

N663gar3                            Cosma - Direct

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  That's a summons I provided Mr. Garlick that night.

4    Q.  Is it a true and accurate copy of the summons that you

5    provided to Mr. Garlick that night?

6    A.  Yes, it is.

7            MR. GARLICK:  Object, your Honor.  Hearsay.

8            THE COURT:  It hasn't been offered yet.

9            Did you offer it, Mr. Fang, and I didn't hear you?

10           MR. FANG:  I have not yet.

11           THE COURT:  Okay.

12           MR. FANG:  Ms. Gutierrez, please display for the

13   witness Government Exhibit 502.

14   Q.  Officer Cosma, I am showing what you has been marked for

15   identification as Government Exhibit 502.

16           Do you recognize it?

17   A.  Yes, I do.

18   Q.  What is it?

19   A.  That's the electronic copy of the summons I wrote that

20   night.

21   Q.  Is it a true and accurate copy of the electronic copy of

22   the summons?

23   A.  Yes, it is.

24           MR. FANG:  If we can put both of them up on the

25   screen, the government offers Government Exhibits 501 and 502.

1          THE COURT:  Just so I understand, 502, do you create

2     that by just inputting the data from the paper ticket that you

3     filled out on the scene back at the office, and you create then

4     an electronic summons?

5          THE WITNESS:  Yes, your Honor.

6          THE COURT:  Any objection to 501 and 502?

7          MR. GARLICK:  501, ma'am.  Hearsay.

8          THE COURT:  Overruled.  501 is received.

9          502 there is no objection.  It is received.

10         (Government's Exhibit 501, 502 received in evidence)

11    Q.  Officer Cosma, why was Mr. Garlick issued a summons?

12    A.  He was issued a summons because of an unregistered bike.

13    Q.  Was his bike supposed to be registered?

14    A.  Yes.

15    Q.  So, what happened to Mr. Garlick's moped?

16    A.  After the stop, we took the bike in our possession, and we

17    took it to the 44 Precinct.

18    Q.  And when you conducted the stop, did you notice a license

19    plate on Mr. Garlick's moped?

20    A.  No.

21    Q.  Are you aware --

22         THE COURT:  You didn't notice one way or another or

23    there was no license plate?

24         THE WITNESS:  There was no license plate, your Honor.

25    Q.  Did Mr. Garlick have insurance?

1    A.  No.

2                MR. GARLICK:  Objection.  Relevance.

3                THE COURT:  Overruled.

4    Q.  What, if anything, was Mr. Garlick doing with the moped

5    during the stop?

6    A.  During the stop, Mr. Garlick went to open the moped, taking

7    his belongings and putting it on the seat of the moped.  And he

8    did that two times I would say.

9    Q.  What items was Mr. Garlick taking out of the moped?

10   A.  He was taking out a charger, wires, and a black rag.

11   Q.  And how did Mr. Garlick take those items out of the moped?

12   A.  By opening the compartment with the key and taking it out,

13   putting it on the seat of the moped.

14   Q.  Based on your observation, was the compartment where

15   Mr. Garlick was removing the items from locked?

16   A.  Yes, it was locked.

17   Q.  Could you see inside the center compartment of the moped?

18   A.  No.

19   Q.  Why not?

20   A.  Because of the position I was, and also the distance in the

21   compartment was deep inside and it was tilted to the left, and

22   I was on the right side of the bike.

23   Q.  When you say it was tilted to the left, what do you mean?

24   A.  That it was on Mr. Garlick's side more than my side.

25                THE COURT:  The bike was tilted to the right?

1          THE WITNESS:  To the left.

2          THE COURT:  To the left.

3          THE WITNESS:  Yes, and I was on the right.

4          MR. FANG:  With the Court's permission, I ask that

5    Officer Cosma be permitted to enter the well to look at Exhibit

6    202 to aid in her testimony.

7          THE COURT:  Sure.  Give her a microphone.

8    Q.  Officer Cosma, can you please stand where you were standing

9    during the stop relative to the bike.

10   A.  I was standing just right here.

11   Q.  Can you please indicate where on the moped the center

12   compartment was.

13   A.  The center compartment is right here in the middle.

14         THE COURT:  Indicating the center compartment of the

15   bike.

16   Q.  Can you please demonstrate for the jury how the center

17   compartment opens.

18   A.  Yes, I can demonstrate.  So you place the key in here and

19   you twist it, and then you lift this part.

20   Q.  Officer Cosma, is that the compartment from where the

21   defendant removed the items that you just described?

22   A.  Yes, it is.

23   Q.  Officer Cosma, can you please return to where you were

24   standing during the stop.

25   A.  Yes.

1   Q.  Could you see into the center compartment from where you

2   were standing?

3   A.  No.

4           MR. FANG:  I'd ask that Officer Cosma be permitted to

5   return to the witness box.

6           THE COURT:  Okay.

7   Q.  What, if anything, did Mr. Garlick do after he removed his

8   belongings from the center compartment?

9   A.  After Mr. Garlick removed his belongings, I recall him

10  asking for a bag to put his belongings inside.

11  Q.  Do you remember what he did with the belongings that he

12  took out?

13  A.  Yes.  He proceeded to open the compartment again, and place

14  the items inside, and lock the compartment.

15  Q.  What, if anything, happened next with respect to the stop?

16  A.  I'm sorry.  Can you repeat that question?

17  Q.  Sure.  What, if anything, happened next with respect to the

18  stop?

19  A.  Officer Dempsey was asking him for the keys of the moped.

20  Q.  What was Mr. Garlick's reaction, if you remember?

21  A.  Yes.  I remember he didn't want to give the keys, because

22  he was worried because it could get lost.  That's what he said.

23  He stated.

24  Q.  Do you have any recollection about Mr. Garlick's demeanor

25  at that time?

1    A.  He was just not complying at first, like giving the key.

2    And he said he just wanted -- he was, like, I rather leave it

3    empty the bike.  So yeah, that's all I remember.

4    Q.  What, if anything, did Mr. Garlick do next?

5    A.  After -- I don't recall.

6    Q.  So Officer Cosma, how did the stop end?

7    A.  I'm sorry.  Can you repeat that?

8    Q.  How did the stop of Mr. Garlick's moped end?

9    A.  Okay.  It ended when I gave, I wrote the summons, I gave it

10   to Mr. Garlick, and Officer Shakoor walk him to the sidewalk

11   where the other bikes were.

12   Q.  And with respect to the belongings that were in

13   Mr. Garlick's bike at the end of the stop, what happened to

14   those belongings?

15   A.  Mr. Garlick placed the items inside the moped and locked

16   the compartment.

17   Q.  And what, if anything, did he do with the key?

18   A.  He gave the key to Officer Shakoor.

19   Q.  Officer Cosma, I'd like to hand you what has been marked

20   for identification as Government Exhibits 302, 303, and 304.

21        Officer Cosma, what did I just hand you?

22   A.  This is the footage of my body worn camera and Shakoor,

23   Officer Shakoor's body worn camera.

24   Q.  How do you recognize Officer Shakoor's body worn camera?

25   A.  The way I recognize Officer Shakoor's body worn camera is

1    by the tone of his voice, and also I was there with him on the

2    stop.

3    Q.   What is the event that is shown in these body cam videos?

4    A.   Mr. Garlick's stop.

5    Q.   Have you viewed the videos in Government Exhibits 302, 303

6    and 304?

7    A.   Yes, I have.

8    Q.   What, if anything, did you do to the CD after you watched

9    those videos?

10   A.   After I watched the videos, I initialed my -- the CDs,

11   which is L.C., Lairy Cosma.

12   Q.   Are those your initials on all three of the CDs?

13   A.   Yes, yes, it is.

14   Q.   Do Government Exhibits 302, 303, and 304 accurately depict

15   the stop of Mr. Garlick?

16   A.   Yes, they are.

17           MR. FANG:  The government offers Government Exhibits

18   302, 303 and 304.

19           THE COURT:  Any objection?

20           MR. GARLICK:  Your Honor, objection for

21   authentication.

22           THE COURT:  Overruled.

23           302, 303, and 304 are received.

24           (Government's Exhibit 302, 303, 304 received in

25   evidence)

1          MR. FANG:  The government, your Honor, has also

2     prepared transcripts of Government Exhibits 302 and 303, which

3     are marked for identification as Government Exhibits 302-T and

4     303-T.  And we would ask that we be permitted to pass out paper

5     copies to the Court and to the jury at this time.

6          THE COURT:  Okay.  Any objection.  They are going to

7     be received like the others, only as an aid to the jury.

8          Any objection?

9          MR. GARLICK:  No objection.

10          THE COURT:  So these are just like the other

11     transcripts.  It is what is on the tape that counts.  This is

12     just to help you follow the transcript.  If you hear something

13     different than what's in the transcript, it is what you hear

14     that governs.

15          (Pause)

16          THE COURT:  Can I get one, please.

17          Okay, Mr. Fang.

18          MR. FANG:  Ms. Gutierrez, can you please play

19     Government Exhibit 303, starting from time 1800 in the video

20     through 20:09 in the video, and that's going to be page 12 and

21     onward in Government Exhibit 303-T.

22          (Video playing)

23     Q.  Officer Cosma, whose body cam video is this?

24     A.  This is my body cam.

25          MR. FANG:  Ms. Gutierrez, if I can ask you to freeze

1    frame 20:07 on the video of Government Exhibit 303.

2                   (Video playing)

3    Q.  Officer Cosma, what do you see on the sidewalk?

4    A.  On the sidewalk, I can see Officer Shakoor with Mr. Garlick

5    with blue shorts with his bike.

6    Q.  Was there anything else on the sidewalk at that point?

7    A.  There were a couple more bikes that we took that night.

8                   MR. FANG:  Ms. Gutierrez, please play Government

9    Exhibit 302, starting from time 18:24 through 19:30, and that's

10   going to be page 16 and on in Government Exhibit 302-T.

11                  (Video playing)

12                  THE COURT:  Okay.  I don't know about the jury, but I

13   can't find the transcript where you are referencing us at all.

14   16 is only a half a page on the transcript which you've given

15   us.

16                  MR. FANG:  It should be Government Exhibit 302-T.

17                  THE COURT:  302-T page 16 is a half a page.

18                  MR. FANG:  Just a moment, your Honor.

19                  My apologies.  That should start at page 15 and go on

20   to page 16.

21                  THE COURT:  So back up the tape.  And what line are we

22   starting at?

23                  MR. FANG:  At line 12.

24                  THE COURT:  What minute are we starting at again?

25                  MR. FANG:  18:24 and play through 19:30.

1          (Video playing)

2    Q.  Officer Cosma, whose body cam video is this?

3    A.  That's Officer Shakoor body worn camera video.

4    Q.  Are these the same events that we watched previously on

5    your body cam?

6    A.  Yes, they are.

7          MR. FANG:  Ms. Gutierrez, if we can please display

8    time 18:30 of Government Exhibit 302.

9          (Video playing)

10   Q.  Officer Cosma, are the items that Mr. Garlick took out of

11   his bike visible?

12   A.  Yes.

13   Q.  Where are they?

14   A.  They are on top of the seat of the moped.

15         MR. FANG:  Let's play Government Exhibit 302 from

16   19:30 until the end.  And there is no transcript associated

17   with this section.

18         (Video playing)

19   Q.  Officer Cosma, is this the sidewalk where you testified the

20   mopeds were being moved?

21   A.  Yes, it is.

22   Q.  Just to be clear, was Mr. Garlick's moped on that sidewalk

23   too?

24   A.  Yes, it was.

25   Q.  What, if anything, did you see Officer Shakoor doing after

1  he moved the moped to the sidewalk?

2  A.  I could see Officer Shakoor talking to Mr. Garlick, and I

3  saw him, like, trying to turn the bike off.

4        MR. FANG:  We can take that down.  Thank you.

5  Q.  What did you do after Officer Shakoor moved Mr. Garlick's

6  moped to the sidewalk?

7  A.  After Officer Shakoor moved the moped to the sidewalk, I --

8  I was helping Officer Perez with his arrest by helping him

9  opening the police car to place his defendant inside the car.

10 Q.  Just to be clear, that arrest has nothing to do with

11 Mr. Garlick's case, right?

12 A.  No.

13 Q.  Where was this arrest happening?

14 A.  162 and Jerome Avenue in the Bronx.

15 Q.  Relative to the sidewalk where the mopeds were, how far

16 were you?

17 A.  I was approximately three car length.

18       MR. FANG:  Ms. Gutierrez, can you please play

19 Government Exhibit 303 from time 20:09 until 21:55.  There is

20 no transcript associated with this clip.

21       (Video playing)

22 Q.  Officer Cosma, who approached on the left-hand side at the

23 end of the video?

24 A.  That's Officer Shakoor.

25       MR. FANG:  Ms. Gutierrez, let's please play Government

1    Exhibit 304 from the beginning until 50 seconds in.

2            THE COURT:  And we have no transcript of this, right?

3            MR. FANG:  That's correct, your Honor.

4            (Video playing)

5    Q.  Officer Cosma, just to be clear, whose body cam video is

6    this?

7    A.  This is Officer Shakoor body worn camera.

8    Q.  Why is there no audio?

9    A.  The first minute of the body worn camera, there is no

10   audio.

