# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

---

**Barry D. Leiwant**
*Interim Executive Director
and Attorney-in-Chief*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

March 12, 2024

**BY ECF**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

    **RE:**    <u>United States v. James Garlick</u>
              **22 Cr. 540 (VEC)**

Dear Judge Caproni:

    During trial, as he represented himself, we gained some insight into James Darnell Garlick. He is not an easy person. It would be simple, and indeed tempting, to brand him as manipulative and call it a day. But nothing is as easy as it seems.

    The truth is complicated. Dr. Jessica Pearson, a doctor of clinical and forensic psychology who recently evaluated Mr. Garlick, concluded:

> Mr. Garlick's personality functioning is significant for paranoid ideation, feelings of persecution, rigid and inflexible thinking, obsessive compulsive ideation and behaviors, and some grandiosity. These traits and attributes, many of which likely developed as protective strategies when he was experiencing such significant loss and feelings of abandonment by his family, have led to considerable dysfunction in his current circumstances with his legal case. . . . The stress of being incarcerated again, along with the separation and loss from his family, may have exacerbated these traits, with Mr. Garlick relying on his protective coping strategies to manage this new and massive stressor, resulting in significantly maladaptive behavior in the courtroom.

Forensic Psychological Evaluation, Ex. A at 8.

    Given this, to achieve the aims of sentencing, we respectfully request that Your Honor sentence Mr. Garlick to 30 months' incarceration. This sentence is a substantial one that is "sufficient, but not greater than necessary" to reflect the seriousness of the offense, provide adequate deterrence and punishment and enable Mr. Garlick to obtain the services he needs. *See*

18 U.S.C. § 3553(a). It would punish Mr. Garlick's conduct—possession of a gun that was never brandished or fired—while recognizing the unique manifestation of his mental health struggles and traumatic background.

### I.     Background

James Darnell Garlick spent his early childhood in a home pervaded by domestic violence. His father, who abused drugs and alcohol, routinely beat his mother. Forensic Psychological Evaluation, Ex. A at 2 ("Ms. Garlick confirmed that she was a victim of domestic violence."). Darnell—as he is known to his loved ones—had no siblings and bore the brunt of his parents' turbulent relationship. Because Ms. Garlick was a police officer, she never called law enforcement or asked for help. Darnell was only five years old when his parents divorced. Growing up, he "experienced physical abuse from his mother, including beatings with belts which he said sometimes felt unpredictable and excessive." *Id.*

After his parents' divorce, Darnell primarily lived with his mother and maternal grandmother; he visited his father on the weekends. "His father was disengaged and started another family and his mother began using drugs and alcohol during his late childhood." *Id.* at 7. Mr. Garlick does not know when his mother began abusing drugs, but he recalls his first memory of her addiction. "One day, me and my grandmother were cleaning up, I was about six years old," he shares. "We found her little box kit with drug paraphernalia." Mr. Garlick did not understand it at the time, but now recognizes that his mother was using cocaine.

Most of Mr. Garlick's childhood memories involve his grandmother, who primarily raised him while his mother worked late. Darnell often stayed home alone and in his parents' absence learned to cook for himself. When he was 11 or 12 years old, Darnell's mother sent him to boarding school. *Id.* at 2. Around 1991, when his grandmother became ill, Darnell's mother "brought [him] home because she did not want to be alone." *Id.* Soon after, his grandmother passed away. His mother was distraught. As she recently conveyed to a forensic psychologist, "after her mother's death, she began using drugs and alcohol and staying out of the house, not giving Mr. Garlick the attention he needed." *Id.* Mired in grief, Mr. Garlick recalls observing his mother using cocaine for the first time. He had just lost his grandmother and looked on as his mother began slipping away, addicted to drugs. He was just 13 years old.

Mr. Garlick's mother "developed an addiction to cocaine and alcohol." *Id.* As she recently confirmed, Darnell "was living with her during that period and . . . at times, there would be no food in the house, and she would leave for days." *Id.* Darnell learned to fend for himself. In 1995, Darnell's mother was hospitalized for suicidality before being transferred to a substance abuse treatment program. *Id.*

When she was home, Darnell's mother would periodically kick him out of the house. *Id.* He effectively became homeless, "sleeping on the train, on rooftops, or at friends' homes." *Id.* Mr. Garlick felt "that his mother wanted to party and did not want to take care of him." *Id.* As a result, "he often acted out to get her attention." *Id.* His mother confirms that "she was not present or

2

available for her son during his early teen years and nor was his father. He turned to his peers in the community and began getting into trouble." *Id.* at 7.

