

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

March 12, 2024

**BY ECF**
The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

      Re:    **United States v. James Garlick**, 22 Cr. 540 (VEC)

Dear Judge Caproni:

      The Government respectfully submits this letter in advance of sentencing in this matter for defendant James Garlick (the "defendant"), which is scheduled for March 26, 2024. Count One of the above-referenced indictment (the "Indictment") charged the defendant with possessing a firearm after a felony conviction, in violation of Title 18, United States Code, Sections 922(g)(1) and 2. The defendant proceeded to trial and, on June 12, 2023, the Court declared a mistrial. On July 20, 2023, days before his retrial, the defendant pled guilty to Count One pursuant to a *Pimentel* letter. Because of the seriousness of the offense, the defendant's history of committing violent and cruel acts, his lack of remorse, and his lies to the Court about his competency and to the jury about his factual innocence, this Court should impose a sentence of 87 months' imprisonment.

    A. **Overview**

        i.   <u>The Offense Conduct</u>

      On the evening of August 27, 2022, the defendant was riding his electric moped (the "Moped") outside of Yankee Stadium in the Bronx. The defendant was stopped as he approached a New York City Police Department ("NYPD") traffic checkpoint. (PSR ¶ 8). NYPD officers would go on to seize the Moped after the defendant could not provide proof of registration or insurance. (PSR ¶ 11).

      Later that evening, NYPD officers took the Moped back to the 44th Precinct station and performed an inventory search. In the Moped's locked storage compartment, they found a loaded .25 Colt pistol. As a felon, the defendant was prohibited from possessing a firearm—having been released from prison just three months earlier after serving over 10 years' imprisonment for committing first degree manslaughter. (*Id*. ¶ 14). The defendant was on parole at the time he possessed a firearm. (*Id*. ¶ 14).

      A photograph of the defendant with his Moped at the traffic stop is below:



A photograph of the defendant's firearm is below:



    ii.  <u>Procedural History</u>

The defendant was arrested on September 26, 2022 on a complaint and detained following his presentment. A grand jury sitting in this District subsequently returned an Indictment charging the defendant with possessing a firearm after conviction for a felony, in violation of Title 18, United States Code, Sections 922(g)(1) and 2. (Dkt. 5).

On May 17, 2023, the Court found that the defendant had knowingly, voluntarily, and unequivocally waived his right to counsel and would be allowed to proceed at trial *pro se*. (Dkt. 63). In the weeks leading up to trial, the defendant claimed to be a sovereign citizen and repeatedly attacked the Court's jurisdiction. For example, the defendant told the Court:

> You do not have subject matter over my *de jure* actions. You do not have subject matter over living people. This is why you do not want to certify my documents, because you want to try to charge all my caps corporation that I am in control of.
>
> . . .
>
> I have the birth certificate, which is the bond that you need my permission to charge this straw man in counsel, which I am ready to furnish upon request. So you can sit there and think that you are in charge and that you run the courtroom, when you actually don't. You are a public servant. You are a minister of justice. You are supposed to serve the people, and you are going against your oath. So I know you think that you sit there high and mighty, but these matters have already been reported to the people that are in front. I will not be appealing this to no Second Circuit. This matter is going to be squashed here in your courtroom.

Similarly, the defendant demanded, on numerous occasions, that the court "put subject-matter jurisdiction in the record." (Dkt. 95 at 7). At another proceeding, the defendant told the Court to "[c]all [him] Master," not "Mr. Garlick." (Dkt. 135 at 2-3).

At the final pretrial conference, the defendant claimed, among other things, to be unaware he was in a "criminal case," claiming he did not "understand [] how the government is the victim and the prosecution." (Final Pretrial Conference ("FPTC") Tr. 9).[1] The defendant argued that he did not have to "abide" by the Court's rules of decorum because there were no rules of "decorum on the [Court's] website." (FPTC Tr. 10). The defendant also claimed he had not received discovery and did not have adequate time to prepare for trial. (FPTC Tr. 19). The Court granted the defendant's request for an evidentiary hearing regarding access to discovery, although it noted that officials at the Metropolitan Detention Center ("MDC") had said that the defendant had made no efforts to access a laptop loaded with discovery. (FPTC Tr. 19-20; 35-36). On the day of the hearing, however, the defendant refused to be produced, claiming to be observing an unspecified "religious holiday" and suffering from a heart condition. (Dkt. 103 at 3). As the Court observed, the defendant likely "decided he didn't want [the hearing] because he knew how that was going to come out" once officials at the MDC were placed "under oath" and "testified." (Dkt. 151 at 32).