11   Q.  Do you see yourself in this clip?

12   A.  Yes, I do.

13   Q.  Are these the same events that we just watched on your body

14   cam?

15   A.  Yes, they are.

16           MR. FANG:  Ms. Gutierrez, let's switch back to

17   Government Exhibit 303 and play that from 22 minutes in to

18   24:01.

19           (Video playing)

20   Q.  Officer Cosma, is this your body worn camera?

21   A.  Yes, it is.

22   Q.  What, if anything, is Officer Shakoor holding in his hand?

23   A.  Shakoor, Officer Shakoor is holding Mr. Garlick's moped

24   key.

25   Q.  How do you know that those are Mr. Garlick's moped keys?

1    A.  Because I had it in my possession before, and it was few

2    minutes after Mr. Garlick bike was placed on the sidewalk by

3    Officer Shakoor.

4    Q.  I believe you testified that you also had Mr. Garlick's

5    keys.  Who did you get them from?

6    A.  Officer Shakoor gave me the keys for Mr. Garlick's moped.

7    Q.  Why did Officer Shakoor give you the keys?

8    A.  The reason he gave me the key was because I --

9            MR. GARLICK:  Objection, your Honor.  Speculation.

10           THE COURT:  Sustained.

11   Q.  Officer Cosma, why did you have the keys?

12   A.  The reason I have the key was because I did the summons for

13   Mr. Garlick's moped, so that was my stop.

14   Q.  Is it typical, that the person who issues the summons holds

15   onto the key?

16   A.  Typically, yes.

17           MR. FANG:  Ms. Gutierrez, let's keep playing

18   Government Exhibit 303 until 24:38.

19           THE COURT:  There is no transcript of this, right?

20           MR. FANG:  Correct, your Honor.

21           (Video playing)

22   Q.  Officer Cosma, what, if anything, did you see Officer

23   Shakoor holding in his hand?

24   A.  He had Mr. Garlick's key.

25   Q.  Approximately what time was it at this point?

1    A.  It was 8:35 p.m.

2            MR. FANG:  Let's play Government Exhibit 303 until the

3    end.

4            (Video playing)

5    Q.  What were you and Officer Shakoor doing at the end?

6    A.  At the end, we proceeded to go to where the mopeds were

7    parked, so I can take a picture of the moped I just stopped.

8            MR. FANG:  Ms. Gutierrez, let's display for the

9    witness Government Exhibit 202-13A on the left and 202-13A on

10   the right.  And these are in evidence already.

11   Q.  Approximately when did you take this photograph?

12   A.  I took this photograph at 8:38 p.m.

13   Q.  Where was the moped at this point?

14   A.  It was on the sidewalk.

15   Q.  Officer Cosma, you testified a minute ago about Officer

16   Shakoor gave you Mr. Garlick's key.

17           To be clear, was that after the last clip that we just

18   watched?

19   A.  Yes, it was after this picture.

20   Q.  So, Officer Cosma, let me show you again, just so we have a

21   clear record, Government Exhibit 303, from 24:38 onwards.

22           (Video playing)

23   Q.  We can take that down.

24           Officer Cosma, is it your recollection that Officer

25   Shakoor gave you the key to Mr. Garlick's moped after this clip

N663gar3                              Cosma - Direct

1    we just watched?

2                  MR. GARLICK:  Objection, your Honor.  Asked and

3    answered already.

4                  THE COURT:  Overruled.  You can answer that.

5    A.  Yes.

6    Q.  Do you recall approximately how long after?

7    A.  I would say 10 minutes after.

8    Q.  Do you recall approximately what time?

9    A.  No, I don't recall.

10                 THE COURT:  When did you put the sticker on the bike?

11                 THE WITNESS:  We put the sticker after -- before --

12   maybe I would say 8:30.

13                 THE COURT:  Was it on the sidewalk when you put the

14   sticker on?

15                 THE WITNESS:  Yeah, it was on the sidewalk, your

16   Honor, yes.

17                 THE COURT:  Did you have the key by that point?

18                 THE WITNESS:  No.  Not by that point.  Officer Shakoor

19   had the key.

20                 MR. FANG:  Let's place Government Exhibits 202-13 and

21   202-13A back on the screen.

22   Q.  Can you remind the jury where Mr. Garlick's moped was at

23   the time of this picture?

24                 MR. GARLICK:  Objection, your Honor.  Asked and

25   answered already.

N663gar3                          Cosma - Direct

1            THE COURT:  Overruled.

2   A.  Yes.  It was on the sidewalk.

3   Q.  And at this time, was the center compartment of

4   Mr. Garlick's moped open?

5   A.  No.  It was locked.

6   Q.  Did the moped appear to have been tampered with?

7   A.  No.

8   Q.  After Officer Shakoor gave you the key to Mr. Garlick's

9   moped, what did you do with it?

10  A.  I remember putting it on my person.

11  Q.  What happened to Mr. Garlick's moped after that?

12  A.  After that, Mr. Garlick's moped was taken to the 44

13  Precinct by a barrier truck.

14  Q.  What is a barrier truck?

15  A.  It is a truck used to load mopeds or whatever we take from

16  the defendants, to take it to the precinct or somewhere else.

17  Q.  Do you recall approximately what time the barrier truck

18  showed up?

19  A.  I don't have the exact time, but I -- I do, it was around

20  maybe 45 minutes after Mr. Garlick's stop.

21  Q.  Was Mr. Garlick's moped the only moped that was loaded onto

22  the truck?

23  A.  No, it was not the only one.

24  Q.  Were you personally involved in loading the mopeds to the

25  barrier truck?

1   A.  No, I wasn't.

2   Q.  Between the time that Officer Shakoor gave you the key to

3   Mr. Garlick's moped, up until the point when it was loaded onto

4   the barrier truck, did you open Mr. Garlick's moped?

5   A.  No, I didn't.

6   Q.  Did you see anyone else try to open Mr. Garlick's moped

7   during that time?

8   A.  No, I didn't see nobody.

9   Q.  Did anybody ask you for the key to Mr. Garlick's moped?

10  A.  Nobody.

11  Q.  Did you give the key to Mr. Garlick's moped to anybody

12  else?

13  A.  No.

14  Q.  Where was Mr. Garlick's key this entire time?

15  A.  It was on my person.

16  Q.  Officer Cosma, did you stop any other mopeds that night,

17  after Mr. Garlick's moped?

18  A.  Yes, I did.

19  Q.  Approximately when did that stop occur?

20  A.  I would say around 9:21.

21  Q.  Did you take photographs of that other moped?

22  A.  Yes, I did.

23  Q.  Did you keep the key to that other moped as well?

24  A.  Yes, I did.

25  Q.  When do you recall leaving the checkpoint?

1   A.  I recall leaving the checkpoint some time around after

2   midnight.  Maybe 1.

3   Q.  Where did you go after the checkpoint ended?

4   A.  After the checkpoint ended, we went to the 44 Precinct.

5   Q.  Do you remember approximately when you got back to the

6   precinct?

7   A.  I don't recall the exact time.

8   Q.  Do you know how far the precinct is from the checkpoint?

9   A.  10 minutes from the checkpoint.

10  Q.  Did you go straight back to the precinct?

11  A.  Yeah.

12  Q.  What do you remember happening after getting back to the

13  precinct?

14  A.  After we got back to the precinct, I remember Officer Pino

15  told us it was time to do the inventory of the bike.  So we

16  proceeded to go to the parking lot where the bike were.

17  Q.  Who is Officer Pino?

18  A.  He is a patrol officer from the 44 Precinct.

19  Q.  What was your understanding of how the inventory would

20  proceed?

21  A.  My understanding was whoever wrote the summons for any bike

22  have to do the voucher.  A voucher is like when we take

23  defendant's property, we take it to the precinct and we link it

24  to the defendant, and we safeguard it at the precinct.

25  Q.  So, how would the actual inventory of the items, any items

1   found in a moped work?

2   A.  We proceed to open the bikes, and then we grab a bag to put

3   everything inside, that's inside the bike on the bag.

4   Q.  Officer Cosma, were you involved in inventorying

5   Mr. Garlick's moped?

6   A.  Yes, I was.

7   Q.  Who else was involved?

8   A.  Officer Pino.

9   Q.  Can you describe, relative to the moped, where you were

10  standing during the inventory.

11  A.  Yes.  I was standing on the left side of the moped, holding

12  a bag.

13  Q.  Can you describe relative to the moped where Officer Pino

14  was standing.

15  A.  Yes.  Officer Pino was standing on the right side of the

16  moped.

17  Q.  Approximately how close were you to Officer Pino during the

18  search?

19  A.  During the search I was about, I'd say, an arm distance.

20  Q.  So arm's length?

21  A.  Hmm-hmm.  Yes.

22  Q.  Officer Cosma, please explain to the jury how the search

23  started.

24  A.  The search started, I grabbed the bag, I was on the left

25  side.  Officer Pino was on the right side of the bike.  He

1    proceeded to open the compartment by putting the key in,

2    twisting it, and opening the compartment.  And he took the

3    belongings of Mr. Garlick's and place it on the bag that I was

4    holding.

5    Q.  Let's unpack that a little bit.  How did Officer Pino get

6    the key?

7    A.  I gave the key to Mr. Pino.

8    Q.  Between the time that Officer Shakoor gave you the key

9    until the time when you gave the key to Officer Pino, did you

10   give the key to anybody else?

11   A.  No.

12   Q.  What are some of the items that Officer Pino pulled out of

13   Mr. Garlick's moped?

14   A.  I remember him put pulling out wires, a rag, black rag, and

15   a charger.

16   Q.  After he pulled out the rag and charger and wires, what, if

17   anything, happened?

18   A.  After he pulled those items out, he proceed to see if there

19   was something left on the bike, and he placed his hands inside.

20   And I am going to say exactly how he said it.  He was like, he

21   placed his hands inside, and he was like, "Oh, shit, I touched

22   it."  That's what he said.

23   Q.  What happened next?

24   A.  He pulled out a gun and placed it on the seat of the bike.

25   Q.  Do you recall the general size of the gun?

N663gar3                          Cosma - Direct

1    A.  I know it was a small gun.  But I don't know, I don't have

2    the exact size.

3    Q.  During the search, could you see into the compartment of

4    the moped?

5    A.  No.

6    Q.  By the way, during the search, Officer Cosma, was your body

7    camera on?

8    A.  It was not on.

9    Q.  And why not?

10   A.  I forgot to put it on.

11   Q.  Do you know if you were supposed to have it on?

12   A.  Yes, I was supposed to have it on.

13          MR. FANG:  Ms. Gutierrez, can you please display for

14   the witness Government Exhibit 202-16 on the left and 202-16A

15   on the right.

16   Q.  Officer Cosma, I am showing you what has been marked for

17   identification as Government Exhibits 202-16 on the left and

18   202-16A on the right.

19          Do you recognize these exhibits?

20   A.  Yes, I do.

21   Q.  What is the one on the left?

22   A.  The picture on the left is a picture of Mr. Garlick's moped

23   on the parking lot of the 44 Precinct.

24   Q.  What about the exhibit on the right?

25   A.  The one on the right is the screenshot of the picture I

N663gar3                          Cosma - Direct

1    took from Mr. Garlick's bike.

2    Q.   Does it appear to be a screenshot of the photograph that's

3    on the left?

4    A.   Yes.  It is the screenshot with the time stamp.

5    Q.   Is Government Exhibit 202-16 a true and accurate copy of a

6    photograph that you took of Mr. Garlick's moped in the parking

7    lot of the 44 Precinct?

8    A.   Yes, it is.

9    Q.   Is Government Exhibit 202-16A a true and accurate copy of a

10   screenshot of Mr. Garlick's moped in the parking lot of the 44

11   Precinct?

12   A.   Yes, it is.

13            MR. FANG:   The government offers Government Exhibits

14   202-16 and 202-16A.

15            THE COURT:   Any objection?

16            MR. GARLICK:   No.

17            THE COURT:   202-16 and 202-16A are received.

18            (Government's Exhibit 202-16, 202-16A received in

19   evidence)

20   Q.   Officer Cosma, approximately when did you take this

21   photograph?

22   A.   I took those photograph at 2:10 a.m.

23            MR. FANG:   Ms. Gutierrez, if you can please blow up

24   the beige tag on Government Exhibit 202-16.

25   Q.   Officer Cosma, what does this tag say?

N663gar3                        Cosma - Direct

1    A.  This tag says my name, L-A-I-R-Y.

2    Q.  Did you put that tag on the bike?

3    A.  Yes.

4    Q.  Why?

5    A.  Because I wanted to make sure that that was my bike.

6          MR. FANG:  Ms. Gutierrez, please display for the

7    witness Government Exhibit 202-24 on the left, and 202-24A on

8    the right.

9    Q.  Showing you what's been marked for identification as

10   Government Exhibits 202-24 and 202-24A.

11         Do you recognize these exhibits?

12   A.  Yes, I do.

13   Q.  What is the exhibit on the left?

14   A.  The one on the left is -- oh, Mr. Garlick's moped along

15   with the gun that was found in his bike.

16   Q.  What about the one on the right?

17   A.  The one on the right is Mr. Garlick's moped with the gun

18   that was found inside of the bike.  That's a screenshot of the

19   picture that I took.