As a teenager, "Mr. Garlick developed significant emotional issues that presented as anger and severe depression. He was hospitalized for depression and suicidality. His acting out behavior contributed to ongoing legal difficulties." *Id.* "I heard my mom talking to her lawyer in family court saying she couldn't take care of me," Mr. Garlick reveals. "She didn't want me. I didn't let that go until my son was born."

Darnell spent much of his adolescence rotating through group homes and mental health facilities. When he was 15, Darnell participated in mental health treatment for two months while attending boarding school; his mother's absence left him depressed. Presentence Report ¶ 49. While Darnell was away, he had only minimal contact with his mother. When he was discharged from his last youth placement at 18 years old, Darnell returned to the place he used to call home. His mother wasn't there. He learned that she had moved to an unknown address. Darnell searched for his mother. It took him time to track her down. In the interim, he spent nights at friends' homes, sometimes sleeping in the street. When he finally found his mother, she was living with another aunt. "She would try to get her own apartment," he recalls, "but she'd end up moving back in with my aunt."

During that time, Darnell stayed with a friend in Harlem. "That's how I met Monica," he says of his son Joshua's mother. Darnell and Monica began dating and briefly squatted in an apartment together before moving into Darnell's mother's home. She was still using drugs. They all struggled. One day, during an argument with his girlfriend, Darnell snatched her phone; Monica grabbed a knife. When he tried to take the knife from her, she sliced him across his left hand. The scar remains. Darnell's mother reached her breaking point, demanding her son's girlfriend leave the home. Monica was pregnant at the time.

Monica and Darnell moved into a shelter together. They married with hopes of spending their lives together. To support his burgeoning family, Darnell unfortunately began selling drugs. "It was an easy way to get fast money," he explains. Mr. Garlick's childhood friend, Michelle Burke, observes, "There weren't many positive role models or paths to take, just a group of people who used drugs, sold drugs, and turned to gangs. You're very impressionable at a young age and it's easy to do what others do. Being the odd ball was a choice that not many would follow because everyone just wanted to belong to something and to fit in." Letter of Michelle Burke, Ex. B.

When Darnell's son, Joshua, was born, he and Monica were still living in a shelter somewhere in Brooklyn. Four days later, Darnell was arrested for selling drugs and incarcerated. He was just 18 years old. Presentence Report ¶ 29.

Joshua, who was born prematurely, stayed at the hospital. Monica was discharged and never returned to her son. Darnell's mom stepped in. "My mom was acting like the dad," he notes, recalling that despite her struggles with addiction, she "got right" around the time of Joshua's birth. The Administration for Children's Services (ACS) threatened to take the newborn if Monica failed to visit. Darnell's mother was granted temporary guardianship over Joshua, while Monica was given six months to prove her ability to parent her son. Six months passed, and she was granted a

3

second chance. A year after Joshua's birth, Monica's parental rights were terminated. Mr. Garlick was granted legal guardianship over his son, while his mother had physical custody.

Mr. Garlick's "mental health difficulties continued due to another interpersonal loss, his arrest shortly after the birth of his only son and his son's mother's abandonment of him." Forensic Psychological Evaluation, Ex. A at 7. He did the best he could to raise his son, but he was just a child himself. Although he continued selling drugs—the only way he knew how to survive—Joshua remained his priority. Mr. Garlick's former neighbor recalls, "He had his son with him every day and we would go to the park and watch his son play. He was doing the work by himself." Letter of Shakisa Fairly, Ex. C. *See also* Letter of Shavon Richardson, Ex. D. "I know Darnell was really sad about the mom not wanting to be there. The neighborhood he was from was really bad, and it was better by our building." Letter of Shakisa Fairly, Ex. C.