Trial commenced on June 5, 2023, with the defendant proceeding *pro se*. Before *voir dire*, the defendant claimed, among other things, that the Court did not have jurisdiction because there was no "injured party." (Dkt. 151 at 7). The defendant said he did not "understand this is a

---

[1] The FPTC transcript does not appear on the public docket. It is attached as Exhibit 1.

criminal proceeding." (Trial Tr. 8). Standby counsel stated that they had concerns that the defendant was not competent to stand trial. (Trial Tr. 22). The Court ultimately found, however, that the defendant clearly understood "the nature and consequences of [the] proceeding." (Trial Tr. 31-32). The Court noted that the defendant "is a manipulative guy, he thinks he can manipulate this proceeding so he doesn't need to go to trial, and he kicks the can down the road again." (Trial Tr. 33).

Trial began, and during trial, the defendant repeatedly ignored the Court's various orders. For example, the defendant ignored the Court's admonishments that he not question the lawfulness of the stop, seizure, and inventory of his moped in the presence of the jury. (Trial Tr. 145). In the presence of the jury, while questioning an NYPD officer, the defendant said, "I want to put for the record that, during this stop, I feel that you violated my Fourth Amendment rights at the stop. They're saying that's irrelevant, but I'm saying for the record, I know where you got your—as an officer of the law." (Trial Tr. 162).

The defendant also repeatedly—and falsely—declared his factual innocence to the jury and baselessly suggested that NYPD officers planted the gun. During his opening statement, he told the jury, "My thing is I never had a gun." (Trial Tr. 59). And during his closing, the defendant said, "[A]ll I got is the truth. So I want to talk to you about the truth in my closing argument, and the truth is on August 27, 2022, I did not have a firearm" (Trial Tr. 581), "I didn't run because I didn't have anything to hide" (Trial Tr. 582), "I didn't try to hide anything from anybody" (Trial Tr. 585), "I know what some officers are capable of" (Trial Tr. 583), "Maybe you are wondering to yourself why would cops plant a gun? I ask myself the same question every day since this day" (Trial Tr. 593), "I don't trust cops" (Trial Tr. 602), "All I wanted was for someone to tell me why I was being wanted" (Trial Tr. 605), "like I said, I don't trust cops" (Trial Tr. 605), "When I found out I was wanted, I turned myself in to fight these charges" (Trial Tr. 607), and "I didn't possess any firearms" (Trial Tr. 607). On June 12, 2023, after the jury reported that it was deadlocked at 11-1, the Court declared a mistrial. (Dkt. 159 at 13, 22).

Shortly before the retrial, the defendant demanded that the Court remove the Federal Defenders as standby counsel, claiming that there was a conflict of interest. (Dkt. 135 at 5). Among other things, the defendant was angered that the Federal Defenders had provided the Court with dates for a retrial. (*Id.*). The Court rejected the defendant's request to disqualify the Federal Defenders, noting that the claimed conflict was likely meritless and "just seems like further manipulation on the [defendant's] part." (Dkt. 135 at 5). The Court found that the defendant was "not complying with [] court orders" and denied his request to have standby counsel removed. (*Id.*).

On July 20, 2023, at the final pretrial conference, just days before the re-trial, the defendant pled guilty to Count One of the Indictment pursuant to a *Pimentel* letter dated July 20, 2023. In his allocution, the defendant stated that, on August 27, 2022, in the Bronx, he "possessed a firearm knowing that [he] had previously been convicted of a crime punishable by more than one year in jail." (Dkt. 166 at 15). The Court set sentencing for November 7, 2023. (Dkt. 166 at 18). The defendant twice sought and was granted an adjournment of the sentencing date. (Dkts. 171, 173).

iii. The Presentence Report and Guidelines Calculation

Based on the November 1, 2021 Guidelines Manual—which was effective at the time the Presentence Investigation Report ("PSR") was issued—the Probation Office calculated an offense level of 22 and Criminal History Category of III, resulting in a United States Sentencing Guidelines (the "Guidelines") range of 51 to 63 months' imprisonment. (PSR ¶¶ 27, 34, 67). The PSR applied a base offense level of 20 under U.S.S.G. § 2K2.1(a)(4)(A) because the defendant committed the instant offense after his conviction for first-degree manslaughter, added a four-level enhancement under U.S.S.G. § 2K2.1(b)(4)(B) because the firearm had an altered or obliterated serial number, and decreased the offense level by two levels under U.S.S.G. § 3E1.1(a) due to the defendant's guilty plea before the re-trial, yielding a total offense level of 22. (PSR ¶¶ 19-27).