20   Q.  Is Government Exhibit 202-24 a true and accurate copy of

21   the photograph that you took of Mr. Garlick's moped with the

22   gun?

23   A.  Yes, it is.

24   Q.  And is Government Exhibit 202-24A a true and accurate copy

25   of a screenshot that you took of a photograph of Mr. Garlick's

N663gar3                          Cosma – Cross

1   moped with the gun?

2   A.  Yes, it is.

3          MR. FANG:  The government offers Government Exhibits

4   202-24 and 202-24A.

5          THE COURT:  Any objection?

6          MR. GARLICK:  No, your Honor.

7          THE COURT:  No?

8          MR. GARLICK:  No.

9          THE COURT:  202-24 and 202-24A are received.

10         (Government's Exhibit 202-24, 202-24A received in

11  evidence)

12  Q.  Officer Cosma, when did you take this photograph?

13  A.  I took those photograph at 2:45 a.m.

14         MR. FANG:  Just a moment, your Honor.

15         No further questions.

16         THE COURT:  Thank you.

17         Mr. Garlick.

18  CROSS-EXAMINATION

19  BY MR. GARLICK:

20  Q.  Good afternoon, Ms. how do you say your last name?

21  A.  Cosma.

22  Q.  Cosma.  Good afternoon.  Sorry once again with this delay.

23  Real quick.

24         Officer Cosma, on August 27, 2002, you never saw

25  myself with a gun; is that correct?

1    A.  Correct.

2    Q.  During the stop, the police said that they was taking the

3    bike; is that correct?

4    A.  I'm sorry.  Can you repeat?

5    Q.  During the stop, y'all was instructed to seize these

6    vehicles if they didn't have the proper paperwork?

7    A.  Yes.  No plates on it, yes.

8    Q.  You said that I had a number of personal items that I took

9    from the center console, and you also stated that one of those

10   items was a black rag; is that correct?

11   A.  Yes.

12   Q.  From your angle, where you were standing, you said that you

13   couldn't see inside the compartment; is that correct?

14   A.  Correct.

15   Q.  So, how would you say that you can -- how do you know how

16   deep or not the compartment was if you couldn't see inside it?

17   A.  I couldn't see inside because it was tilted to the left

18   where you were.  And also I could see you going in, and it was

19   from my understanding it was deep, yeah.  I couldn't see

20   anything inside your compartment at that time.

21          MR. GARLICK:  If it's possible, can you put GX 303 at

22   2:40 through -- I mean 12:40 through 12:47.

23          (Video playing)

24   Q.  How long do you, in your estimation, how long were we

25   standing there while you was writing the summons?

1    A.  I would say about 20 minutes maybe.

2    Q.  You were there as I was pulling these things out of my

3    bike, correct?

4    A.  Yes, I was there.

5    Q.  Is this your body worn camera footage?

6    A.  Yes.

7    Q.  Of the stop, of the 2022 August 27 stop?

8    A.  Yes.

9    Q.  Is that me wearing the black shirt?

10   A.  Yes, that's you.

11   Q.  Who was I speaking to during this traffic stop?

12   A.  You were speaking with Officer Dempsey.

13   Q.  Who was that standing on the far right of you?

14   A.  I'm sorry.  Can you repeat that?

15   Q.  Who was that standing in the picture on the far right, on

16   your angle, the far right of you standing next to you?

17   A.  That's Officer Shakoor.

18   Q.  And he's within arm's reach of this bike from this picture,

19   correct?

20   A.  I'm sorry?

21   Q.  He is within arm's length of the bike from where he was

22   standing?

23   A.  Yeah.

24   Q.  From this photo, is the center console open or closed?

25   A.  It's open.

1           MR. GARLICK:  Your Honor, I would like to inquire if

2    the prosecution still has the defense counsel pictures we have.

3    I would like to use one of them.

4           THE COURT:  Okay.  If you can give Mr. Garlick back

5    his pictures.

6           What's the exhibit number?

7           MR. GARLICK:  A-6.

8           THE COURT:  Is this the same image?

9           MS. GUTIERREZ:  Sorry.  Just give me one second.

10          MR. GARLICK:  It should be at 12:44.

11          (Video playing)

12   Q.  Officer Cosma, can you see the image --

13          THE COURT:  Is this video in evidence?

14          MR. FANG:  Yes, the video is in evidence.

15          THE COURT:  Okay.  Go ahead.

16   Q.  Can you see the image in front of you?

17   A.  Yes, I do.

18   Q.  It is a still shot in your body cam, from the clip of your

19   body cam we just watched.  Can you see me in the still shot?

20   A.  Yes.

21   Q.  Can you see the bike?

22   A.  Yes.

23   Q.  Is this a fair and accurate representation of the bike stop

24   on August 27, 2022?

25   A.  Yes, it is.

N663gar3                        Cosma – Cross

1              MR. GARLICK:  I would ask for Defense Exhibit A-6 be

2    entered into evidence.

3              THE COURT:  Any objection to A-6?

4              MR. FANG:  Your Honor, the copy we've received as

5    Defense Exhibit A-6 looks a little bit different from what's

6    currently depicted on the screen, even though it is the same

7    time stamp.

8              THE COURT:  Stop.  Are you objecting to the admission

9    of A-6?

10             MR. FANG:  No.

11             THE COURT:  It's not quite the same time.  No

12   objection.  So A-6 is received.

13             (Defendant's Exhibit A-6 received in evidence)

14             THE COURT:  Go ahead, Mr. Garlick.

15   Q.  This is a still shot from your body worn camera footage.

16   You were standing right next to me, next to this bike; is that

17   correct?

18   A.  Yes, that's correct.

19   Q.  There is an individual on your right side of this picture.

20   Is that myself?

21   A.  On the right side?

22   Q.  On the right side of the bike.

23   A.  You are on the left side of the bike.

24   Q.  All right.  I'm sorry.  There is an individual on the right

25   side of the picture.  Who was that individual?

N663gar3                         Cosma - Cross

1        THE COURT:  I am not sure.  Are you talking about the

2    person with the T-shirt that has some sort of a -- has the

3    Statue of Liberty on it?

4        MR. GARLICK:  Yes.

5    A.  I'm not sure.  In this picture -- you are talking about

6    this picture?

7    Q.  Hmm-hmm.

8    A.  I can see Officer Dempsey on my left.

9    Q.  Who was the other person in the picture?

10   A.  That's a traffic --

11   Q.  I am asking if --

12       THE COURT:  Just to be clear, the picture what you've

13   got on the screen is not what's in the picture that you are

14   asking her about.  So, why don't we use the Elmo so that you

15   all are looking at the same thing.

16       Okay, Mr. Garlick, now ask your question.  Which

17   person are you asking about?

18   Q.  Person wearing the black shirt, the person wearing the

19   black shirt.  Can you identify that person from the video, from

20   the screenshot?

21   A.  The person on the left of the bike with the black shirt is

22   you.

23   Q.  Thank you.  I'm standing next to the bike.  On the left

24   there is a police officer, correct?

25   A.  Yes.

N663gar3                          Cosma - Cross

1    Q.  Holding a notepad.  That's Officer Dempsey, correct?

2    A.  Yes.

3    Q.  Directing your attention towards the bottom right of the

4    screen.  That is the top of the console, correct?

5    A.  Yes.

6    Q.  Next to my arm, correct?

7    A.  Yes.

8    Q.  Is it open or closed?

9    A.  It's open.

10   Q.  You testified during the stop that I appeared nervous; is

11   that correct?

12   A.  You was not complying about giving the keys and was asking

13   for a bag.

14   Q.  Did you have a feeling I might be hiding something?

15   A.  No.

16   Q.  Because of your distance from the scooter and angle of

17   compartment, the compartment was tilted during the traffic

18   stop, did you stay in one place?

19   A.  No.  I was looking back, I was -- I never went to the left

20   side of the bike.

21   Q.  You never tried to get a better angle of the compartment to

22   look inside?

23   A.  No.

24   Q.  You said you couldn't see inside the compartment because it

25   was dark out.  But you had a flashlight with you that night,

1   correct?

2   A.  Yes, I did.  But the reason I couldn't see in the

3   compartment was because it was tilted to the left, and the

4   distance I was from the bike also.

5   Q.  I want to talk to you about your memory of what happened on

6   August 27, 2022.

7           Before you testified today, you met with the

8   prosecutors, correct?

9   A.  Yes, I did.

10  Q.  Did they ask you questions right before coming into court

11  today?

12  A.  Court prep.

13  Q.  You met with the government several times, correct?

14  A.  I'm sorry?

15  Q.  Did you meet with the prosecution, any of these people

16  sitting here, several times before trial?

17  A.  Yes.

18  Q.  A few days ago, on June 2nd, 2023, you took notes to help

19  yourself remember events, correct?

20  A.  Yes, that's correct.

21  Q.  You took notes based on your review of the body worn camera

22  footage; is that correct?

23  A.  Yes.

24  Q.  The body worn camera footage was of the incident of the

25  stop, correct?

1   A.   Correct.

2   Q.   On August 27, 2022?

3   A.   Yes.

4   Q.   To remember what happened more than nine months ago, your

5   notes included specific times, what time you stopped me, what

6   time you asked -- what time you asked about my bike key, the

7   time you helped another officer with his transport, the time

8   you made another bike stop, the time --

9            Around what time do you think that you got the key

10  from Mr. Shakoor?

11  A.   Sorry, Mr. Garlick, but on my notes, as I remember, I never

12  stated when I asked for the keys.

13  Q.   So from the body worn camera footage that we watched of you

14  and Mr. Shakoor, it is safe to say he actually had the keys

15  through the duration of the body worn footage.  He had the keys

16  from the duration of the time when we crossed the street with

17  the bike?

18  A.   When you was in the sidewalk with him, he had the key, keys

19  in his hands, yes.

20  Q.   From the end of all of your body cam footage, did he still

21  possess these keys?

22  A.   I would say -- when I was helping Officer Perez, he still

23  had the keys with him.  And minutes after that, we went to the

24  sidewalk where your bike was placed, and I proceed to take a

25  picture of your bike with the sticker.  And after that, I

1   remember Officer Shakoor gave me the key to me.

2   Q.  You also took notes about my body language.  Your notes

3   reflected what was on the body camera footage; is that correct?

4   A.  Yes.

5   Q.  What did you write in your notes concerning my body

6   language, do you remember?

7   A.  I didn't.  I just remember I put body language.  That's it.

8   The way I saw you.

9   Q.  There is no body worn camera footage of you handing Pino

10  the key.  There is no photograph of you handing Pino the key.

11  There is no photograph --

12          MR. FANG:  Objection.

13          THE COURT:  Sustained.

14          Do you have a question, Mr. Garlick?

15          MR. GARLICK:  Yes.

16          THE COURT:  Phrase it as a question.

17  Q.  There is no body worn footage of you handing Officer Pino

18  the key.

19          THE COURT:  Stop.  That's a statement.  You want to

20  ask --

21          MR. GARLICK:  I'm asking her if there is any body worn

22  camera footage of her handing the key.

23          THE COURT:  You didn't ask that.  You just stated a

24  statement.  Are you asking her is that true?

25          MR. GARLICK:  Yes.

1              THE COURT:  That's a helpful thing to add.

2              Is that true that there is no picture, no body worn

3    footage of Pino handing you the key or you handing Pino the

4    key?

5              THE WITNESS:  That's true, your Honor.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  What's your next question?

2     BY MR. GARLICK:

3     Q.  Did you make any activity log in your entry book when you

4     gave Officer Pino the key?

5     A.  No, I didn't.

6     Q.  The notes you prepared for trial today, did they say what

7     time you gave Officer Pino the key?

8     A.  No, Mr. Garlick.

9     Q.  You issued me the summons; is that correct?

10    A.  Yes, that's correct.

11    Q.  After you issued the summons, Officer Shakoor took the

12    motorbike; is that correct?

13    A.  After I issued the summons, yes, Officer Shakoor took the

14    bike to the sidewalk.  Yes, that's correct.

15    Q.  Officer Shakoor walked the bike to the sidewalk; is that

16    correct?

17    A.  Yes.

18    Q.  I walked away with Officer Shakoor to place the bike on the

19    sidewalk; is that correct?

20    A.  That's correct.

21    Q.  Was there anyone officially assigned to watch these bikes

22    at a certain amount of time while the searches was going on

23    after they was already on the sidewalk?

24    A.  I don't recall if they assigned someone, but I'm pretty

25    sure they -- someone has to be watching the bike -- the bikes.

1  Q.  Nobody generally has to watch the mopeds, nobody was

2  officially assigned to watch the mopeds, but the idea was

3  generally for someone to keep an eye on the mopeds; is that

4  correct?

5  A.  I didn't say nobody was assigned.  I just said that I

6  don't -- I didn't remember if anybody was assigned, but I did

7  saw officers next to the bikes all the time.

8  Q.  Do you recall who those officers were?

9  A.  I don't know their name, because I was new at that time.

10          MR. GARLICK:  Can I have GX 202, photo of the

11  voucher -- never mind.

12          THE COURT:  You want the government's exhibit?

13          MR. GARLICK:  No, I don't want it, your Honor.

14          THE COURT:  How much longer are you going to be?

15          MR. GARLICK:  Until I finish my questions.

16          THE COURT:  About how much longer is that going to

17  take?