To this day, Mr. Garlick's son, Joshua, does not have contact with Monica, his birth mother. *See* Letter of Joshua Garlick, Ex. E. "I had other people in my life, but my father's support always meant the most to me," Joshua expresses." *Id.* "Despite the circumstances of our lives, he's always been there and always looked out for me when others looked away." *Id.*

In 2011, Mr. Garlick was arrested in the Bronx after fighting a man who he believed to be harassing his then-girlfriend. He was convicted of manslaughter after a jury trial and sentenced to a term of incarceration. His son was old enough to remember this time. "He went to prison when I was in middle school, but I was able to stay in contact with him. I didn't see him for a while, because I wasn't ready to, but he would call and we would write each other letters." *Id.*

While "Mr. Garlick only remembered being distraught," a forensic psychologist now concludes that "the treatment he received in jail and in prison over the years sounds like more significant symptoms of mental illness. He was treated with antipsychotic medications and described as having psychotic experiences. He was placed in solitary confinement during his incarceration, and he had a worsening of mental health symptoms. He remained on medication for several years but then stopped prior to his release from custody." Forensic Psychological Evaluation, Ex. A at 8.

While incarcerated, Mr. Garlick appealed his conviction. He argued his confrontation rights were violated when an autopsy report was introduced through the testimony of a medical examiner who did not prepare the report. The First Department of the New York Appellate Division affirmed the conviction, squarely rejecting Mr. Garlick's claim and citing a New York Court of Appeals case that had firmly addressed the issue years prior. *People v. Garlick*, 144 A.D.3d 605, 606 (N.Y. App. Div. 1st Dep't 2016) (citing *People v. Freycinet*, 11 N.Y.3d 38 (N.Y. Ct. App. 2008)). The Court of Appeals then refused to hear Mr. Garlick's case. *People v. Garlick*, 29 N.Y.3d 948 (N.Y. App. Ct. 2017).

Undeterred, Mr. Garlick petitioned for a writ of *habeas corpus*. The case made its way to the Second Circuit, where the court affirmed Judge McMahon's ruling that the admission of the autopsy report at trial violated Mr. Garlick's confrontation rights. The conviction was vacated. On April 5, 2022, Mr. Garlick pled guilty to the same offense and was sentenced to 11 years in prison. He was released the following month.

4

By the summer of 2022, most people were fully vaccinated for Covid-19. The worst of the pandemic was behind us. Everyone was outside, including the people who lived in Mr. Garlick's neighborhood at the time of his arrest more than a decade earlier. When Mr. Garlick went home he returned to the same dangerous neighborhood where he lived before prison. "They were all preparing for war, and all I wanted to do was go to the bar, have a drink, and hang out with some females," Mr. Garlick conveys. Having been away for so long, Mr. Garlick "was just trying to have fun and enjoy my life." But his past haunted him. "I had to watch my back," he maintains.

In August 2022, a team of police officers stopped James Garlick at a traffic checkpoint in the Bronx. They issued him a ticket for driving an unregistered electric scooter and stood by as he emptied the contents of the center console of the bike. The officers impounded the scooter and, during a subsequent inventory search at the precinct, found a small, decades-old gun in the vehicle's locked center console.

"It's the area, the area is why I had the gun," Mr. Garlick explains. "When people found out I was home, certain people wanted to do me harm," he reveals. Although his possession was certainly wrong, Mr. Garlick never brandished or discharged the gun, nor did he ever threaten anyone with it.

Mr. Garlick voluntarily surrendered to law enforcement and was charged with one count of 18 U.S.C. § 922(g)(1). Following a contested detention hearing, he was ordered detained. Mr. Garlick confessed to having "suicidal thoughts upon his incarceration. He believed that he continued to cause his family pain." Forensic Psychological Evaluation, Ex. A at 6.

In June 2023, as the Court certainly remembers, Mr. Garlick proceeded to trial representing himself. On June 12, 2023, the Court declared a mistrial following a jury deadlock. The Court set a second trial date. On July 20, 2023, Mr. Garlick accepted responsibility for possessing the gun. He pled guilty before Your Honor to the sole count in the indictment, unlawful possession of a firearm, pursuant to the government's *Pimentel* letter. He remains incarcerated at the MDC. "[H]e has not incurred any disciplinary infractions while in custody for the instant offense." Presentence Report ¶ 5.