The Government's current position as to the Guidelines is that the defendant's offense level should be calculated as 26, and the defendant's Criminal History Category should be II. The Government agrees with the PSR's calculation that the base offense level is 20 under U.S.S.G. § 2K2.1(a)(4)(A) and that a four-level enhancement applies under U.S.S.G. § 2K2.1(b)(4)(B). However, the Government respectfully submits that this Court should exercise its discretion not to apply the two-level reduction under U.S.S.G. § 3E1.1(a), and that the Court should instead apply the two-level enhancement under U.S.S.G. § 3C1.1(a) for the reasons set forth below. These calculations would yield a Guidelines range of 70 to 87 months' imprisonment.[2]

*First*, a defendant "who enters a guilty plea is not automatically entitled to an adjustment for acceptance of responsibility" solely for pleading guilty. *United States v. Strange*, 65 F.4th 86, 91 (2d Cir. 2023) (citations omitted). Rather, "evidence of acceptance of responsibility . . . may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1 application note 3. The defendant repeatedly declared his factual innocence to the jury. (*See, e.g.*, Trial Tr. 59 ("My thing is I never had a gun."); Trial Tr. 581 ("[A]ll I got is the truth. So I want to talk to you about the truth in my closing argument, and the truth is on August 27, 2022, I did not have a firearm."), Trial Tr. 582 ("I didn't run because I didn't have anything to hide."), Trial Tr. 585 ("I didn't try to hide anything from anybody."); Trial Tr. 607 ("I didn't possess any firearms"). The defendant also repeatedly and baselessly suggested that NYPD officers planted the gun to obtain recognition. (*See, e.g.*, Trial Tr. 590-93).

Courts have properly denied acceptance of responsibility points where a defendant denies his factual guilt at trial, even if the defendant subsequently pleads guilty after a mistrial is declared. *See United States v. Coffie*, 734 F. App'x 693, 694-95 (11th Cir. 2018) (affirming district court's denial of a two-level reduction for acceptance of responsibility where defendant "had put the government to trial once, resulting in a mistrial, and only pled guilty to the same charge 'three days before a second trial, which probably required the government to prepare for the second trial

---

[2] The Government's *Pimentel* letter from July 20, 2023 (the date of the defendant's plea) calculated a Guidelines range of 51 to 63 months' imprisonment using the same calculations as the PSR. The Government did not object to the PSR's calculation at the time of its issuance. Nevertheless, in preparing for sentencing, conducting further research, and reviewing the record as a whole, the Government has concluded that the Guidelines range that should apply is 70 to 87 months' imprisonment for the reasons stated below.

as well'"); *United States v. Jury*, 53 F.3d 334, 1995 WL 26114, at *1, *3 (7th Cir. May 3, 1995) (affirming district court's denial of two-level reduction for acceptance of responsibility where the defendant "initially pleaded not guilty and put the government to its burden of proof at trial. . . [and] only accepted a plea agreement on the eve of the second trial"). Moreover, the Guidelines clearly contemplate that "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility" is salient in determining whether to grant the two-level reduction for acceptance of responsibility. U.S.S.G. § 3E1.1 application note 1.

Here, the defendant's repeated statements affirmatively denying his factual guilt and his insinuations that the NYPD planted his gun cannot be squared with a finding that he has clearly accepted responsibility, especially given that the only indicator of acceptance of responsibility is the defendant's guilty plea.[3] *Cf. Coffie*, 734 F. App'x at 695 (rejecting Coffie's argument that he—unlike defendant here—"never made any statements denying the factual basis" and only sought to hold the government to its burden of proof); *United States v. Wilson*, 159 F.3d 1349, 1998 WL 538119, at *4 (2d Cir. Mar. 13, 1998) (affirming denial of acceptance points where defendant did not deny possession of firearm but claimed that government agents planted the firearm). And even after the first trial, defendant chose not to plead until days before his retrial, underscoring the inappropriateness of the acceptance of responsibility points.

*Second*, the Court should apply a two-level obstruction enhancement based on the defendant's conduct in the leadup to his first trial and during his first trial. The defendant clearly and repeatedly lied to the Court about his capacity to understand the proceedings. On May 30, 2023, in a recorded prison call the day before the final pretrial conference, the defendant told his girlfriend, "I'm about to go to Court tomorrow and act crazy and shit." (*See* Exhibit 2 (jail call recording), at 03:18). The defendant's candid, unfiltered admission is powerful evidence of the willfulness of his obstructive conduct.