18          MR. GARLICK:  About 10, 15 minutes.

19          THE COURT:  Why don't we take our afternoon break,

20  then.  It's about 3:35.  I'm going to bring you back at 3:45.

21  Don't discuss the case, please leave your stuff on the chairs.

22          (Continued on next page)

23

24

25

N66Ggar4

1                    (In open court; jury not present)

2                    THE COURT:  Okay, folks.  Ten minutes.

3                    (Recess)

4                    THE COURT:  You ready, Mr. Garlick?

5                    MR. GARLICK:  Yes.

6                    THE COURT:  Let's get the jury in.

7                    Where is the witness?

8                    (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  You are still under oath.

3              Do we still need this exhibit up, the picture?

4              MR. GARLICK:  I can't see it, so -- no.

5              THE COURT:  Let's go, Mr. Garlick.

6    BY MR. GARLICK:

7    Q.  Your body worn camera was not on when Pino supposedly found

8    the gun in my bike; correct?

9    A.  It wasn't on because I forgot to put it on.

10   Q.  But you turned on your body worn camera after the gun was

11   found; is that correct?

12   A.  Correct.

13   Q.  You indicated that you watched the inventory search with

14   the AUSAs on 5/27 after the gun was found; is that correct?

15   A.  Can you rephrase.

16             THE COURT:  Rephrase that question.  There's a

17   misplaced modifier.

18   Q.  Did you watch the inventory search with the AUSAs on 5/27?

19   A.  Yes, the --

20             MR. GARLICK:  Can I get the exhibit -- Maria, can you

21   please find the first minute of what's marked defense Exhibit

22   A12.

23             THE COURT:  A12?

24             MR. GARLICK:  Yes.

25             THE COURT:  It's on the screen.  What do you want to

1     do, Mr. Garlick?

2              MR. GARLICK:  Can Maria please play the first 30

3     seconds.

4              (Media played)

5     BY MR. GARLICK:

6     Q.  Officer Cosma, do you recognize this video?

7     A.  Yes, I do.

8     Q.  Is that your body worn camera footage?

9     A.  Yes, it is.

10    Q.  Is that from the parking lot at the precinct?

11    A.  Yes, it is.

12    Q.  Is this the video that you viewed with the government a

13    week ago, May 29th, 2003 -- I mean, 2023?

14    A.  Yes, I saw that video.

15    Q.  Is this video you just watched a fair and accurate

16    representation of the 44th Precinct parking lot on August 28th,

17    2022?

18    A.  Yes, it is.

19              MR. GARLICK:  I would ask defense exhibit be entered

20    into evidence.

21              THE COURT:  Is it just the 30 seconds you just played

22    or the entire video?

23              MR. GARLICK:  The entire video.

24              THE COURT:  Any objection?

25              MR. FANG:  No objection.  Although the top of the

1    video indicates it's A15.

2              THE COURT:  I don't understand.

3              MR. GARLICK:  It says A15, not A12.

4              THE COURT:  The exhibit number is A15?

5              MR. GARLICK:  Yes.

6              THE COURT:  A15 is received.

7              (Defendant's Exhibit A15 received in evidence)

8              MR. GARLICK:  Maria, can you please publish this

9    evidence to the jury, A15.

10             THE COURT:  So we have a still on the screen,

11   Mr. Garlick.  What do you want the paralegal to do?

12             MR. GARLICK:  We can take it down for now, ma'am.

13             THE COURT:  Okay.

14   BY MR. GARLICK:

15   Q.  Is this footage from after the gun was recovered?

16   A.  Yes, it is.

17   Q.  Because that's when you pressed the button to turn on your

18   body worn camera?

19   A.  Yes.

20             MR. GARLICK:  Maria, can you please continue to play

21   A15 through 4:41 from the beginning.

22             (Media played)

23   BY MR. GARLICK:

24   Q.  Officer Cosma, in this clip that we just watched, another

25   officer approached you, another officer approached you while

N66Ggar4                          Cosma - Cross

1    you was doing the inventory search; is that correct?

2    A.  We finished the inventory search at that point.

3    Q.  Did another officer approach you and ask -- stating that

4    Officer Dempsey is going to take this one, referring to my

5    search of -- the search of my bike?

6              MR. FANG:  Objection.

7              THE COURT:  Sustained.

8              Rephrase the question.

9              MR. GARLICK:  Can you go back to 4:24, Maria.  Go back

10   to 20, please.

11             (Media played)

12   BY MR. GARLICK:

13   Q.  What did this officer that approach you -- that is your

14   body cam footage; correct?

15   A.  Correct.

16   Q.  What did this officer say to you when he approached you?

17   A.  I don't recall what he was saying to me at that time.

18   Q.  In January or February of this year, you got an email about

19   NYPD medals; is that correct?

20   A.  I don't recall if it was January or February, but I do

21   remember it happening, yes.

22   Q.  You can earn medals for excellent police work; correct?

23   A.  Never had one, so -- I'm new, so.

24   Q.  Have you heard that you can earn these medals from doing

25   your police work?  Do you remember what the email said?

N66Ggar4                          Cosma - Cross

1    A.  I didn't read the email.  Just that it's a recommendation,

2    but I didn't pay attention to it.

3    Q.  You talked to Officer Shakoor about this medal, but you

4    didn't ask for a reward?

5    A.  I'm sorry?

6    Q.  Did you speak to Officer Shakoor about these potential

7    medals?

8    A.  I told him that I received an email.  That was it.

9    Q.  So you didn't put in a request for a medal?

10   A.  No.

11   Q.  Because it wasn't your arrest; correct?

12   A.  It wasn't my arrest and I also didn't know because I was

13   new.  I'm new, still new.

14   Q.  After the motorbike -- I want to talk to you about the

15   inventory search.

16           After the inventory search, you went back to the

17   precinct?

18   A.  Yes.

19   Q.  At the precinct, you spoke with other officers, more senior

20   officers; correct?

21   A.  I'm sorry?

22   Q.  At the precinct, you spoke with more officers, senior

23   officers than yourself that was going to conduct this inventory

24   search?

25   A.  Officer Dempsey, yes, and Officer Pino.

N66Ggar4                          Cosma - Cross

1    Q.  Officer Pino told you to go to the parking lot to do the

2    inventory search; is that correct?

3    A.  Yeah, he did.

4    Q.  You were new to doing these searches; correct?

5    A.  Yes.

6    Q.  Was this your first time participating in a motorbike

7    checkpoint?

8    A.  Yes, it was my first time.

9    Q.  Did you just graduate from the academy a few weeks earlier?

10   A.  Yes.

11   Q.  Was this your first time writing a summons?

12   A.  Yes.

13   Q.  Officer Pino was your -- was senior to you; is that

14   correct?

15   A.  Yes, and Officer Dempsey.

16   Q.  Was he helping to train you on August 27th during the

17   inventory search?

18   A.  I'm sorry, can you repeat that again.

19   Q.  Was he training you how to do inventory searches on the day

20   that you searched this bike?

21   A.  The day that we searched that bike, he just told me to grab

22   a bag and he did the inventory search.

23   Q.  You said you gave him the keys a few minutes before the

24   search of this bike; is that correct?

25   A.  That's what I recall, yes.

N66Ggar4                          Cosma - Cross

1    Q.  Pino opened the compartment?

2    A.  I'm sorry?

3    Q.  Do you know if Officer Pino was the one who opened the

4    compartment?

5    A.  He was.

6    Q.  Not you?

7    A.  Not me.

8    Q.  Even though you were the one who issued the summons?

9    A.  Yes.

10   Q.  Pino is the person who found the pistol; correct?

11   A.  Can you repeat that.

12   Q.  Is Officer Pino the one who found this firearm?

13   A.  The one that found --

14   Q.  The firearm?

15   A.  Yes, he was the one who found the firearm.

16   Q.  You remember -- you said that you remember Officer Pino

17   saying, oh, shit, I touched it?

18   A.  Yes.

19   Q.  Did you know what "it" was in reference to?

20   A.  When he pulled it out, yes.  But I pretty much -- at that

21   time, when he said that, I pretty much assume it was because he

22   was like, oh, shit, I touch it.  So what else it could be.

23   Q.  Did he put the gun down with his bare hands on the seat; is

24   that correct?

25   A.  He touched the gun with his bare hands.

N66Ggar4                          Cosma - Cross

1    Q.  You said bikes over a hundred pounds have to wear a helmet;

2    is that correct?

3    A.  I was advised by Officer Dempsey at the moment of your stop

4    that that was the reason why, yes.

5    Q.  Did they give you any training material as far as prior to

6    this motorcycle stop?

7    A.  Not that I recall.

8    Q.  Did they give you any pictures of what the style -- any

9    description of the difference between an e-bike, moped,

10   scooter, nothing?

11   A.  Not that I recall.

12   Q.  You said that you stated that you took pictures of -- did

13   you take pictures of my stop and the other stop that you did

14   during the checkpoint?

15   A.  I took pictures of your bike on the sidewalk with the

16   sticker on it.  And I also took picture of the other bike that

17   I stopped on the parking lot, yes.

18   Q.  What other pictures did you take of these stops?

19   A.  Of the stop?

20   Q.  Of these bikes that you stopped, did you take any other

21   pictures?

22   A.  What do you mean, like just the bike?

23   Q.  Did you take pictures of the -- you took pictures of the

24   bikes with the bags, did you take pictures of the keys, did you

25   take pictures with the bike standing next to the bike?

N66Ggar4                          Cosma - Cross

1    A.  I took a couple of pictures.

2    Q.  Did you take any pictures to indicate which keys were with

3    which bikes?

4    A.  Just the one that -- yeah.

5    Q.  Just one?

6    A.  Two bikes I took pictures of with the key, along with the

7    key.

8    Q.  And was one of those bikes my bike?

9    A.  No.  It was one of the -- one was my bike, my second stop.

10   And the other one was -- I was going to help another officer do

11   the inventory for that bike.  That was the reason I took that

12   picture, so I can remember which was the bike I was going to

13   help the officer.

14   Q.  So you never took any pictures with the keys of my bike?

15   A.  I took a picture of your bike with the gun on top of the

16   seat.  And if you zoom in the picture, you can see my name on

17   the key fob that's on the bike.  That's the -- that's why I

18   took that picture.

19   Q.  If you was taking pictures to indicate which bike belongs

20   to what person and you had keys that belong from one bike to

21   another and you took -- you said you took pictures of one set

22   of -- one stop that you had with the keys of the bike, why

23   didn't you take a picture with the keys with my bike before

24   this firearm was found?

25   A.  Because they place a sticker on your bike, and I took a

picture.  That way, I remember what's your bike.  And also that

day, I stopped two bikes; one was black and yours was red.  And

on the picture, you can see the color of your bike along with

the sticker.

Q.  So the sticker was on the bike before it went to the

precinct?

A.  I'm sorry, the sticker was on -- yes, it was when I was

inside -- sorry -- when I was in sidewalk, you could see the

time, around 8:30 something, I took that picture and your bike

was on the sidewalk still.

Q.  Did you touch this firearm?

A.  I didn't.

Q.  Did you hear any references to any firearms or any types of

weapons within the time that you was in the bike stop writing

the summons from me or any other officer?

A.  Can you rephrase that.

Q.  Did anybody mention a weapon during the traffic stop, from

your recollection, while you was writing the summons?

A.  No, I don't recall nobody mentioning a gun.

Q.  You earlier said that I wanted to leave the bike empty.

What did you mean by that?

A.  Because you state -- well, Officer Dempsey was asking you

for the key.  What I remember, you stated -- he was explaining

to you that the belongings inside your bike were going to be

vouchered at the precinct, safeguard under your name.  And you

N66Ggar4                          Cosma - Redirect

1    stated, I rather just leave it empty.

2    Q.  From your recollection, the first time that you actually

3    saw this firearm, it was in Officer Pino's hand when he put it

4    on the seat; correct?

5    A.  Yes.  When Officer Pino pulled out from your bike and he

6    put it on the seat, yes.

7              MR. GARLICK:  No further questions, your Honor.

8              THE COURT:  Anything further, Mr. Fang?

9              MR. FANG:  Yes, your Honor, just very briefly.

10             THE COURT:  Very briefly.

11   REDIRECT EXAMINATION

12   BY MR. FANG:

13   Q.  Officer Cosma, you were asked some questions on

14   cross-examination about preparing notes on your body cam.  Why

15   did you take those notes?

16   A.  The reason why I took those notes is because it was a year

17   ago and I wanted to -- I was like reviewing my body worn camera

18   and I was taking notes to make sure I was reviewing my stop.

19   Q.  Did anyone ask you to prepare those notes?

20   A.  Nobody.

21   Q.  Did anyone help you in preparing those notes?

22   A.  Nobody.

23   Q.  Was it important to make sure you gave the jury your best

24   recollection today?