**II.     The applicable guidelines range is 46 to 57 months' incarceration.**

The defense respectfully objects to probation's guidelines calculation, pursuant to the 2021 Guidelines Manual, of a sentencing range of 51 to 63 months' incarceration. Instead, the Court should adopt a guidelines range of 46 to 57 months' incarceration pursuant to the November 1, 2023, Guidelines Manual, currently in effect. 18 U.S.C. § 3553(a)(4)(A).

The offense level in this case is not in dispute. Under both the 2021 and 2023 Guidelines Manuals, the total offense level is 22.

Similarly, Mr. Garlick's criminal convictions result in a criminal history score of three under both Manuals. But Probation has applied the 2021 Guidelines Manual, under which Mr. Garlick receives an extra two "status points" for committing the instant offense while on state post-

5

release supervision. As a result, Probation calculates a criminal history score of 5, placing Mr. Garlick in Criminal History Category III. Presentence Report ¶¶ 34, 35.

In 2023, however, the Sentencing Commission amended the Guidelines to limit the overall impact of "status points." Because Mr. Garlick only has three criminal history points under Section 4A1.1(a) through (d), he should not receive any additional points for committing the offense while under a criminal justice sentence. U.S.S.G. § 4A1.1(e). Accordingly, under the November 1, 2023, Sentencing Manual, which is applicable at this sentencing, Mr. Garlick's total criminal history score is 3, placing him in Criminal History Category II.

At offense level 22 and Criminal History Category II, Mr. Garlick's advisory guidelines range is 46 to 57 months' incarceration.

### III.    Thirty months' incarceration is the most appropriate sentence for James Garlick.

Thirty months' incarceration is "sufficient, but not greater than necessary" to achieve the sentencing goals of retribution, deterrence and rehabilitation. 18 U.S.C. § 3553(a).

#### A.    *James Garlick has suffered with untreated mental illness throughout this case, contributing to his demeanor at trial.*

As the Court is all too aware, Mr. Garlick's demeanor and behavior throughout his trial can be generously described as bizarre. He expressed sovereign citizen beliefs; he wore prison garb and did not participate in jury selection; he repeatedly expressed doubts about the Court's jurisdiction. The Court and government surely, and understandably, found Mr. Garlick frustrating. But it is important to note the factors that contributed to Mr. Garlick's behavior: his history of prevailing in legal claims that judges and attorneys had deemed hopeless; and his mental illness, now confirmed by a forensic psychologist.

In the spring of 2022, Mr. Garlick saw his prior state conviction vacated against all odds. Following his conviction at trial, he lost on direct appeal to the New York State Appellate Division. The New York State Court of Appeals—the highest state court—denied his application for leave. New York State law was clear: he did not have a viable legal argument.

By all measures, Mr. Garlick's federal *habeas petition* was a Hail Mary. He would have been told by nearly every lawyer along the way that the law was against him. Indeed, every court in New York state had counseled that his claim was untenable. But Mr. Garlick went to federal court raising a claim under state law that no one had accepted before—and won. He remade New York state law. *People v. Ortega*, 40 N.Y.3d 463, 473 (N.Y. Ct. App. 2023) ("Applying 'clearly established Supreme Court precedent,' the Second Circuit rejected this Court's rationale in *Freycinet*.").

Months after his release from prison following his *habeas* win, Mr. Garlick once again found himself locked behind bars. With a history of winning supposedly non-viable legal claims, it's no surprise that he remained resolute when counseled by lawyers (and even Your Honor) about

the federal legal system and the admissibility of evidence. He decided to exercise his constitutional right to trial, and if his lawyers wouldn't support his defense strategy, he would go it alone.

Mr. Garlick's persistence in his beliefs about the Court's jurisdiction was not only rooted in his prior legal successes; it was a symptom of his mental illness. He "rigidly hold[s] on to beliefs and ideas that are not based in reality. He feels that he has been wronged but his grandiosity allows him to believe that he can be more effective than his attorneys." Forensic Psychological Evaluation, Ex. A at 8.