The next day, at the final pretrial conference—just as he promised his girlfriend he would do—the defendant was uncooperative with the Court and falsely denied that he was aware of the nature of the proceedings. For example, he claimed to be unaware he was in a "criminal case," claiming he did not "understand [] how the government is the victim and the prosecution." (FPTC Tr. 9). The defendant argued that he did not have to "abide" by the Court's rules of decorum because there were no rules of "decorum on the [Court's] website." (*Id.* 10). But after the Court made clear that continued obstructionist behavior would result in a finding that the defendant had "waived [his] right to represent [him]self," the defendant completely changed his tone. (FPTC Tr. 9). For most of the rest of the proceedings, the defendant was lucid, engaged with the motions *in limine*, and strenuously objected to the appointment of counsel, stating "I'm of sound mind and body and I can handle my own affairs." (FPTC Tr. 18).

Yet the first day of trial, the defendant reverted to lying to the Court about his capacity to understand the nature of the trial proceedings. (*See* Trial Tr. 3-4 (stating "I don't understand the nature and the cause of these crimes and I really don't know what's going on," and asking "what

---

[3] Indeed, there are reasons that one may choose to plead guilty that are not necessarily reflective of clear acceptance of responsibility. For instance, the defendant may simply not have wanted to endure the rigors of a second trial.

type of proceeding is this, what type of trial"), Trial Tr. 8 (claiming that "I don't understand this is a criminal proceeding"), Trial Tr. 11 (claiming not to "know the nature and the cause of this crime"), Trial Tr. 13 (claiming not to know what defendant is defending himself against); *see also* Trial Tr. 36 (claiming not to "understand what is going on"), Trial Tr. 37 (claiming not to understand the criminal nature of the case and the prospect of jail time if convicted). The defendant's statements and conduct caused defendant's standby counsel to raise concerns that the defendant was "mentally decompensating" and "not actually competent to stand trial," which the Court regarded as "carr[ying] a lot of weight" and possibly indicative that "he's genuinely broke with kind of reality." (Trial Tr. 22). The Court ultimately denied standby counsel's motion for a competency hearing, noting that the defendant "thinks he can manipulate this proceeding so he doesn't need to go to trial," and that "[w]hat we are seeing is manipulation." (Trial Tr. 33-34, 42). Throughout the trial, the defendant showed an ability to competently mount a defense, including through cross-examining witnesses, delivering jury addresses, and coordinating with standby counsel and standby counsel's paralegal. The defendant's provision of materially false information to the Court in an effort to delay his trial falls squarely within the scope of the obstruction enhancement. *See* U.S.S.G. § 3C1.1 application note 4(F).

Other examples of the defendant's pattern of obstructionist conduct and contempt toward the Court and the proceedings in the leadup to trial are legion. (*See, e.g.*, Trial Tr. 5 (objecting to not being permitted to speak), Trial Tr. 6-7, 15 (objecting to selecting a jury and to "the type of crime I'm charged with"), Trial Tr. 8-11, 14-15, 17-20, 39 43 (objecting repeatedly to jurisdiction and the Court's authority), Trial Tr. 10-11 (objecting to the trial), Trial Tr. 18 (accusing the Court of treason), Trial Tr. 40-41 (repeatedly demanding to ask the jury questions), Trial Tr. 59 (remarking to the jury that "I know y'all don't want to be here"), FPTC Tr. 8-9 (objecting to jurisdiction), FPTC Tr. 10-11 (refusing to comply with court decorum), FPTC Tr. 12-14 (objecting repeatedly to the appointment of counsel), FPTC Tr. 18 (refusing to proceed with final pretrial conference)). The Court summarized the defendant's conduct at the final pre-trial conference succinctly: "I think he was intentionally interrupting the Court and trying to obstruct by again raising the issues of jurisdiction and his other misguided sense of why this Court can't proceed." (FPTC Tr. 28). The Court also explicitly warned the defendant that "[i]f, at trial, you engaged in obstructive behavior, you took stand and committed perjury, that could be an obstruction enhancement." (FPTC Tr. 112). As described above, the most obvious way to describe the defendant's behavior at trial and in the leadup to trial is obstructive.[4] And while the defendant did not take the stand (as is his constitutional right), he chose to address the jury, and as described above, he lied to the jury repeatedly about his factual guilt. In such circumstances, an obstruction enhancement is palpably appropriate. *Wilson*, 1998 WL 538119, at *4 (affirming propriety of