25   A.  Yes, because it's important to tell the truth.

1          MR. FANG:  Just a moment, your Honor.

2          (Conferring)

3          MR. FANG:  No further questions.

4          THE COURT:  Thank you.  You can step down.

5          THE WITNESS:  Thank you.

6          THE COURT:  Call your next witness.

7          MR. SOWLATI:  The government calls Jeffrey Byram.

8   JEFFREY BYRAM,

9        called as a witness by the Government,

10       having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. SOWLATI:

13   Q.  Good afternoon, what is your current title?

14   A.  I am a supervisory special agent at the FBI's Secured

15   Technology Exploitation Unit.

16   Q.  Is the Secure Technologies Exploitation Unit also called

17   STXU?

18   A.  Yes, STXU.

19   Q.  What is STXU?

20   A.  STXU is the FBI's decryption unit.  We provide decryption

21   capabilities for law enforcement, that means we make unreadable

22   text human readable.

23   Q.  What sort of decryption capabilities does STXU offer?

24   A.  STXU decrypts all kinds of encrypted files.  STXU also

25   maintains an automated service that retrieves iCloud

N66Ggar4                          Byram - Direct

1    information from Apple and decrypts it.

2    Q.  Is a human involved in that pulling process from Apple?

3    A.  A human is not.

4           THE COURT:  I assume you mean you pull it with

5    appropriate process?

6           THE WITNESS:  Correct.

7           THE COURT:  The FBI is not just reaching into the

8    iCloud?

9           THE WITNESS:  Correct.

10          THE COURT:  Had a little heart attack there.

11   BY MR. SOWLATI:

12   Q.  Feel free to explain.

13   A.  Yes, I'll explain.  When legal process is served to Apple,

14   Apple responds to it and puts that response, codes it with two

15   layers of encryption.  The first layer of encryption is called

16   GNU privacy guard or GPG.  The second layer of encryption is

17   called -- well, it's an Apple proprietary encryption -- then

18   that encrypted response to the legal instrument, such as a

19   search warrant, is put on an Apple-owned online storage

20   facility.

21          Then Apple provides law enforcement with a download

22   link so law enforcement has the ability to go access that

23   information.  Apple also provides law enforcement with a

24   password to get around the layer of encryption that's Apple

25   proprietary, and then instructions how to decrypt the publicly

1    available GPG encryption.

2              That said, my unit, STXU, has an automatic program

3    that provides this service.  What the STXU service does is it

4    goes and it looks at the download link provided by Apple, it

5    goes -- it reads that link, goes to the online storage facility

6    provided by Apple, downloads the information, then it

7    automatically uses the password provided by Apple to undo the

8    Apple encryption.  And finally, it undoes the GPU privacy guard

9    encryption.

10             The end results that -- and this is all completely

11   automated, no human beings are involved in this process -- this

12   automated process then stores this to a location on the FBI

13   enterprise.

14             MR. SOWLATI:  Permission to give Special Agent Byram

15   GX 604.

16             THE COURT:  Yes.

17   BY MR. SOWLATI:

18   Q.  Special Agent Byram, do you recognize GX 604?

19   A.  I do.  It's a thumb drive.

20   Q.  What are the contents of it?

21   A.  That thumb drive contains the undecrypted Apple response

22   that was downloaded from the Apple provided iCloud location for

23   the iCloud account JamesGarlick48@gmail.com.

24   Q.  Do you know that from your review of the contents of this

25   drive?

1    A.  I do.

2    Q.  There are initials on there, whose initials are on there?

3    A.  Those are mine.

4    Q.  Did these files need to be decrypted?

5    A.  They need to be decrypted.

6    Q.  Sorry, did they need to be decrypted when you pulled them?

7    A.  They did need to be decrypted.

8    Q.  Were they decrypted?

9    A.  Yeah, the STXU automated service decrypts them.

10   Q.  And just to be clear, where did these files come from

11   originally?

12   A.  They came originally from Apple.

13          MR. SOWLATI:  Permission to give Special Agent Byram a

14   hard drive that's been marked for identification as GX 605.

15          THE COURT:  Yes.

16   BY MR. SOWLATI:

17   Q.  Special Agent Byram, do you recognize Government

18   Exhibit 605?

19   A.  Yes.

20   Q.  What is it?

21   A.  It is a hard drive.

22   Q.  And what are the contents of the hard drive, if you know?

23   A.  The contents of this hard drive are the decrypted response

24   from the STXU process for the iCloud account

25   JamesGarlick48@gmail.com.

N66Ggar4                        Byram - Cross

1    Q.  Have you reviewed the contents of this hard drive?

2    A.  Yes.

3    Q.  There are two sets of initials on there.  Do you recognize

     any of them?

5    A.  Yes, mine.

6              MR. SOWLATI:  No further questions.

7              THE COURT:  Any cross?

8    CROSS-EXAMINATION

9    BY MR. GARLICK:

10   Q.  Good afternoon.  Sir, how are you do today?

11   A.  Good.

12   Q.  I take it you like your job, because you explained that

13   very well.

14             You testified about an automated system.

15             MR. GARLICK:  Can you please put GX 604 on the FBI

16   network.

17             THE COURT:  604 is a disk.

18             MR. GARLICK:  Excuse me, I got a little confused.

19   BY MR. GARLICK:

20   Q.  You testified an automated system put GX 604 on the FBI

21   network; is that correct?

22             THE COURT:  Rephrase the question.

23   Q.  Did you put anything on the FBI's network?

24   A.  No.

25   Q.  So you didn't put an automated system, the GX 606 onto the

N66Ggar4                     Joseph - Direct

1   FBI network?

2              MR. SOWLATI:  Objection, your Honor.

3              THE COURT:  Nobody said anything about 606, so

4   sustained.

5   BY MR. GARLICK:

6   Q.  What is the name of the human being who then downloaded

7   GX 605 from the FBI network?

8   A.  I don't know.

9   Q.  What is the name of the human being who then downloaded the

10  GX 605 from the FBI?

11  A.  I don't know.

12             MR. GARLICK:  No further questions, your Honor.

13             THE COURT:  Thank you.  You can step down.

14             Call your next witness.

15             MR. SOWLATI:  The government calls Alvin Joseph.

16  ALVIN JOSEPH,

17       called as a witness by the Government,

18       having been duly sworn, testified as follows:

19  DIRECT EXAMINATION

20  BY MR. SOWLATI:

21  Q.  Good afternoon.  Where do you currently work?

22  A.  FBI.

23  Q.  What is your position at the FBI?

24  A.  I'm an IT specialist, digital forensic examiner.

25  Q.  What are your duties and responsibility as an IT

1    specialist, digital forensic examiner with the FBI?

2    A.  I examine any kind of digital evidence, ranging from

3    laptops, desktops, iCloud returns, mobile devices.

4    Q.  Approximately how long have you been an IT specialist,

5    digital forensic examiner with the FBI?

6    A.  About seven months, since November of this year.

7    Q.  Approximately how many iCloud accounts have you

8    forensically examined during your time at the FBI?

9    A.  About 20.

10            MR. SOWLATI:  Permission to approach.

11            THE COURT:  Yes.  Just give it to Angela; she'll give

12   it to the witness.

13   BY MR. SOWLATI:

14   Q.  Mr. Joseph, do you recognize GX 605?

15   A.  Yes.

16   Q.  What is it?

17   A.  It's a decrypted iCloud account of

18   JamesGarlick48@gmail.com.

19   Q.  How do you know that?

20   A.  I reviewed it.

21   Q.  Who did you receive this decrypted production from?

22   A.  I received it from headquarters, their name is STXU.

23   Q.  There are two sets of initials on there.  Do you recognize

24   any of them?

25   A.  Yes.

N66Ggar4                          Joseph - Direct

1   Q.  Which initials do you recognize?

2   A.  My initials are on there.

3   Q.  When you received this decrypted Apple production from

4   STXU, what, if anything, did you do to it?

5   A.  I opened it with something called Cellebrite Physical

6   Analyzer, and then I generated two reports with it.

7   Q.  What is Cellebrite Physical Analyzer?

8   A.  It's an application that Cellebrite made to parse any kind

9   of social media returns.  And it presents it in a user friendly

10  way.

11          MR. SOWLATI:  If I can give the witness a USB drive

12  marked for identification as GX 606.

13          THE COURT:  606?

14          MR. SOWLATI:  Yes.

15  BY MR. SOWLATI:

16  Q.  Mr. Joseph, do you recognize GX 606?

17  A.  Yes.

18  Q.  What is it?

19  A.  It's a copy of the two reports that I was talking about

20  that I made.

21  Q.  Have you reviewed this hard drive?

22  A.  Yes.

23          THE COURT:  Is it a hard drive or a thumb drive?

24          MR. SOWLATI:  Sorry, this thumb drive, your Honor.

25          THE WITNESS:  Yes.

```
1    BY MR. SOWLATI:
2    Q.  Whose initials are those on there?
3    A.  It's mine.
4            MR. SOWLATI:  If I can hand one more exhibit.
5    Q.  Mr. Joseph, you have just been handed a CD that is marked
6    for identification as GX 603A through GX 603N.
7            Do you recognize these exhibits?
8    A.  Yes.
9    Q.  What are they?
10   A.  They are chat messages of that iCloud of
11   JamesGarlick48@gmail.com and also a few photos.
12   Q.  How do you know that?
13   A.  I reviewed it.
14   Q.  What, if anything, did you compare them to?
15   A.  I compared it to the two reports that I made.
16   Q.  Did you verify whether those exhibits were in the two
17   reports that you made?
18   A.  Yes.
19           So I went through each and every single chat message
20   individually and also the photos that were involved in it and
21   compared it to the reports that I made, and it was in it.
22   Q.  Based on your review, were the files altered in any way,
23   other than excerpting them from the larger report?
24   A.  No.
25           MR. SOWLATI:  The government offers Government
```

N66Ggar4                        Joseph - Direct

1    Exhibits 603A through Government Exhibit 603N.

2              THE COURT:  Any objection?

3              MR. GARLICK:  Objection, your Honor, on

4    authentication.

5              Can we please have a sidebar.

6              THE COURT:  Let's have a sidebar.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2              MR. GARLICK:  I object.  They are not created in the

3      regular course of business, but for the purpose of litigation.

4      Also, Apple only stores these records, it does not create,

5      therefore, they are not created by a person within the business

6      duty to do so actively.

7              THE COURT:  That's not quite accurate, under the

8      circumstances.

9              But I think you have skipped a step, right.  You don't

10     have the originals in evidence yet.  So the objection on

11     authentication for the excerpts would be denied, assuming you

12     don't get the originals in.  So do you want to do this subject

13     to connection?

14             MS. KELLY:  So our plan was, your Honor, to have the

15     witness authenticate the exhibits that contain the full report,

16     but only introduce the excerpts because we're not introducing

17     the full report into evidence.  If there are additional steps

18     your Honor thinks we need to do that, I think the witness has

19     demonstrated that he pulled the entire report down into

20     Cellebrite and then he created these excerpts from that larger

21     report.  So I think that the whole Cellebrite report that would

22     be the exhibits we marked for identification but haven't

23     introduced are authenticated for purposes of introducing the

24     excerpts like we would do in the stipulation.

25             THE COURT:  Assuming that you have your 601 in.

1          MR. SOWLATI:  Right.  So that was one -- the motion in

2    limine that your Honor granted.

3          THE COURT:  I did grant that.

4          MR. SOWLATI:  The business certification.

5          THE COURT:  I thought I was granting that it would be

6    permitted, not that I actually admitted them into evidence.

7          MR. SOWLATI:  We can move that into evidence.

8          THE COURT:  So you are moving them into evidence now?

9          MS. KELLY:  We'll move that into evidence now.

10         THE COURT:  They're received, 601 and 601A was

11   received.

12         That resolves your business records problem.  The

13   records themselves, as they were produced, is a business record

14   of Apple, ordinary course of business.  As the FBI agent

15   explained and is explained in the certification, that in

16   response to appropriate process, they were produced, the

17   contents of an account.  So after that, these are not the

18   business records of Apple.  Apple just collects the records

19   that their customers are storing up in the cloud, so these

20   don't have to be Apple's business records.  They have

21   adequately chained up the account from Apple via an encrypted

22   system to an unencrypted system to Cellebrite to here.

23         Your objection is overruled.

24         MR. GARLICK:  I have one more.

25         I object to 604 and 605 under the constitution clause,

N66Ggar4                        Joseph - Direct

1   I am entitled to cross-examine the person who downloaded these

2   files since they are the same as an analyst.

3           THE COURT:  Except that I heard him testify that it's

4   an automated process, so there was no human being that was

5   involved.

6           MR. GARLICK:  He could not identify that person.

7           THE COURT:  It was an automated process.

8           MR. GARLICK:  There's nobody that downloaded from

9   their system to their system?

10          THE COURT:  It's an automated system.  There was no

11  person involved.

12          MR. GARLICK:  If it wound up in paper form, then

13  somebody had to download it, I agree.

14          THE COURT:  Overruled.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

N66Ggar4                        Joseph – Cross

1              (In open court; jury present)

2              THE COURT:  You have a couple of other exhibits to

3     move in.

4              MR. SOWLATI:  No, your Honor, that's it.

5              THE COURT:  Are you going to move 601 and 601A in?

6              MR. SOWLATI:  Yes, your Honor.  We move 601 and 601A.

7              THE COURT:  601 and 601A I have previously dealt with,

8     so those are received.

9              (Government Exhibits 601 and 601A received in

10    evidence)

11             THE COURT:  The objection to 603A through 603N is

12    overruled.  Those exhibits are admitted.