At Mr. Garlick's trial, we all witnessed the behavior of a traumatized individual struggling with untreated mental illness. "Although his insight and judgment seem within normal limits… he has demonstrated impaired judgment and insight when emotionally overwhelmed." *Id.* at 6. He had days where he was incredibly "up," smiling and making jokes; and others when he was completely "down," refusing to come to court and filing nonsensical motions. He slept during jury selection wearing prison garb one day, and on another delivered a persuasive summation in a suit. He refused to acknowledge counsel's presence, and then invited his lawyers to help him prepare his cross-examinations. He was not easy to deal with.

Mr. Garlick may have appeared manipulative. In truth, we witnessed the physical manifestation and inconsistency of a mentally ill person. "Overall, his profile suggests an individual with difficulty concentrating and thinking clearly, who is experiencing significant distress and rumination," forensic psychologist Dr. Jessica Pearson discerns. *Id.* at 7. "[He] likely engages in maladaptive behaviors aimed at coping with his anxiety and fear. He's likely rigid and perfectionistic and has difficulty with changes in routine." *Id.*

During a psychological evaluation, "Mr. Garlick reported symptoms consistent with a traumatic event, likely causing episodes of anxiety. He reported symptoms consistent with psychotic experiences, such as paranoid ideation, auditory hallucinations, and other peculiarities in thinking. He described himself as suspicious and hostile in his relations with others, often quick to feel that he is being mistreated. He also noted problems associated with an elevated or labile mood, including grandiosity and inflated self-esteem." *Id.* This personality came through at his pre-trial proceedings, at trial, and even in his recorded jail phone calls and emails to family.

"Mr. Garlick's personality functioning is significant for paranoid ideation, feelings of persecution, rigid and inflexible thinking, obsessive compulsive ideation and behaviors, and some grandiosity. These traits and attributes, many of which likely developed as protective strategies when he was experiencing such significant loss and feelings of abandonment by his family, have led to considerable dysfunction in his current circumstances with his legal case." *Id.* at 8. "The stress of being incarcerated again, along with the separation and loss from his family, may have exacerbated these traits, with Mr. Garlick relying on his protective coping strategies to manage this new and massive stressor, resulting in significantly maladaptive behavior in the courtroom." *Id.*

And critically, Mr. Garlick was not malingering. Although he may have been competent in a legal sense, he was also unquestionably mentally ill. While psychological testing revealed that "Mr. Garlick may have a tendency to present himself in a favorable manner and minimize

difficulties others are willing to acknowledge," Dr. Pearson concluded that "[t]here was no evidence of exaggeration or feigning of symptoms." *Id.* at 7.

Concededly, it took Mr. Garlick nearly a year to admit guilt. That was partially due to his mental illness, partially due to a stubborn belief in the sorts of bizarre legal theories that abound at the MDC, and partially due to a fear that admitting guilt would destroy the complicated relationship he was trying to rebuild with his mother. That fear was not unfounded: she severed ties almost completely upon learning of Mr. Garlick's conviction. As Dr. Pearson observes, "his most recent arrest seems to have strained his relationship with his mother." *Id.* at 8. When contacted by probation, Mr. Garlick's mother "stated that the defendant is no longer welcome in her home due to the instant offense as well as his prior term of incarceration and denied a home inspection." Presentence Report ¶ 45. Glaringly, Mr. Garlick's mother refused to write a letter of support for her son's sentencing.

But in the end, James Darnell Garlick did the right thing. He admitted in open court that on August 27, 2022 in the Bronx, he knowingly possessed a firearm. He said: "I know what I did was wrong, and I apologize for my actions." *Id.* ¶ 18. Even the government agrees he should receive credit for acceptance of responsibility. *Id.* ¶ 4(d).

Mr. Garlick deserves a sentence that reflects the nature of the offense—unlawfully possessing a gun in a scooter found during a traffic stop—not his irrational behavior during trial. He should not have had a gun. But he never fired it, never brandished it, and never threatened anyone with it. He is someone who needs help, not a lengthy term of incarceration. That warrants consideration at sentencing.

### B. *The punishing conditions of James Garlick's pretrial incarceration warrant a 30-month sentence.*

Since September 2022, Mr. Garlick has languished at the MDC, now notorious for its inhumane conditions of confinement. The Court should consider the shameful conditions at the jail when weighing Mr. Garlick's sentence.