---

[4] There are almost too many examples to cite. For example, and as discussed above, this Court also granted the defendant an evidentiary hearing regarding his access to discovery at MDC. On the day of the hearing, the defendant refused to be produced, claiming to be observing an unspecified "religious holiday" and suffering from a heart condition. (Dkt. 103 at 3). Again, the Court put it best: the defendant likely "decided he didn't want [the hearing] because he knew how that was going to come out" once officials at the MDC were placed "under oath" and "testified." (Dkt. 151 at 32). Such behavior also falls squarely within the conduct contemplated by the obstruction enhancement. *See* U.S.S.G. § 3C1.1, application note 4(E) (willful failure to appear as ordered for a judicial proceeding).

obstruction enhancement where defendant "engaged in a pattern of obstructionist and contemptuous conduct throughout the prosecution of the case").

### B. Discussion

A sentence of 87 months' imprisonment is appropriate here, whether the Court finds that the applicable Guidelines range is 70 to 87 months' imprisonment or not. The defendant committed an extremely serious offense: just three months after being released from prison and while on parole, he possessed a loaded firearm. The defendant's history and characteristics additionally show that he is a danger to the community and extremely likely to recidivate. The defendant has a history of violence and cruelty. Indeed, despite serving 10 years' imprisonment for first-degree manslaughter, the defendant quickly returned to a life of crime, possessing a firearm and promoting prostitution. Finally, in fashioning a sentence, the Court should take into account the defendant's lack of remorse and repeated attempts to obstruct these proceedings.

i. Applicable Law

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 46).

ii. The Seriousness of the Defendant's Conduct

The defendant's crime of conviction is unquestionably a serious offense. As the Second Circuit has recognized, "[t]he legislative history of the felon-in-possession provision confirms that Congress regarded convicted felons as persons 'who pose serious risks of . . . danger to the community.'" *United States v. Dillard*, 214 F.3d 88, 95 (2d Cir. 2000) (citing legislative history of 18 U.S.C. § 922(g)); *see also United States v. Jones*, No. 11 Cr. 43 (JBW), 2011 WL 4014322, at *2 (E.D.N.Y. Aug. 30, 2011) ("Possession of a firearm by a convicted felon is a serious offense."); *United States v. Munlyn*, 607 F. Supp. 2d 394, 399 (E.D.N.Y. 2009) (concluding that 18 U.S.C. § 922(g) is "a serious offense"). In addition to the inherent risk of violence associated with carrying loaded firearms in a densely populated city, ready to use at a moment's notice, the purpose of Section 922(g)(1), which is "predicated on a defendant's failure to be reformed by the criminal justice system and a continuing disrespect for the law, highlights the crime's seriousness." *Munlyn*, 607 F. Supp. 2d at 399.

Each of the concerns animating the felon-in-possession statute is implicated here. The defendant possessed a loaded firearm that was designed to be concealed. (Trial Tr. 424-25 (testimony of ATF Supervisory Special Agent Fleming)). The firearm was not traceable because its serial number was obliterated. The defendant did not store the firearm in a safe or lockbox— instead, he concealed the firearm in an unregistered Moped, within easy reach and access. If the defendant were to, for example, shoot someone during a road rage argument, neither the firearm nor the Moped would be traceable. This is not a pure hypothetical, because individuals generally do not carry loaded firearms within easy access unless they plan to use them. As discussed below, the defendant is not just any convicted felon—he was convicted of stabbing two pet lizards to death to get back at a woman and holding a knife to the woman's face, and he was later convicted of stabbing a man seven times as the man bled to death. The defendant poses a serious risk of danger to the community, and the fact that he obtained a firearm within months after being paroled is deadly serious. The seriousness of the defendant's conduct is exacerbated by his concealment of the loaded gun in the Moped, where it was easily accessible, and that he was driving the Moped around in a crowded street, right outside of a concert at Yankee Stadium.

### iii. The Defendant's History of Committing Violent and Cruel Acts

The history and characteristics of the defendant and the need to promote respect for the law also strongly support the imposition of a sentence of 87 months' imprisonment. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). The defendant has an extensive history of committing violent and cruel acts. He committed the instant offense just months after being released from prison. He has shown throughout his life that he cannot be deterred from criminal activity and will recidivate.