13             (Government Exhibits 603A through 603N received in

14    evidence)

15             MR. SOWLATI:  No further questions.

16             THE COURT:  Any questions, Mr. Garlick?

17    CROSS-EXAMINATION

18    BY MR. GARLICK:

19    Q.  When you -- you just -- you didn't download these from the

20    file, they sent them to you; correct?

21    A.  Yes.

22    Q.  So you didn't have any process -- you didn't have to

23    encrypt, decrypt anything, you didn't have to -- what is your

24    process from the point when you got it to the point that we

25    have now into the evidence?  Like what was your actual role of

N66Ggar4                        Joseph - Cross

1    these messages, just to review them, to look for things or --

2    A.  I just opened it with Cellebrite -- the decrypted files, I

3    opened it with Cellebrite Physical Analyzer and I generated a

4    report, that's it.

5    Q.  So you didn't read the emails or nothing, you just took it

6    from one form and put it into another?

7    A.  Yes, but I also -- I reviewed it after.

8    Q.  All of the emails?

9            THE COURT:  You reviewed what after?

10           THE WITNESS:  I didn't -- sorry.

11           THE COURT:  What exhibits did you review after?

12           THE WITNESS:  I reviewed the exhibits on this one.

13           THE COURT:  We don't know what --

14           THE WITNESS:  603A to 603N.

15           THE COURT:  So you verified that those were all in the

16   original materials that you downloaded into Cellebrite?

17           THE WITNESS:  Yes, your Honor.

18           MR. GARLICK:  No further questions, your Honor.

19           THE COURT:  Thank you.  You can step down.

20           Call your next witness.

21           MR. SOWLATI:  The government calls Manuel Alonzo.

22   MANUEL ALONZO,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

BY MR. SOWLATI:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Where do you work?

A.  I work in the firearms analysis section of the forensic investigation division of the NYPD.

Q.  What is your current title?

A.  My current title is firearms examiner.

Q.  What are your responsibilities working in the firearms analysis section?

A.  My responsibilities are to determine the identification and operability of the firearms and ammunition.

Q.  How long have you worked in the firearms analysis section?

A.  I worked in the firearms analysis section a little bit over two and a half years.

Q.  What sort of training have you received?

A.  My training started with an eight-month training program that was given by an outside consultant that is in accordance with the AFTME training manual.  AFTME stands for Association of Firearms and Tool Marks Examiners.  This is the standard training for firearms examiners across the country and in other countries as well.  This training is eight months, it's multiple lectures, exams, instructions, research.  You do -- I do about six weeks with a senior examiner.  The program also teaches you to tear down, rebuild and diagnose multiple

different firearm frames.  I'm also a weapons armor for Smith &
Wesson, Glock and Springfield.  I was required to do multiple
exams and practical exams in order to be allowed to do casework
for the NYPD laboratory.

Q.  Can you explain how you go about testing the operability of
a firearm?

A.  The first process I do is I go to evidence control room,
the property where the firearm is there inside of a plastic
security envelope.  It's given to us at random or it's assigned
to us by a supervisor.

          Upon getting the evidence into my custody, I check the
paperwork to see if there's any requests, such as fingerprints
or DNA requests.  That request, when I finish overlooking my
paperwork and I make sure that no requests are there -- there
are no specific requests, I take the package to my desk and I
start to print out an inventory sheet and I print out a
worksheet.  Upon getting it on my desk and printing out those
sheets, I start the inventory.  So I take the voucher, which is
a listing of all the inventory that was taken from the scene or
wherever they got the evidence from, and then I start to
document it on my own inventory sheet to ensure that I got
everything that is on that voucher.  Once that's done, I jump
over to a worksheet.  But before I jump over to the worksheet,
I'll take the firearm, and I'll take it over to the port where
I'm going to check two things; wrack the slide in the firearm

and make sure it's safe, clear and empty and I'm going to do a

function check, make sure there's no obstruction, the frame is

not broken, the slide is not broken, I'm not missing any major

components of the firearm.

          After that's done, I go to a measurement station.

Where, again, all of this information is documented on the

worksheet.  I measure the firearm for the length of it.  And

then I also measure the barrel on the firearm.  After that's

done, I take the worksheet from the firearm back to my station

and I continue to document on the worksheet things such as the

make, model, the capacity of the magazine, if it has a

magazine, if the weapon was made in a foreign country, if it

had exporter information on it, and the type of firearm,

whether it's semiautomatic or revolver.

          At that point, I would select the type of ammunition

that I use for the firearm, whether it's ammunition that came

with the firearm or ammunition that's part of the FAS supply.

I then start to etch a number onto each one of these items of

evidence.  So what I'm putting on is the year, the lab number

and the item number and my initials.  Those are my identifying

marks.  That will be it for that process.

Q.  And what do you do next to actually test the operability?

A.  Okay.  So to test the operability, I'm taking the evidence

I just described, and I'm going to a bullet recovery room.

Inside this bullet recovery room, there's a metal tank with

1    approximately 800 gallons of water.

2              I get into that room and I take the evidence or the

3    ammunition, and I'll put it into the magazine.  I'll put the

4    firearm into the port, and then I'll load the firearm from the

5    bottom or the magazine, and then I'll continue to fire each

6    shot one at a time into the port.

7              Once that's done, I take the magazine out and I'm

8    going to put the gun back onto a desk we have there.  I proceed

9    to open the tank and collect all the evidence from the tank,

10   which is the projectiles and the casings.

11   Q.  Why do you shoot into a tank?

12   A.  The purpose of shooting into a water tank is to ensure that

13   I get evidence, any evidence that comes out of that firearm

14   it's not tampered with, in case they request future microscopic

15   analysis of it.

16             MR. SOWLATI:  If I may approach and hand the witness

17   what's been marked in evidence as Government Exhibit 201.

18   Q.  Detective Alonzo, please feel free to remove it from the

19   bag, if that will help you examine Government Exhibit 201.

20   A.  Sorry, I'm just going to do a quick safety check.

21             Safe clear and empty.

22   Q.  I'm sorry?

23   A.  I was doing a quick safety check.  Safe, clear and empty.

24   Q.  Do you recognize this?

25   A.  Yes.

1   Q.  How do you recognize it?

2   A.  This has those identifying marks, I have the lab number --

3   the year, lab number, item number and my initials, as well as a

4   lead seal on it.

5   Q.  Did you test it for operability?

6   A.  This firearm, yes, I did.

7   Q.  What was your determination of its operability?

8   A.  That this firearm is ready and capable of shooting a live

9   round of ammunition.

10  Q.  How did you test its operability?

11  A.  By shooting this into the water tank.

12  Q.  What ammunition did you use to shoot it?

13  A.  Is it possible I could look at my report?  That will tell

14  me exactly what ammunition.

15  Q.  Absolutely.

16          MR. SOWLATI:  Can you please put on the screen

17  Government Exhibit 1109.

18  Q.  Does this refresh your recollection of what type of

19  ammunition you used?

20  A.  It does.

21  Q.  What type of ammunition did you use?

22  A.  So for this particular case, I used three rounds of the

23  case ammunition, the ammunition that came with the firearm, and

24  two rounds of ammunition from our supply.

25  Q.  You mentioned the lead seal, what is a lead seal?

N66Ggar4                        Alonzo - Direct

```
1    A.  A lead seal is placed on a firearm when a firearm is
2    defaced, meaning they tried to remove the serial number of the
3    firearm.
4    Q.  Can you please read out the numbers on the lead seal of
5    Government Exhibit 201.
6    A.  274858.
7    Q.  Do you recall if the lead seal was on the firearm at the
8    time you tested it for operability?
9    A.  Say again.
10   Q.  Do you recall if a lead seal was on the firearm at the time
11   you tested it for operability?
12   A.  Yes, it was.
13   Q.  Do you recall what those numbers were?
14   A.  If I could look at my notes, I could tell you exactly what
15   the numbers were.
16   Q.  That's Government Exhibit 1109?
17   A.  Yes.
18           The numbers are 274858.
19           MR. GARLICK:  Objection, your Honor.
20           THE COURT:  Overruled.
21   BY MR. SOWLATI:
22   Q.  Does that refresh your recollection?
23           MR. GARLICK:  Your Honor, he's reading from a document
24   that's not in evidence.
25           THE COURT:  Does that refresh your recollection about
```

1    the numbers?

2            THE WITNESS:  It does.

3    BY MR. SOWLATI:

4    Q.  What were those numbers?

5    A.  274858.

6    Q.  Does that match what's on the lead seal of the firearm

7    you're holding right now?

8    A.  It does.

9            MR. SOWLATI:  No further questions.

10            THE COURT:  Any cross?

11   CROSS-EXAMINATION

12   BY MR. GARLICK:

13   Q.  Good afternoon, Mr. Alonzo.  How are you doing today, all

14   right?

15   A.  I'm doing well, sir.

16   Q.  You testified about the steps to your job; is that correct?

17   A.  Yes.

18   Q.  First step is getting the evidence from the evidence

19   control room; correct?

20   A.  Yes.

21   Q.  Second step is checking for fingerprint and DNA requests;

22   right?

23   A.  Yes.

24   Q.  It means you checked to see if someone requested DNA

25   evidence was requested, what means are those?  How do you know

N66Ggar4                         Pino - Direct

1    if somebody requested those to be tested?

2    A.  Initially, when we get the packaging that has the voucher,

3    61, it also has any laboratory requests for the item that is

4    coming into our evidence control section.

5    Q.  There was no request to test DNA on this gun; is that

6    correct?

7    A.  According to my notes or my recollection, should I say,

8    there was not.

9    Q.  Did you actually physically held and touch this weapon when

10   you were doing your examination?

11   A.  Yes.

12            MR. GARLICK:  Thank you.

13            THE COURT:  Anything further?

14            MR. SOWLATI:  Nothing further.

15            THE COURT:  Thank you.  You can step down.

16            Call your next witness.

17            MR. FANG:  Government calls Edgar Pino.

18   EDGAR PINO,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. FANG:

23   Q.  Who is your employer?

24   A.  NYPD.

25   Q.  How long have you been working with the NYPD?

1   A.   About nine years.

2   Q.   What precinct are you currently assigned to?

3   A.   The 44th Precinct.

4   Q.   Have you been assigned to any other precincts?

5   A.   No, I have not.

6   Q.   What is your current title?

7   A.   I'm a police officer working in the detectives unit.

8   Q.   When did you join the detective unit?

9   A.   March 27th of this year.

10  Q.   What are some of your current responsibilities with the

11  detective unit?

12  A.   We investigate crimes, speak to complainants, victims and

13  we try to collect enough evidence to apprehend a suspect.

14  Q.   Officer Pino, what was your role when you started with

15  NYPD?

16  A.   I was a police officer.  So basically, I would respond to

17  911 jobs, do the same thing; investigate, I would do an initial

18  investigation, complaint reports and apprehend suspects.

19  Q.   Have you heard of the term conditions?

20  A.   Yes, I have.

21  Q.   What are conditions?

22  A.   It's basically any problem that we have in the precinct,

23  our lieutenant or our supervisor will tell us, let's try to

24  address this condition, this problem in the precinct.  So we

25  would go out and try to address that.

N66Ggar4                        Pino - Direct

```
1   Q.  Officer Pino, where were you assigned after you initially
2   started as a patrol officer?
3   A.  I'm sorry, can you repeat that.
4   Q.  Where were you assigned after you were a patrol officer?
5   A.  To conditions unit.
6   Q.  And in brief, what does the conditions unit do?
7   A.  So basically what I --
8           MR. GARLICK:  Objection, asked and answered.
9           THE COURT:  Agreed.  You just went through that with
10  him.
11  BY MR. FANG:
12  Q.  Officer Pino, did there come a time when the conditions
13  unit began to focus on mopeds?
14  A.  Yes, 2021.
15  Q.  Why were mopeds a condition?
16  A.  There was a lot of violent crimes occurring, a lot of
17  shootings, robberies using mopeds.
18  Q.  Any other reasons?
19  A.  Yes, they're unregistered, they're uninsured.  I'm sure
20  plenty of you have seen that.
21  Q.  Why was it an issue if a moped was not registered?
22  A.  If someone got into an accident, who is going to pay the
23  bills, basically, you know.
24  Q.  And why was it an issue if a moped was not insured?
25  A.  It was basically the same problem, the same issue.  You
```

N66Ggar4                          Pino - Direct

1    have no -- who is going to pay the bills if you got hurt, if

2    someone hit you with a moped.

3    Q.  Officer Pino, have you personally stopped a moped before?

4    A.  Yes.

5    Q.  Approximately how many times?

6    A.  Over a hundred times.

7    Q.  How would those stops work?

8    A.  We would basically wait until the moped stops doing any

9    violations or any infractions, we would follow them, wait until

10   they stop so they don't hurt nobody.  Once they stop at either

11   a light or on the sidewalk, that's when we come out the car and

12   we stop them.

13   Q.  What would happen after you stopped the moped?

14   A.  We would see if the vehicle was registered or insured.

15   Once we saw that it wasn't, we would issue a citation and then

16   we would take the vehicle.

17   Q.  I'm sorry, I missed the last part.

18   A.  We would take the vehicle back to the precinct.

19   Q.  And what, if anything, would you do to the vehicle once it

20   was back in the precinct?