Even in "normal" times, courts in this District have acknowledged that "it is no small thing to deprive a person of his or her freedom" because prison "is a harsh environment, in which fear and misery are never far from the surface, boredom is endemic, and privacy is nil." *United States v. Sayoc*, 388 F. Supp. 3d 300, 301 (S.D.N.Y. 2019). Mr. Garlick's period of detention has been marred by conditions that far exceed the punitiveness of what incarceration should be in "normal" times.

For years, judges in this District have decried the state of MDC Brooklyn and the mismanagement and understaffing that have plagued any attempts at improvement. As Judge Berman has noted, MDC Brooklyn is "dirty," "infested with drugs," and there is a prevalence of "violence." *United States v. Moran*, No. 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), Doc. 90, Tr. 12:25–15:21, 37:15–18. Judge McMahon has described the conditions at MDC Brooklyn "as disgusting [and] inhuman as anything I've heard about any Colombian prison, but more so because

we're supposed to be better than that." *United States v. Days*, No. 19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021), Doc. 35, Tr. 19:17–20.

The conditions have not improved. As Judge Engelmayer recently observed, "the conditions at the MDC remain unacceptable. They have been described to me by too many people in too many cases for it any longer to be factually disputable that that is just an inhospitable, terrible place to be." *United States v. Arias*, Case No. 22 Cr. 495 (PAE), Dkt. 34 at pp. 32-34 (continuing defendant's pretrial release pending sentence citing conditions of confinement at MDC Brooklyn as "exceptional reason"); *see also United States v. Rivera*, 23 Cr. 236 (PAE) (same).

Mr. Garlick recently detailed his experience at the MDC. His account echoes that of countless MDC inmates and of correctional officers alike. "We only have a steady officer from Wednesday night to Saturday," he begins. With no steady officer on duty, he doesn't know whether he'll be allowed out of his cell. "That's the excuse: We don't have staff to let you out. We'll let you out for an hour, but then we've got to lock you back down," Mr. Garlick reports. "No officers want to work here."

In June 2023—while Mr. Garlick was on trial—the corrections officers' union made plain the "unsafe" conditions at the MDC. Council of Local June 2023 Union Memo, Ex. F. For years, the MDC has been "severely understaffed." *Id.* Consequently, MDC housing units are frequently unmanned and "locked down," resulting in "inhumane" conditions for inmates. *Id.* These allegations are not new. In September 2022—the month Mr. Garlick entered the facility—the union issued a memorandum detailing the "hazardous conditions" at the MDC. September 2022 Union Memo, Ex. G. "Such conditions are abusive and inhumane as inmates often receive meals untimely, have no access to hygiene products [ ] or the ability to shower, and lack access to adequate medical care." *Id.*

Mr. Garlick has spent more than half of his time at the MDC locked in his cell for an entire day. When inmates are locked in, they cannot shower. Nor can they use hot water to make food, which they are forced to eat in their cells, next to the toilet. They cannot communicate with their loved ones or review their discovery on a computer. There is no recreational time while the facility is on lockdown. Inmates are provided cold (sometimes frozen) food in their cells, often miss meals, and are unable to access the already limited services in the facility. "If they do let us out, it's only for 15 minutes," Mr. Garlick explains. He must then choose between using that time to shower, access a computer, or connect with his family by phone. There is not enough time for all three.

Mr. Garlick, whose friends and family characterize him as a "hard worker," has tried to make the most of his time incarcerated. *See* Letter of Cheri Valdez, Ex. H. From September 2022 through February 2023, Mr. Garlick worked as an inmate observer through the Bureau of Prison's inmate companion program, monitoring potentially suicidal inmates. Between November 2022 through August 2023, Mr. Garlick worked in food service in the MDC kitchen. *See* Presentence Report ¶ 5. In August 2023, for reasons the MDC legal department refused to share with counsel, Mr. Garlick lost his job. He's been trying to get it back ever since, with no success. "Ever since he lost that job, he's been stuck in his cell all day with nothing productive to do." Letter of Cheri Valdez, Ex. H.

9

...

A typical day in his unit begins with breakfast. "In the morning, I get oatmeal and farina," he shares. The hot water machine is directly across from his cell, but if locked down, he cannot access hot water to cook breakfast. Because Mr. Garlick does not eat meat, he struggles with food at the jail. Forensic Psychological Evaluation, Ex. A at 6. At night, Mr. Garlick receives frozen food—he can't eat it because they don't have a working microwave in the unit.