The defendant has spent much of his adult life in jail for committing serious offenses, including acts of extreme violence. From the age of 18 to 33, he spent almost three years in prison for committing two offenses related to narcotics trafficking. (PSR ¶¶ 30, 31). In 2009, at the age of 31, the defendant was at the apartment of a victim, threatened her, went to the kitchen and retrieved a knife, and then proceeded to repeatedly stab the victim's two pet lizards until the knife finally broke. (PSR ¶ 32). He then retrieved a second knife from the kitchen and continued stabbing the lizards. (PSR ¶ 32). Both lizards died. (PSR ¶ 32). The defendant obtained a third knife and slashed the victim's couch cushions. He then threatened the victim by putting the knife up to her face. (PSR ¶ 32). After the defendant was apprehended by law enforcement officers, the defendant said, "it's just misdemeanors," and he could do "whatever [he] want[ed] with the [lizards]" and killed them to get back at the victim. (PSR ¶ 32).

Just two years later, on November 1, 2011, the defendant stabbed a man to death. (PSR ¶ 32). The defendant stabbed the victim seven times and was charged and convicted of first-degree manslaughter. (PSR ¶ 33). He was sentenced to 11 years' imprisonment and released in May 2022.[5] (PSR ¶ 33).

---

[5] The defendant was originally sentenced to 25 years' imprisonment. *Garlick v. Lee*, 1 F.4th 122, 127 (2d Cir. 2021). In 2021, the Second Circuit granted the defendant's *habeas* petition, after concluding that the autopsy report of the victim was improperly admitted through a surrogate witness instead of the medical examiner who prepared the report. *Id.* at 136. The Government understands, from its conversations with the Bronx District Attorney's Office (the "Bronx DA"),

This criminal history paints the picture of a man who is capable of extreme violence and cruelty—someone who has little regard for the value of life or the law. He was unperturbed by killing animals because "it's just misdemeanors." He has shown a willingness to use weapons to kill humans. And just three months after being released from prison for the first-degree manslaughter conviction, the defendant was already in the possession of another weapon—a loaded firearm. Given the defendant's history, there is every reason to believe he would have eventually used that weapon had he not been caught.

While the November 1, 2023 Guidelines removed the addition of criminal history points for the commission of an offense while under Court-ordered supervision, it is notable that the defendant was on parole at the time he committed the instant offense. Court supervision did not deter him. More fundamentally, he had just been released from prison. After serving 11 years in prison—now in his 40s and well into adulthood—he had every reason to turn his life around, finally. But he did not. In committing the instant offense, the defendant showed how incapable he is of being a law-abiding member of society. He has not aged out of a life of crime.

Indeed, besides possessing a firearm, the defendant was engaged in other unlawful conduct at the time of his arrest. The defendant was involved in prostituting women. (PSR ¶ 37). He discussed prostituting women with an associate, took photographs of women that were used in advertisements for prostitution, and even had a second phone number which he used to coordinate prostitution. (PSR ¶ 37). That number was listed as the contact number in prostitution advertisements. (PSR ¶ 37).

All of this paints a picture of a man who, despite having just been released from prison, was determined to continue a life of crime. At bottom, any indication that the defendant will live a law-abiding life is belied by his history—a history that shows he is innately violent and manipulative and has not been chastened by significant and repeated exposure to the criminal justice system. In order to ensure the safety of the community and deter future unlawful conduct by the defendant, a substantial prison sentence is necessary.

### iii. The Defendant's Obstruction and Lack of Remorse

As discussed above, the defendant repeatedly attempted to manipulate and obstruct these proceedings. The defendant sought to mislead the Court about his access to discovery and his competency to stand trial, even admitting to his girlfriend that he was going to go to court and "act crazy and shit." Moreover, while the defendant admitted his factual guilt, he has not shown remorse for his actions. Indeed, despite repeated warnings by the Court that he should not testify while delivering his jury addresses, the defendant did just that—repeatedly proclaiming his factual innocence and suggesting that the NYPD planted a gun in his Moped. It was only on the eve of the second trial that he pled guilty. Put simply, the defendant's plea was no run of the mill plea;

---

that, instead of retrying the defendant approximately 10 years after the death of the victim, the Bronx DA offered the defendant a plea agreement that effectively resulted in the defendant receiving a sentence of time served.

the Court should take into account the defendant's efforts to obstruct these proceedings and his lack of remorse in crafting a just sentence and evaluating whether he is likely to recidivate.

### C. Conclusion

For the reasons set forth above, a sentence of 87 months' imprisonment is warranted.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by: /s/
Adam Sowlati / Jerry Fang
Assistant United States Attorneys
(212) 637-2438/2584

cc: Defense Counsel (by ECF)