21   A.  Once we were headed back to the precinct, we would voucher

22   a vehicle and any items that were inside of it.

23   Q.  Where would the vouchering process occur?

24   A.  It would occur in the back of our precinct.  We have a

25   parking lot.

1    Q.  Turn your attention to August 27, 2022.  Were you working

2    that day?

3    A.  Yes, I was.

4    Q.  What hours did you work?

5    A.  I worked from 3:00 p.m. to 11:35 p.m.

6    Q.  What unit were you in at that time?

7    A.  I was in the NCO unit.

8    Q.  What is the NCO unit?

9    A.  It's a neighborhood coordinating officer.  So basically,

10   anyone in that unit, we would -- we would work closer with the

11   community.  So if anyone -- we would have quarterly meetings,

12   basically, so anyone who attended those meetings, they would

13   tell us what issues they would have on the block and we would

14   try to address those.

15   Q.  Who was your partner?

16   A.  Officer Dempsey.

17   Q.  Did there come a time during your shift on August 27 when

18   you became assigned to a moped checkpoint?

19   A.  Yes.

20   Q.  How did you learn about that checkpoint?

21   A.  While we were in the station house, Captain Pierce told us

22   about it around 7:15 p.m.

23   Q.  What were you doing when you learned about the checkpoint?

24   A.  We were processing an arrest from earlier.

25   Q.  Who is Captain Pierce?

1    A.  He is the -- he was the captain of the 44 Precinct.

2    Q.  What was your understanding of what that operation would

3    entail?

4    A.  Basically anything -- we would stop anybody who had an

5    unregistered, uninsured motorcycle.

6    Q.  And what was your assigned role with respect to this

7    operation?

8    A.  I was supposed to transport the vehicles.

9    Q.  And what does that role entail?

10   A.  I would grab the key from whoever issued the summons and

11   transport the vehicle back to the precinct by riding it.

12   Q.  Were you assigned to any particular location?

13   A.  Yes, I was.  I was assigned that day to East 164th Street

14   and River Avenue.

15   Q.  Is that near any particular landmark?

16   A.  Yes, it's right next to Yankee Stadium on the east side.

17   Q.  Were you yourself making any stops that night?

18   A.  I'm sorry, can you repeat that.

19   Q.  Were you stopping any mopeds that night?

20   A.  No, I never got a chance to.

21         MR. FANG:  Ms. Gutierrez, can you please display what

22   is in evidence as Government Exhibit 1002.

23   Q.  Officer Pino, do you recognize what is in front of you as

24   Government Exhibit 1002?

25   A.  Yes, I do.

1   Q.  What is it?

2   A.  This is an area of the precinct that I work in.

3   Q.  Is that the area where the moped operation happened?

4   A.  Yes.  The moped operation happened on Jerome Avenue between

5   East 164 Street and where 162 Street would be on Jerome.

6   Q.  Can you circle where that is for the jury.

7   A.  Sure.

8   Q.  Officer Pino, what happened after you were informed about

9   the moped operation?

10  A.  Well, once I got to post, I was -- which was on East 164th

11  Street and River, I received a phone call to go to the location

12  that I circled to transport the vehicles back to the precinct.

13  Q.  And just for the record, can you identify where your

14  original post was.

15  A.  Sure.

16  Q.  Officer Pino, what did you see once you got to Jerome and

17  East 162?

18  A.  Once I got to East 162 and Jerome, I saw a line of

19  motorcycles that were parked on the sidewalk right next to each

20  other.

21  Q.  Did you see anybody there?

22  A.  Yes, I saw plenty of officers that were next to the bikes.

23  Some of them were still doing stops.

24  Q.  Can you point out on Government Exhibit 1002 where you saw

25  the line of mopeds.

N66Ggar4                    Pino - Direct

1   A.  Sure.

2              THE COURT:  So across from Yankee Stadium?

3              THE WITNESS:  Yes.

4   BY MR. FANG:

5   Q.  What was your understanding of what these mopeds were?

6   A.  They were the mopeds where people that were already stopped

7   and issued summonses.

8              THE COURT:  And their bikes had been seized?

9              THE WITNESS:  Yes, the bikes were seized.  And also,

10  because they didn't have either -- they weren't insured or

11  registered.

12  BY MR. FANG:

13  Q.  What, if anything, did you do once you got to the

14  checkpoint?

15  A.  Once I got to the checkpoint, me and Officer Cruz, we both

16  took a motorcycle back to the precinct.

17  Q.  Roughly, how far is the precinct from Jerome and East 162?

18  A.  It's about five minutes away.

19  Q.  How many mopeds did you wind up transporting that night?

20  A.  Only two.

21  Q.  How did you take the first moped back?

22  A.  I rode it back to the precinct.

23  Q.  And how long after you got to the checkpoint did you start

24  riding that first moped back?

25  A.  Immediately.

1    Q.  Do you know who that moped belonged to?

2    A.  No, I do not.

3    Q.  So what happened after you took the first moped back to the

4    precinct?

5    A.  Once me and Officer Cruz got to the precinct, we waited for

6    Officer Cruz's partner, which is Officer Sorlini.  Once he came

7    with the -- once he came with the car, he transported us back

8    to the location of the checkpoint.

9    Q.  What happened after you got back to the checkpoint?

10   A.  We both took a motorcycle each and we rode it back to the

11   precinct.

12   Q.  Do you know who that second moped belonged to?

13   A.  No, I do not.

14   Q.  What happened after you took the second moped back to the

15   precinct?

16   A.  Once we took the second moped back, we waited for Officer

17   Sorlini again.  And once he got to the location, he transported

18   us back to the checkpoint.

19   Q.  So what happened after you got back to the checkpoint the

20   second time?

21   A.  We had saw that there was a barrier truck, an NYPD barrier

22   truck.

23   Q.  Approximately when did the barrier truck show up?

24   A.  It was there right when I got to the location.

25   Q.  Do you recall approximately what time?

1    A.  Probably around 9:00 p.m.

2    Q.  Officer Pino, what is a barrier truck?

3    A.  It's a truck used to transport smaller vehicles back to the

4    precinct.  So with motorcycles, in this case, you could fit up

5    to maybe 15 or 20.

6    Q.  And what was the purpose of the barrier truck that night?

7    A.  To transport them from the checkpoint to the precinct.

8    Q.  Is the barrier --

9         THE COURT:  I'm sorry to interrupt, but about how much

10   longer is his direct?

11        MR. FANG:  I would say, approximately, 25 to 30.

12        THE COURT:  Then look for a good stopping point and

13   we're going to stop.

14        MR. FANG:  Certainly.

15   BY MR. FANG:

16   Q.  Officer Pino, is the barrier truck a separate command than

17   the 44?

18   A.  Yes, it is.

19   Q.  And where was the barrier truck parked?

20   A.  It was parked right in front of the location that I circled

21   where 162 Street would be and Jerome.  It was on the southbound

22   lane facing northbound.

23   Q.  Officer Pino, just because you have drawn three circles by

24   this point, if you could just draw an X where you recall the

25   barrier truck being.

1              Officer Pino, did you see the mopeds being loaded onto

2    the truck?

3    A.  Yes, I did.

4    Q.  At that time, did you know who owned any of the mopeds on

5    the truck?

6    A.  No, I did not.

7    Q.  Who put the mopeds on the barrier truck that night?

8    A.  There was officers in the barrier truck, so they -- they

9    put them on, and also officers on scene helped.

10   Q.  Were the officers from the barrier truck unit members of

11   the 44?

12   A.  No, they were not.

13   Q.  And were the officers who were part of the barrier truck

14   unit conducting the checkpoint stops?

15   A.  No, they were not.

16   Q.  When the mopeds were being loaded onto the truck, did you

17   see anyone try and open any of the mopeds?

18   A.  No, I did not.

19   Q.  How did you get back to the precinct?

20   A.  I actually hopped in the barrier truck in the backseat,

21   passenger's side.

22   Q.  Was that after the mopeds were loaded?

23   A.  Yes.

24   Q.  And did the barrier truck make any stops between the

25   checkpoint and the precinct?

N66Ggar4                         Pino - Direct

1    A.  No, it did not.

2              MR. FANG:  Your Honor, I think we're at a good

3    stopping point.

4              THE COURT:  Okay.  Why don't we stop for the evening.

5    It's a little bit after 5:00 o'clock, so we're going to stop

6    for the evening.  And we're going to ask you all to arrive by

7    9:15 to this courthouse so that we can start promptly at 9:30.

8    Please leave your books on your chair, don't discuss the case.

9    Have a wonderful evening.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury not present)

2           THE COURT:  Well, to say the least, we are way behind

3    where I was hoping we were going to be.

4           You say, Mr. Fang, you have another half an hour of

5    direct for Officer Pino?

6           MR. FANG:  Yes, your Honor.

7           THE COURT:  What about after Pino, who are your other

8    witnesses for tomorrow?

9           MR. FANG:  Your Honor, after Officer Pino, we have

10   Officer Brightman.

11          THE COURT:  What did he do or she do?

12          MR. FANG:  Your Honor, apologies.  Were you looking

13   for a set order of witnesses for tomorrow?

14          THE COURT:  Well, ideally.

15          MR. FANG:  Understood.

16          Your Honor, we anticipate calling Officer Piazza,

17   Frank Piazza.

18          THE COURT:  What's his role?

19          MR. FANG:  He enhanced certain body cam videos.

20          THE COURT:  And then who?

21          MR. FANG:  Parole Officer Garrett.

22          THE COURT:  Okay.

23          MR. FANG:  Special Agent Fleming.

24          THE COURT:  What's Fleming's role?

25          MR. FANG:  He examined the interstate nexus.

N66Ggar4

1          THE COURT:  Okay.

2          MR. FANG:  Special Agent Welsh.

3          THE COURT:  What is Welsh's role?

4          MR. FANG:  Special Agent Welsh is our lingo, slang

5   expert.

6          THE COURT:  Got it.

7          MR. FANG:  Officer Brightman.

8          THE COURT:  What is Brightman's role?

9          MR. FANG:  Brightman was part of the evidence

10  collection team who examined the firearm.

11         THE COURT:  Okay.  Does she do anything beyond what's

12  already been done?

13         MR. FANG:  It's possible we may not call Officer

14  Brightman.

15         THE COURT:  Okay.

16         MR. FANG:  And then, finally, we have Special Agent

17  Friedman, who is the government's summary witness.

18         THE COURT:  To actually get into the texts and things

19  like that?

20         MR. FANG:  That's correct, your Honor.

21         THE COURT:  Mr. Garlick, how long do anticipate your

22  cross-examination of Officer Pino is going to be?

23         MR. GARLICK:  About 45 minutes, your Honor, give or

24  take.  It may be shorter.

25         THE COURT:  How long do you think --

N66Ggar4

```
 1              MR. GARLICK:  Your Honor --

 2              THE COURT:  How long do you think the

 3    cross-examination of the parole officer is going to be?

 4              MR. GARLICK:  That's going to be fast; five or ten

 5    minutes.

 6              THE COURT:  Do you anticipate lengthy

 7    cross-examination of any of the other people other than Officer

 8    Pino?

 9              MR. GARLICK:  I would like to remind you about the

10    Daubert hearing for the --

11              THE COURT:  I remember that.  That's going to be

12    short, or at least I anticipate it's likely to be short.

13              MR. GARLICK:  Probably not with the government side.

14    But I also have witnesses that I would like to also add.

15              Now, I have a question.

16              THE COURT:  Who are your witnesses?

17              MR. GARLICK:  I would like to call Maurice Himes.

18              THE COURT:  Who is that?

19              MR. GARLICK:  I think they said that's the Reo DA Don

20    guy.

21              THE COURT:  That's his true name?

22              MR. GARLICK:  Yes.

23              THE COURT:  Has he agreed to appear or have you

24    subpoenaed him?

25              MR. GARLICK:  That's another question I would have
```

N66Ggar4

1    to -- was asking you.  He has agreed to appear, yes.  But my

2    question is, scheduling, because Cheri Valdez also would like

3    to appear.  And I was wondering if there's any way we could

4    like do it through the screen.

5             THE COURT:  No.

6             MR. GARLICK:  So they have to physically be here?

7             THE COURT:  Correct.

8             MR. GARLICK:  Okay.

9             THE COURT:  So those are your two witnesses?

10            MR. GARLICK:  Ali Shakoor, Police Officer Ali Shakoor.

11            THE COURT:  Has she been subpoenaed?  Has the

12   government agreed to produce her?