Notwithstanding the lockdowns, which purportedly serve to protect inmates during the staffing crisis, Mr. Garlick's unit is mired in gang violence. Roughly every ten days, there's a gang fight precipitated by something minor, like a fight over the television or showers. People are routinely stabbed or cut in their cells. It's dangerous. Gang members frequently rob people's cells and steal their food. When the detainees are locked in, there are no correctional officers in sight. "It's scary," Mr. Garlick admits, "if something were to happen, no one is there to help."

"There is a lot of gang activity in there that he is trying really hard not to get caught up in. We do our best to support him through this time, but it is taking a huge toll on him mentally and physically." Letter of Cheri Valdez, Ex. H.

On March 24, 2023, the Warden issued a memorandum "declaring my decision to implement a planned lock-down on various floors and units to slow operations dawn, conduct shakedowns, and gather additional intelligence." Warden Memo March 2023, Ex. I. Mr. Garlick spent the entire month of March locked down at the MDC. "Confining inmates to their cells is for at least some inmates tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane," Judge Furman recently stated, lamenting the conditions at the MDC. *United States v. Chavez*, 22 Cr. 303 (JMF).

Mr. Garlick has been hesitant to share his miserable conditions with his family. "Only recently has he started opening up about the challenges of having to sleep on a metal bed with no mattress, being in a cell all day, and not being able to use the computer," Ms. Valdez shares. Letter of Cheri Valdez, Ex. H. "When he was in state custody we could send care packages, but in federal custody he can't receive anything from us." *Id.*

It's proven difficult for Mr. Garlick to maintain his support system while jailed at the MDC. "There are only four phones, and three of them are controlled by gangs," he reports. On the weekends, when the MDC is short staffed, Mr. Garlick is locked in a cell 24 hours a day; he cannot call his family. When he's not locked in his cell, Mr. Garlick will choose one person to call each day.

"It's so hard when you can't even speak to the people you love because of the lockdowns," relays his childhood friend, Michelle Burke. Letter of Michelle Burke, Ex. B. "It's like double taking away your freedom – not only are you in jail, but then you can't even talk to your loved ones on top of that. That really affects him." *Id.* As Dr. Pearson observed, Mr. Garlick "likely feels isolated from others and has few close relationships on which to rely." Forensic Psychological Evaluation, Ex. A at 7.

Mr. Garlick's time at the MDC has also taken a toll on his loved ones. "It's hard for us, too," Ms. Valdez laments, "not being able to speak to him or check in on him." Letter of Cheri

10

Valdez, Ex. H. His half-sister, Shavon Richardson, echoes, "I've been hurting since he's been back in jail. I used to check on him all the time but now I haven't been able to talk to him as much." Letter of Shavon Richardson, Ex. D.

The MDC also presents other, more practical challenges. "My toilet has been stopped up for four days, since Thursday," Mr. Garlick disclosed. "Nobody's here on the weekends, so I couldn't get anyone to fix it on Saturday or Sunday. But if I move my cell I get a ticket. So I'm stuck in a cell with toilet water up to the brim." In conversation with Dr. Pearson, Mr. Garlick "reported experiencing headaches and pain in his throat from others smoking." Forensic Psychological Evaluation, Ex. A at 6.

On December 27, 2023, the Federal Defenders learned of an electrical issue on Unit 52 at the facility, which had no lights since Christmas day, with inmates reporting poor ventilation in the unit. Days earlier, the facility issued a memorandum notifying inmates of "modified institutional operations" effective December 15, 2023, due to an assault on staff. December 2023 MDC Memo, Ex. J. During this time, inmates remained on extended lockdown, forced to stay inside their cells 24 hours a day, 7 days a week. In mid-December, all social visits were cancelled until further notice. *Id.*

This is not new. As Judge Kaplan noted at a recent sentencing, "It's a problem we've been dealing with every day for a long time. A sentence of a year in those prisons today, although it's very hard to quantify, is ever so much worse than it would have been five years ago. It's just dreadful." *United States v. Tontisabo*, 21 Cr. 701 (LAK).