13            MR. GARLICK:  It's a him.

14            THE COURT:  What's her last name?

15            MR. GARLICK:  Ali.

16            THE COURT:  Shakoor, the officer we heard about.

17            Has the government agreed to produce Officer Shakoor?

18            MR. FANG:  There hasn't been a request.

19            THE COURT:  Have you subpoenaed him?

20            MR. GARLICK:  I don't know how to do that.

21            THE COURT:  That's a problem.  If I were you, I would

22   either talk to the government or not count on having Officer

23   Shakoor because he's not going to just magically appear.

24            MR. GARLICK:  Okay.  So can I get his information to

25   call him or like --

N66Ggar4

1          THE COURT:  Again, you are going to have to deal with
2     the government on that.
3          Any other witnesses that you intend to call?
4          MR. GARLICK:  If they don't call Brightman, we're
5     calling Brightman as well.
6          THE COURT:  I will deal with this before we get to the
7     actual case, but I'm going to need a proffer of what the
8     relevance of these people is, like what relevant admissible
9     testimony they have.
10          MR. GARLICK:  Talking about my witnesses?
11          THE COURT:  I'm not asking you for it right now.
12          MR. GARLICK:  I also have two more.  But I'm trying to
13     get their legal names so I can put it in.  That's what I was
14     going to do yesterday, but I was locked down.
15          THE COURT:  Those are your two delivery witnesses?
16          MR. GARLICK:  Yes.
17          THE COURT:  Delivery customers.
18          Can you make a proffer as to why they're relevant?
19          MR. GARLICK:  Yes.  One of them is relevant because of
20     the allegations for me not working for DoorDash, things of that
21     nature.  I don't know if they're going to bring that up or
22     anything like that, because they have all the -- what do you
23     call it -- search warrants for all of that stuff, so I'm going
24     to call those witnesses as far as that.
25          THE COURT:  I'm struggling to understand the

N66Ggar4

1   relevance.  Mr. Garlick, to the extent I can stop you from

2   spending time and energy on things that are not productive, I

3   would like to do that.  So I don't see the relevance of the

4   delivery customers.

5          MR. GARLICK:  They're not customers.

6          THE COURT:  Whoever they are.  Anything to do with

7   DoorDash, I just don't see the relevance.  There's no issue of

8   whether you did or didn't work for DoorDash.  That's irrelevant

9   for the trial.

10          MR. GARLICK:  That's what I'm saying, your Honor.  I

11   don't know if they're going to introduce anything to that

12   nature, so in case they do --

13          THE COURT:  Are you intending to put any evidence

14   about DoorDash?

15          MS. KELLY:  No.

16          THE COURT:  Okay.

17          MR. GARLICK:  So the other one is actually the guy

18   that I got the bike from, and he can testify as far as to what

19   Maurice Himes and me was talking about.

20          THE COURT:  No.

21          MR. GARLICK:  Not testify, but --

22          THE COURT:  He will not able to testify to that.

23          Is he going to admit the gun was his and he left it in

24   the middle compartment?

25          MR. GARLICK:  I think people admitted who the gun was.

N66Ggar4

|  |  |
|---|---|
| 1 | THE COURT:  The guy that you bought the bike from, you |
| 2 | said you wanted to call him; right? |
| 3 | MR. GARLICK:  Mm-hmm. |
| 4 | THE COURT:  Is he going to admit that he left a gun in |
| 5 | the center compartment? |
| 6 | MR. GARLICK:  I don't know.  I don't even know nothing |
| 7 | about no gun. |
| 8 | THE COURT:  I don't understand why he's relevant. |
| 9 | MR. GARLICK:  It's relevant to where he had the bike |
| 10 | stored at the time he had it stored. |
| 11 | THE COURT:  Say that again. |
| 12 | MR. GARLICK:  It's relevant to him storing the bike. |
| 13 | THE COURT:  Why is that relevant? |
| 14 | MR. GARLICK:  Because anybody could have had access to |
| 15 | that bike where it was stored, so I want to -- |
| 16 | THE COURT:  I'm going to think about that, whether |
| 17 | that's relevant. |
| 18 | MR. GARLICK:  So I have a question -- |
| 19 | THE COURT:  Mr. Garlick, I'm going to need a proffer |
| 20 | as to what -- |
| 21 | MR. GARLICK:  I don't know what a proffer is.  What is |
| 22 | that? |
| 23 | THE COURT:  Essentially, you're going to have to |
| 24 | explain what relevant testimony Reo DA Don, Maurice Himes and |
| 25 | Cheri Valdez have. |

N66Ggar4

1          MR. GARLICK:  Are they introducing their text
2     messages?
3          THE COURT:  Yes.
4          MR. GARLICK:  Then they're relevant.
5          THE COURT:  Not necessarily.
6          MR. GARLICK:  So you're introducing --
7          THE COURT:  What do they intend to say?
8          MR. GARLICK:  This is part of my mystery defense, so
9     I'm keeping it a mystery.
10          THE COURT:  Well, okay, you can keep it a mystery.
11     Just be aware the problem may be that Cheri Valdez takes the
12     stand, they object, it's sustained --
13          MR. GARLICK:  I don't have an expert witness to call
14     to what they're saying.  I'm having the people physically
15     produced to explain what they were saying.  So I don't see how
16     it's not relevant.  I don't have an expert witness to summarize
17     from some mystery place where they're saying that this means
18     that.  So instead of having people come and make up what they
19     doing, I thought why not have the actual people come here to
20     testify to their own text messages.  I mean, it works for me.
21          THE COURT:  My recollection -- it's been a while since
22     I looked at the text with Reo DA Don -- you ask him for
23     artillery, so he can't testify about what you meant.
24          MR. GARLICK:  Why he can't?  Because he --
25          THE COURT:  Because he can't.

N66Ggar4

1          MR. GARLICK:  So he can testify that he never gave me

2     a thing.

3          THE COURT:  He can.  So is he going to testify that he

4     never gave you a gun?

5          MR. GARLICK:  Yes, most explicitly.

6          THE COURT:  Great.

7          MS. KELLY:  Your Honor, just to flag an issue as to

8     Maurice Himes.  With respect to the messages that are in

9     evidence, some of which are redacted, there's discussion of

10    various illegal activities by Mr. Himes, in addition to what

11    the government would purport is potentially gun trafficking,

12    also sex trafficking activity by Mr. Himes.  I would advise the

13    court that it's possible that he would need counsel appointed

14    if he were expected to testify during this proceeding.

15         THE COURT:  Okay.  We might need to have a CJA lawyer

16    standing by.

17         I'm just trying to suss out what the timing of all

18    this is.

19         MR. GARLICK:  I'm saying, your Honor, we could -- we

20    don't have to do timing.  I told you, this is a complete waste

21    of time in my point because I said I was willing to plea

22    bargain, I mean, so I don't understand why you're such in a

23    rush now, if I'm giving you the plea bargain.

24         THE COURT:  Do you want to plead guilty?

25         MR. GARLICK:  I would plead guilty to a stipulation.

N66Ggar4

1          THE COURT:  They're not stipulating.

2          MR. GARLICK:  I guess you're just going to have to

3    suffer the time, because I'm willing to cop out right now.  All

4    I want to know is where I am at.

5          THE COURT:  Mr. Garlick, I am not suffering.  I am

6    doing my job.  Part of my job is to understand what the timing

7    of all this is so that I can schedule things.

8          So right now, what the issue is is when are we going

9    to have the charge conference.  It appears to me, as optimistic

10   as the government was -- and might I just say, you all have

11   lost total credibility in terms of your ability to estimate how

12   long things last, just telling you -- so if the government

13   rests by close of business tomorrow, I'm going to be incredibly

14   happy, so let's do the charge conference Wednesday at the end

15   of trial, whenever that is.

16         Mr. Garlick, some of these are going to be short

17   witnesses.  You are saying you are not really crossing them

18   very long.  So you need to have your witnesses here as well so

19   that we can roll directly into the defense case after the

20   government rests, assuming you make a motion and it is not

21   granted.

22         I am going to require you to at least give me some

23   sense of what these people are going to testify to.  Because if

24   it's totally irrelevant, then we're not going to waste the

25   jury's time with you calling them.  So I think you understand

N66Ggar4

1    now that the delivery customers are out.

2             MR. GARLICK:  I'm not calling no -- I never said --

3             THE COURT:  The DoorDash people.  Those are out.

4             MR. GARLICK:  Okay.

5             THE COURT:  And you need to talk to the government

6    about these other people, which you seem to want to call, that

7    they may or may not be able to help you out.

8             MR. GARLICK:  I don't understand how --

9             THE COURT:  If not, you have to subpoena them.

10             MR. GARLICK:  Well, I would like to subpoena them now.

11    I don't even want to go through all of that.  If that's the

12    case, I would like to subpoena Ali Shakoor and --

13             THE COURT:  Submit a subpoena, then.

14             So anything further from the government?

15             MR. SOWLATI:  No, your Honor.

16             THE COURT:  Anything further from the defense,

17    Mr. Garlick?

18             MR. GARLICK:  I would just like to state -- see, see,

19    your Honor, like your Honor, I --

20             THE COURT:  I can't hear you.  I can't hear what

21    you're saying I have nothing else to say.  Everything I say is

22    irrelevant.  I would like to ask you that even during this

23    time, if we're locked in, that you can have some way to call

24    the jail so that way I can have access to the computer when I

25    get back, if we're not on lockdown, you know, like I would ask

N66Ggar4

1    you for these things, but it seems like irrelevant because it's

2    like talking to the wind.  You're going to do what you feel

3    anyway.  I'm asking, if it's possible, can you stipulate

4    somehow to them that even if we're locked down -- because the

5    orderlies be out -- can I come out to use the kiosk for my

6    discovery.

7                    (Continued on next page)

N663gar5

1          THE COURT:  Is this in your unit?

2          MR. GARLICK:  Yes.

3          THE COURT:  I sincerely doubt that a request from me

4   is going to make any difference whatsoever.

5          MR. GARLICK:  What?  They called and said you called

6   and said turn the lights on.  They were very angry with you.

7   They said it was going on for a month as punishment.  Thank you

8   for turning the lights on.  When you called, they doing

9   something.  Just like you called or ask somebody to call to get

10  me fired from the mess hall.  They called and said you know you

11  are not supposed to be working here no more.

12         So obviously you have some weight with MDC.  So for

13  you to tell me now that I need a request and you have no pull

14  with them, I find that very hard to believe.

15         THE COURT:  I have absolutely nothing to do with job

16  assignments, electricity at the MDC.  But I will make a request

17  that you be given access to the kiosk even if your unit is on

18  modified operations.

19         MR. GARLICK:  Thank you.

20         THE COURT:  I sincerely doubt my request will make any

21  difference whatsoever.

22         I want everybody here at 9:15 in the morning so we can

23  start hopefully promptly at 9:30.

24         So the marshals just brought to my attention that you

25  have got a hard drive there.  You cannot take the hard drive

N663gar5

```
 1   back.  It can be delivered.  It has to go through the normal
 2   process.  The discovery is delivered to the unit, but you
 3   cannot take a hard drive back into the facility.
 4            Whose is it?
 5            So AUSAs, come on.  He can't take a hard drive into
 6   the facility.  It has to go through the standard operations
 7   that you are well aware of how discovery gets delivered to the
 8   MDC.
 9            So if you can return it to them.  Let's go.
10            (Adjourned until June 7, 2023, at 9:15 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                           INDEX OF EXAMINATION

2    Examination  of:                              Page

3     VINCENT DEMPSEY

4    Direct Mr. Sowlati . . . . . . . . . . . . . 105

5    Cross By Mr. Garlick . . . . . . . . . . . . 135

6    Redirect By Mr. Sowlati  . . . . . . . . . . 208

7    Recross By Mr. Garlick . . . . . . . . . . . 212

8     LAIRY COSMA PAEZ

9    Direct By Mr. Fang . . . . . . . . . . . . . 228

10   Cross By Mr. Garlick . . . . . . . . . . . . 260

11   Redirect By Mr. Fang . . . . . . . . . . . . 284

12   JEFFREY BYRAM

13   Direct By Mr. Sowlati  . . . . . . . . . . . 285

14   Cross By Mr. Garlick . . . . . . . . . . . . 289

15   ALVIN JOSEPH

16   Direct By Mr. Sowlati  . . . . . . . . . . . 290

17   Cross By Mr. Garlick . . . . . . . . . . . . 298

18   MANUEL ALONZO

19   Direct By Mr. Sowlati  . . . . . . . . . . . 300

20   Cross By Mr. Garlick . . . . . . . . . . . . 306

21   EDGAR PINO

22   Direct By Mr. Fang . . . . . . . . . . . . . 307

23                         GOVERNMENT EXHIBITS

24   Exhibit No.                               Received

25    1104    . . . . . . . . . . . . . . . . . . 122

```
 1    201      . . . . . . . . . . . . . . . . . . 126

 2    1106     . . . . . . . . . . . . . . . . . . 128

 3    1201     . . . . . . . . . . . . . . . . . . 142

 4   202 ....................................... 207

 5    1601     . . . . . . . . . . . . . . . . . . 227

 6    202-13, 202-13A   . . . . . . . . . . . . . 232

 7    202-12, 202-12A   . . . . . . . . . . . . . 236

 8    501, 502   . . . . . . . . . . . . . . . . 238

 9    302, 303, 304   . . . . . . . . . . . . . . 243

10    202-16, 202-16A   . . . . . . . . . . . . . 258

11    202-24, 202-24A   . . . . . . . . . . . . . 260

12    601 and 601A  . . . . . . . . . . . . . . . 298

13    603A through 603N   . . . . . . . . . . . . 298
```

14                        DEFENDANT EXHIBITS

```
15   Exhibit No.                          Received

16    A2     . . . . . . . . . . . . . . . . . . 182

17    A5     . . . . . . . . . . . . . . . . . . 214

18    A-6    . . . . . . . . . . . . . . . . . . 264

19    A15    . . . . . . . . . . . . . . . . . . 276
```