Mr. Garlick struggles to remain stoic, but the conditions of confinement have broken him. "He doesn't always open up about painful situations in his life but I know how much this incarceration has affected him." Letter of Michelle Burke, Ex. B.

The Court should consider that the excessively harsh conditions of Mr. Garlick's pretrial confinement have made every day he has served more punishing than it should be. *See United States v. Phillibert*, No. 15 Cr. 647 (PAE), 2021 WL 3855894, at *4 (S.D.N.Y. Aug. 27, 2021) ("Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring a just sentence" (citing, *inter alia*, *United States v. Carty*, 264 F.3d 191, 196–97 (2d Cir. 2001) (holding that that "presentence confinement conditions may in appropriate cases be a permissible basis for downward departures")); *United States v. Gonzalez*, 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021), Doc. 250, Tr. 17:17–18:3 (describing the "extraordinarily harsh" conditions of near constant lockdowns as "basically like solitary confinement," and noting that "because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served").

11

### C. A sentence of 30 months' incarceration is "sufficient, but not greater than necessary" to achieve a deterrent effect.

#### 1. General Deterrence

As is their tendency in gun cases, the government will undoubtedly argue that an extensive period of incarceration is necessary to achieve the sentencing aim of general deterrence and "send a message to the community." But as the Honorable John Gleeson has recognized, general deterrence is "a phenomenon that is notoriously difficult (and perhaps impossible) to measure." *United States v. Brady*, No. 02 CR 1043(JG), 2004 WL 86414, at *9 (E.D.N.Y. Jan. 20, 2004). Determining how much deterrence is achieved by a certain amount of time in prison is "largely a matter of guesswork, or of taking account of the other factors other than general deterrence…." *United States v. Andrew Casperson*, 16 Cr. 414 (JSR) (S.D.N.Y. Nov. 4, 2016). There is no way to "measure how much more general deterrence, if any, is achieved by adding two years or five years or ten years to a prison term." *Id.*

To be sure, Mr. Garlick committed a serious offense that requires a meaningful sentence. But that does not demand a sentence of nearly five years in jail, as probation recommends. Such a lengthy sentence serves no one, and there is no evidence of its general deterrent effect.

#### 2. Specific Deterrence

Just as additional prison time is unwarranted to achieve the sentencing aim of general deterrence, so too is a prolonged sentence unnecessary to achieve specific deterrence. Three years in a federal prison, followed by a term of supervised release including mental health treatment and counseling, will ensure that Mr. Garlick does not recidivate. "He has already spent so much time incarcerated and that is not how he wants to spend the rest of his life." Letter of Michelle Burke, Ex. B.

He is clear about his future. "I do food, I'm a chef. I'm a cook by trade," he reveals. In 2019, Mr. Garlick earned his food handler's certificate. Presentence Report at 23. "Eventually, I want to try to get a small loan to open a food cart. I have recipes, my friend and cousin are in the trade. I want to do something in the food industry." In contrast to when he first came home, in May 2022, Covid concerns are no longer a barrier to employment. Of course, Mr. Garlick will still have to contend with the employment consequences of his criminal history, but he remains optimistic. "I'll probably start in my mother's church in Mt. Vernon cooking food," he says. "He really wants to create a good life for himself where he is living with his family and going to church with them." Letter of Cheri Valdez, Ex. H.

### IV. Conclusion

Mr. Garlick needs the kind of help he can obtain on supervised release; that simply is not available in the federal prison system. An extensive period of incarceration will only function to worsen Mr. Garlick's mental health and maladaptive trauma response. As Dr. Pearson opines, "based on Mr. Garlick's history, he may be at risk for decompensation or a worsening of symptoms

should his expected outcomes not occur as he believes they will. He has a history of suicidality in the past and treatment with an antipsychotic at a time of significant stress." Forensic Psychological Evaluation, Ex. A at 8.

"It's hard to convince someone that you're a good person when they don't know who you are," Mr. Garlick's childhood friend urges, "but it's important that you understand Darnell is more than this case." Letter of Michelle Burke, Ex. B.

Thank you for your consideration of James Garlick's request for a sentence of 30 months' incarceration.

                                              Respectfully submitted,

                                                         */s/*

                                              Marne L. Lenox
                                              Michael Arthus

                                              *Counsel for James Garlick*

cc:       Counsel of Record